**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF GEORGIA**
**ATLANTA DIVISION**

| | |
|---|---|
| JAMES E. EVANS, Derivatively on behalf of Nominal Defendant MIMEDX GROUP, INC.<br><br>   Plaintiff,<br><br> v.<br><br>PARKER H. PETIT, WILLIAM C. TAYLOR, ALEXANDRA O. HADEN, MICHAEL J. SENKEN, JOHN E. CRANSTON, JOSEPH G. BLESER, J. TERRY DEWBERRY, CHARLES R. EVANS, BRUCE L. HACK, CHARLES E. KOOB, LARRY W. PAPASAN, and NEIL S. YESTON,<br><br>   Defendants,<br><br> and<br><br>MIMEDX GROUP, INC.,<br><br>   Nominal Defendant. | Case No.:<br><br>**VERIFIED SHAREHOLDER**<br>**DERIVATIVE COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

Plaintiff James E. Evans ("Plaintiff"), by his attorneys, submits this Verified

Shareholder Derivative Complaint (the "Complaint") against the defendants named

herein. The allegations in the Complaint are based on the personal knowledge of

Plaintiff as to himself, and on information and belief, including an ongoing investigation by Plaintiff's counsel, as to all other matters.

## <u>NATURE OF THE ACTION</u>

1.  Plaintiff brings this shareholder derivative action on behalf of nominal defendant MiMedx Group, Inc. ("MiMedx" or the "Company") against certain current and former members of MiMedx's Board of Directors (the "Board") and executive officers (collectively, the "Individual Defendants," identified herein at paragraphs 21-32) for breaches of fiduciary duties and other violations of law.

2.  MiMedx is a developer, processor and marketer of regenerative biomaterial products and bioimplants processed from human placental tissue, skin and bone.

3.  The Individual Defendants are current or former directors and/or officers of MiMedx.  As such, the Individual Defendants owed the Company and its shareholders the fiduciary obligations of good faith, loyalty, and candor, and were required to use their utmost ability to control and manage the Company in a fair, just, honest and equitable manner.

4.  In breach of their respective fiduciary duties, the Individual Defendants knowingly caused or allowed the Company to misrepresent its financial condition through an improper revenue recognition scheme.

5.      In December 2016, two former MiMedx employees (the "Former Employees") sued the Company, alleging that it was improperly recognizing revenue and submitting fake purchase orders to the Veterans' Administration ("VA").  The Former Employees alleged that this scheme originated at the very top of the Company.

6.      The federal government, and VA hospitals in particular, were critically important to the success of the Company as they comprised a significant portion of the Company's total revenues and accounts receivable.

7.      Prior to commencing their lawsuit against MiMedx, the Former Employees sent reports to Company executives alerting them that MiMedx was engaging in improper revenue recognition in violation of, among other things, the Sarbanes-Oxley Act of 2002 ("SOX").  The Company fired both employees shortly after receiving their reports.

8.      On December 15, 2016, the Company promised to investigate the Former Employees' claims, stating it had "submitted the allegations to our Board[] to thoroughly review the issues."  Only twelve days later, however, the Company confidently declared that the Board's Audit Committee "has advised the Company's management and the Board of Directors that it has found no credible evidence to

indicate that any changes to previously issued financial statements [were] necessary in light of the[] allegations [raised by the Former Employees]."

9.      Previously in 2016, a MiMedx sales representative had directly advised then-Chief Executive Officer ("CEO") and Chairman of the Board Parker H. Petit ("Petit") about "improprieties" at the Company, including, but not limited to, third parties overcharging for MiMedx's products.  Despite a promise to fix these improprieties, the misconduct continued and, like the Former Employees, the complaining sales representative was fired.

10.      On March 1, 2017, the Company announced that the Audit Committee had completed its investigation and "found no merit regarding the allegations of wrongdoing that were made by two former employees against the Company."

11.      The Company continued to deny the allegations, despite conceding in September 2017 that for the preceding nine months it had been compiling documentation to provide to the Securities and Exchange Commission (the "SEC") in response to a subpoena.

12.      It was not until February 20, 2018 that MiMedx vindicated the Former Employees when it announced that it was postponing the release of its fourth quarter 2017 financial results, as well as the filing of its Annual Report on Form 10-K for the financial year ended December 31, 2017, due to potential accounting errors.

13.     On June 7, 2018, eighteen months after being warned of the Company's accounting irregularities, MiMedx finally conceded that, contrary to its previous unequivocal statements, the Company's financial reporting in fact was incorrect and unreliable.  Specifically, the Company stated that its previously issued financial statements dating back to 2012 required restatement and should not be relied upon. The need to restate arose from "accounting treatment afforded to such sales and distribution practices for two distributors which certain implicit arrangements modified the explicit terms of the contracts, impacting revenue recognition during specified periods."

14.     Since June 2018, defendants Petit, William C. Taylor ("Taylor") (former President and Chief Operating Officer), Michael J. Senken ("Senken") (former Chief Financial Officer), and John E. Cranston ("Cranston") (former Treasurer and Controller) have all resigned from the Company.  Despite resigning as Chairman and CEO in late June 2018, Petit remained as a member of the Board.

15.     Because of their roles in the Company's improper revenue recognition scheme, these defendants and MiMedx General Counsel and Secretary Alexandra O. Haden ("Haden") were unjustly enriched through their salaries, stock awards and undeserved bonuses.  They have collectively been unjustly enriched by roughly $20 million.

16.    On June 22, 2018, Plaintiff made a demand on the Board (the "Demand") to take action to recover from the Individual Defendants the damages the Company sustained as a result of their misconduct, including, but not limited to, the costs and expenses incurred in connection with: (1) the restatement of the Company's financial statements; (2) investigations into the Company being conducted by the SEC and Department of Justice ("DOJ"); (3) the potential delisting of the Company's common stock from the NASDAQ Stock Market; (4) amendments to the Company's credit agreement as a result of the Company's failure to timely file its financial statements; (5) repurchases of Company stock while the price of MiMedx common stock was trading at artificially inflated prices based on the Company's overstated and inaccurate financial results; and (6) excessive compensation awarded to its executive officers in connection with the Company's overstated and inaccurate financial performance.

17.    On September 20, 2018, the Company announced that the Board and its Compensation Committee had both determined to reclassify the "resignations" of defendants Petit, Taylor, Senken, and Cranston as "terminations 'for cause.'"  In addition, the Company noted that the Board's Compensation Committee has taken "all required action to cause all equity and incentive awards outstanding under the Plans held by the Separated Employees to be forfeited.    The Board and

Compensation Committee action was based on findings that the Separated Employees engaged in, among other things, conduct detrimental to the business or reputation of the Company."  The Company further stated that the Board and Compensation Committee would take steps to recover an undefined and undisclosed amount of compensation paid to these defendants.  The Company also announced that defendant Petit was resigning from the Board, effective immediately.

18.    Although the Board has complied with a portion of Plaintiff's Demand by clawing back some of the compensation paid to defendants Petit, Taylor, Senken and Cranston, Plaintiff seeks to recover on behalf of the Company all the damages it has sustained as a result of the Individual Defendants' misconduct.

**PARTIES**

19.    Plaintiff, a citizen of Ohio, is a stockholder of nominal defendant MiMedx and has been a stockholder of nominal defendant MiMedx continuously since 2014.

20.    Defendant MiMedx is a Florida corporation with its principal executive offices located at 1775 West Oak Commons Ct. NE, Marietta, Georgia, and therefore is a citizen of Florida and Georgia.

21.    Defendant Petit, a citizen of Georgia, served as MiMedx's CEO and Chairman of the Board from February 2009 until his resignation in June 2018.  On

September 20, 2018, the Board terminated Petit from his position as a director of MiMedx and recategorized his "resignation" as CEO as a "termination for cause."

22.     Defendant Taylor, a citizen of Georgia, served as a director of MiMedx from October 2011 until his resignation in June 2018 and as the Company's President and Chief Operating Officer from September 2009 until his resignation in June 2018.  On September 20, 2018, the Board recategorized his "resignation" as a "termination for cause."

23.     Defendant Haden, a citizen of Georgia, has served as MiMedx's General Counsel and Secretary since March 2015.  She joined the Company as Senior Attorney in June 2013.

24.     Defendant Senken, a citizen of Georgia, served as Chief Financial Officer of MiMedx from January 2010 until his resignation in June 2018.  On September 20, 2018, the Board recategorized his "resignation" as a "termination for cause."

25.     Defendant Cranston, a citizen of Georgia, served as Treasurer, Corporate Controller and Vice-President of MiMedx until his resignation in June 2018.  On September 20, 2018, the Board recategorized his "resignation" as a "termination for cause."

26.     Defendant Joseph G. Bleser ("Bleser"), a citizen of Georgia, has served as a director of the Company since September 2009 and currently serves as a member of the Company's Audit Committee.

27.     Defendant J. Terry Dewberry ("Dewberry"), a citizen of Georgia, has served as a director of the Company since September 2009 and currently serves as Chairman of the Company's Audit Committee.

28.     Defendant Charles R. Evans ("Evans"), a citizen of Georgia, has served as a director of the Company since September 2012 and currently serves as a member of the Company's Audit Committee.  Following Petit's resignation, Evans became Chairman of the Board.

29.     Defendant Bruce L. Hack ("Hack"), a citizen of New York, has served as a director of the Company since March 2009.

30.     Defendant Charles E. Koob ("Koob"), a citizen of Wyoming, has served as a director of the Company since March 2008.

31.     Defendant Larry W. Papasan ("Papasan"), a citizen of Tennessee, has served as a director of the Company since January 2008 and previously served as a member of the Company's Audit Committee.

32.     Defendant Neil S. Yeston ("Yeston"), a citizen of Connecticut, has served as a director of the Company since September 2012.

## JURISDICTION AND VENUE

33.     This Court has subject matter jurisdiction over all claims asserted herein pursuant to 28 U.S.C. § 1332 in that complete diversity exists between Plaintiff and each of the defendants and the amount in controversy exceeds $75,000, exclusive of interest and costs.  This is not a collusive action to confer upon this Court jurisdiction it would not otherwise have.

34.     This Court has personal jurisdiction over each of the defendants because each has sufficient minimum contacts with Georgia to justify that State's exercise of personal jurisdiction over each of them consistent with the laws of Georgia and the United States Constitution.

35.     Venue is proper in this District pursuant to 28 U.S.C. § 1391 because a substantial portion of the transactions and wrongs complained of herein occurred in and/or had a substantial effect in this District, and defendants have received substantial compensation in this District by doing business here and engaging in activities having an effect here.

## THE INDIVIDUAL DEFENDANTS' FIDUCIARY DUTIES

36.     By reason of their positions as officers and/or directors of the Company and because of their ability to control the business and corporate affairs of the Company, the Individual Defendants owe the Company and its shareholders the

fiduciary obligations of good faith, loyalty, and candor, and are required to use their utmost ability to control and manage the Company in a fair, just, honest and equitable manner.  The Individual Defendants are required to act in furtherance of the best interests of the Company and its shareholders so as to benefit all shareholders equally and not in furtherance of their personal interests.  Each director and officer of the Company owes to the Company and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company.

37.    To discharge their duties, the officers and directors of the Company are required to exercise reasonable and prudent supervision over the management, policies, practices, and controls of the Company, and to comply with all applicable local, state and federal laws.

38.    All of the Individual Defendants are likewise held to the standards of the Company's Code of Business Conduct and Ethics (the "Code").  The Code applies to "all employees, officers and directors of the Company."

39.    The Code states the Company promotes "full, fair, accurate, timely and understandable disclosure in reports and documents that the Company files with, or submits to, the Securities and Exchange Commission . . . and in other public communications made by the Company."  The Code further states that MiMedx

"follows all applicable SEC, NASDAQ and other standards and rules regarding reporting" and that it is of "critical importance that all disclosures and announcements made by the Company to security holders of the investment community be accurate and complete, fairly present [sic], in all material respects, the subject matter of the disclosure, and be made on a timely basis."

40.     Defendants Dewberry, Bleser, Evans and Papasan, as members of the Audit Committee, were required to comply with the requirements of the Company's Charter of the Audit Committee (the "Audit Committee Charter").  The Charter states that the committee's purpose is to "oversee the Company's accounting and financial reporting processes of the Company and the audits of the Company's financial statements and internal control over financial reporting."

41.     The Audit Committee Charter requires, among other things, that its members:

(a)     Oversee and monitor the activities of Company management and outside auditors with respect to the Company's accounting and financial reporting processes;

*          *          *

(d)     Review the proposed scope and plan of the annual audits of the financial statements and internal control over financial reporting;

(e)     Direct the Company's outside auditors to review the Company's interim financial statements included in Quarterly Reports on Form 10-Q prior to the filing of such reports with the SEC;

\*       \*       \*

(k)     Review with the Company's outside auditors and management the adequacy of the Company's internal financial controls and reporting systems;

\*       \*       \*

(m)     Review and discuss with the Company's external auditors (1) all critical accounting policies and practices to be used in the audit; (2) all alternative treatments of financial information within generally accepted accounting principles that have been discussed with management, the ramifications of the use of such alternative treatments and the treatment preferred by the auditors; and (3) other material written communications between the auditors and management;

\*       \*       \*

(o)     Establish procedures for the receipt, retention and treatment of complaints received by the Company regarding accounting, internal accounting controls, or auditing matters;

(p)     Establish procedures for confidential, anonymous submission by employees of the Company of concerns regarding questionable accounting or auditing matters;

\*       \*       \*

(v)     Review compliance, information security, and risk assessment reports from management.

42.     With regard to the issue of risk oversight, the Company's public filings state that "[t]he Board as a whole is responsible for overseeing the Company's risk exposure as part of determining a business strategy that generates long-term shareholder value."  MiMedx's public filings further state that defendant Petit's service as CEO and Chairman of the Board "support[ed] a risk oversight function

-13-

that enhances a unified leadership through a single person, and allows for effective input from our independent Board members, all of whom are fully engaged in Board deliberations and decisions."

43.     Accordingly, the Individual Defendants, because of their positions of control and authority as officers and/or directors of the Company, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

## FACTUAL ALLEGATIONS

### *Overview of the Company*

44.     MiMedx is a developer, processor and marketer of regenerative biomaterial products and bioimplants processed from human placental tissue, skin and bone.  MiMedx is a global supplier of allografts processed from amniotic tissue.

45.     The Company acknowledges in its public filings that sales to government accounts, such as the VA, comprise a "significant portion of [MiMedx's] revenues and accounts receivable."

46.     At all relevant times, a significant portion of the Company's sales to government accounts were made through MiMedx's distributor relationship with AvKare, Inc. ("AvKare") which is a General Services Administration Federal Supply Schedule ("FSS") contractor.

47.     MiMedx and AvKare began their distributor relationship in April 2012 upon the execution of a Product Distribution Agreement ("PDA").  The PDA initially had a three year term ending in April 2015, but through two amendments was extended through June 30, 2017.  In total, the PDA has undergone four amendments.  Taylor or Petit signed the PDA and its amendments.

48.     In 2014, MiMedx applied for and, in early 2015, received its own FSS contract with a term through 2020, which permitted the Company to sell directly to government accounts.  The Company thereafter disclosed in its public filings that it "intend[ed] to transition all of our Government sales to sales sold directly to Government accounts on the FSS."

49.     According to information disclosed in the Company's public filings through the end of 2015, sales through AvKare have been responsible for a substantial portion of the Company's total revenues and accounts receivable:

| Year | Percentage of MiMedx total revenue attributable to AvKare | Percentage of MiMedx accounts receivable attributable to AvKare |
|---|---|---|
| 2012 | 40% | 53% |
| 2013 | 56% | 55% |
| 2014 | 34% | 33% |
| 2015 | 24% | 26% |

50.     It is reasonable to infer that the Individual Defendants were aware of the Company's relationship with AvKare and/or the substantive terms of that

relationship by virtue of, among other things: (1) the fact that sales through AvKare constituted a substantial portion of the Company's total revenues and accounts receivable; (2) the Individual Defendants' approval of the PDA and/or the amendments thereto; and (3) the Company's decision to apply for its own FSS and transition sales to government accounts away from AvKare.

### MiMedx's "Channel-Stuffing" Scheme

51.     According to its public filings, MiMedx recognizes revenue on sales of its products as follows:

> The Company sells its products primarily through a combination of a direct sales force, independent stocking distributors and third-party representatives in the U.S. and independent distributors in international markets.  The Company recognizes revenue when title to the goods and risk of loss transfers to customers, provided there are no material remaining performance obligations required of the Company or any matters of customer acceptance.  In cases where the Company utilizes distributors or ships products directly to the end user, it recognizes revenue according to the shipping terms of the agreement provided all revenue recognition criteria have been met.  A portion of the Company's revenue is generated from inventory maintained at hospitals or with field representatives.  For these products, revenue is recognized at the time the product has been used or implanted.  The Company records estimated sales returns, discounts and allowances as a reduction of net sales in the same period revenue is recognized.

52.     In December 2016, the Former Employees filed a lawsuit alleging, among other things, that since at least 2014 the Company, in contravention of Generally Accepted Accounting Principles ("GAAP"), had engaged in a "channel-

stuffing" scheme – i.e., knowingly shipping to distributors and customers more products than they had actually ordered or intended to use, for the purpose of improperly recognizing additional revenue – and had improperly recognized revenue before the revenue had been realized or was realizable and earned.

53.    According to the Former Employees, the scheme entailed MiMedx sales representatives submitting bogus purchase orders for MiMedx products to be delivered to hospitals run by the VA.  The Company would then record the "sales" as revenue on the Company's financial statements.  The Former Employees further alleged that the "VA hospitals are typically unaware of the channel-stuffing orders, much less the volume of MiMedx's products in their possession."

54.    The Former Employees further alleged that the Company usually engaged in channel-stuffing towards the end of financial quarters in order to meet MiMedx's revenue guidance for Wall Street.  Critically, they alleged that defendant Petit, then-Chairman and CEO of the Company, "ordered the MiMedx sales force to submit false orders for unpurchased product for the purpose of recognizing the 'revenue' in the company's financial statements."

55.    In essence, the scheme worked as follows:

(a)     Prior to the end of a quarter, Company management would pressure sales representatives to stock VA hospital shelves with the Company's products.

(b)     MiMedx sales representatives procured the "sold" products and stocked the inventory at VA hospitals without the consent or even knowledge of the hospital's personnel.  The phony sales often included unnecessary products for which there was an oversupply already on site.

(c)     The products were ordered through AvKARE, even though AvKARE never had control or title to the products, and MiMedx booked these "sales" to AvKARE as revenue.

(d)     The unnecessary and/or oversupplied products were later routed back to MiMedx, with the reclamation losses being masked by future revenues.

56.     According to the Former Employees, the Company's channel-stuffing scheme did not comply with GAAP, and in particular, Financial Accounting Standard Board Accounting Standard No. 48, which provides a list of conditions that must be met to recognize revenue at the time of sale if a buyer possesses the right to

return the product.  Specifically, the Former Employees asserted that the Company's channel-stuffing scheme violated Accounting Standard No. 48 because:

    (a)    *MiMedx maintains liability for lost or damaged products allegedly "sold" to AvKARE and placed on VA hospitals' shelves.*  Whether it is a condition of a formal, written agreement, an oral side agreement, or established practice, MiMedx has agreed to accept liability returns on product placed on the shelves. In this event, MiMedx must credit AvKARE for returned, lost, or damaged product. There also remains a distinct possibility that the VA (or AvKARE) could send back the unpurchased product sitting on their shelves at any time.

    (b)    *MiMedx has significant obligations for future performance to directly bring about resale of the product by the buyer.* MiMedx sales representatives work on location at VA hospitals throughout the country and market the product. On information and belief, AvKARE plays no role in procuring customer sales of the products it has allegedly purchased from MiMedx.

    (c)    *The amount of future returns cannot be reasonably estimated.* Whether it is a condition of a formal, written agreement, an oral

side agreement, or established practice, there are relatively long periods in which [MiMedx] products may be returned. There is still unpurchased [MiMedx] product that MiMedx shipped in the first quarter of 2016 that MiMedx recognized as revenue. Even worse, MiMedx was aware at the time of recognizing product sales as revenue that the same [MiMedx] products would have to be returned in future quarters because of a lack of demand.

(Emphasis in original).

***The Individual Defendants Fail to Respond to the***
***Channel-Stuffing Allegations in Good Faith***

57.     According to the Former Employees, on November 2, 2016, they submitted a joint report notifying defendants Petit, Taylor, and Haden, as well as other "MiMedx upper management," that the Company was perpetrating a channel-stuffing scheme in violation of, among other things, SOX.  The Former Employees submitted supplemental reports on November 4 and 7, 2016.

58.     Rather than taking the Former Employees' claims seriously, the Individual Defendants aggressively denied the claims and threatened the Former Employees.

59.     According to the Former Employees, at a December 12, 2016 meeting at MiMedx headquarters, Petit said the Former Employees would be "financially

hit," that "their families and futures will feel it," and they would be "hurt professionally and with every possible resource available."  The Former Employees also allege that Petit said they "and any other who did similarly would be dealt with quickly and harshly."  That same day, MiMedx terminated the Former Employees, and the next day commenced lawsuits against them.

60.     On December 15, 2016, the Former Employees filed a lawsuit in federal court accusing MiMedx of engaging in the channel-stuffing scheme, and filed with the SEC a tip, complaint, or referral relating to this scheme.

61.     The Company's counter-offensive continued on December 15, 2016, when it issued a press release with a quote from Petit stating the allegations made by the Former Employees were "not factual and fallacious."  Petit also claimed the Company had "submitted the allegations to [the] Board of Directors to thoroughly review the issues."

62.     Twelve days later, on December 27, 2016, the Company publicly stated that the Audit Committee of the Board, together with "independent counsel" and MiMedx's external auditor Cherry Bekaert LLP ("Cherry Bekaert"), was conducting an investigation into the allegations made by the Former Employees, but the Audit Committee had preliminarily advised "the Company's management and the Board

[] that it has found no credible evidence to indicate that any changes to previously issued financial statements are necessary in light of these allegations."

63.   Two members of the Audit Committee, defendants Bleser and Dewberry, have close, longstanding ties to Petit that call into question their ability to protect the best interests of the Company.  Both men were appointed to the Board shortly after Petit became Chairman and CEO in February 2009.

64.   In 1970, Petit founded a company known as Healthdyne, which later became known as Healthdyne Information Enterprises, then HIE, Inc., and, eventually, Healthcare.com.  Bleser served as Chief Financial Officer of Healthdyne, and its successor Healthcare.com, from March 1995 through May 1998.  From October 1997 through July 1998, Bleser also served as director of that company.  He continued to act as a consultant to Healthdyne from July 1998 through June 2004.  Beginning in July 2001, Bleser's consulting agreement with Healthdyne paid him approximately $100,000 per year.

65.   Dewberry has even stronger ties to Petit.  Dewberry and Petit were fraternity brothers at Georgia Tech in the early 1960s.  Furthermore, Dewberry served as President and Chief Operating Officer of Healthdyne from September 1987 through March 1992, having previously served there as an Executive Vice President from August 1984 through September 1987.  Dewberry also served as a

director of Healthdyne from February 1981 through March 1996, and as Vice Chairman of Healthdyne from 1992 to 1996.

66.     In addition to their roles at Healthdyne, Bleser and Dewberry also both served on the Board of Directors of another Petit company, Matria Healthcare ("Matria").   Matria was formed through the merger of Healthdyne Maternity Management, a division of Healthdyne, Inc., and Tokos Medical Corporation, on March 8, 1996.  Petit served as Chairman of the Board of Matria from that date until Inverness Medical Innovations acquired Matria in May 2008 (the "Inverness Acquisition").   Petit also served as CEO of Matria from October 2000 until the Inverness Acquisition and as President and CEO from October 2000 through February 2003.  Bleser served on the Board of Directors of Matria from October 2004 until the Inverness Acquisition, and Dewberry served on the Board of Directors of Matria from May 2006 until the Inverness Acquisition.

67.     In an interview, Petit stated that he and Dewberry are "very close" and that Dewberry "has been a member of the executive team for all of *our* businesses over the years."  (Emphasis added).

68.     The Audit Committee's counsel, which public reports have revealed as the law firm of Troutman Sanders LLP ("Troutman"), also lacks independence from

Petit.  Troutman has represented Healthdyne, Matria and MiMedx, and Troutman's founder Carl E. Sanders served as a director of Healthdyne and Matria.

69.    On January 9, 2017, the SEC sent MiMedx a comment letter inquiring into the Company's financial disclosures relating to its arrangement with AvKare. Specifically, the SEC asked that MiMedx "tell us the significant terms of your agreement with AvKare, including payment terms and rights of return," as well as the Company's "policies for recognizing revenues for sales to them."  The Company responded to the SEC's comment letter on January 23, 2017.

70.    On February 6, 2017, the Company issued a press release that the Board approved a $10 million increase to the Company's Share Repurchase Program.  In the press release, the Company continued its combative and dismissive attitude in responding to the allegations made against it.  Indeed, Petit stated in the press release that:

> MiMedx management is just as frustrated with the volatility of our shares as are our shareholders.  We know there are ongoing issues associated with naked short selling in our stock. These naked short selling practices are illegal, and we are continuing to be diligent in bringing to light the perpetrators of these illegal activities.  We believe the 'fake allegations and fake news' should be discredited when the Company publishes the key findings of the Report from the Audit Committee and the 2016 audited financial results on February 22nd.

71.    Undeterred by the SEC's inquiry, on March 1, 2017, the Company disclosed that the Audit Committee had completed its investigation and found "no

merit regarding the allegations of wrongdoing that were made by two former employees against the Company." This announcement further disclosed that "[t]he Audit Committee's investigation determined that the Company has appropriately recognized revenue" and that there was "no credible evidence to indicate that any changes to the Company's previously issued financial statements are necessary in light of the former employees' allegations." The Company disclosed that "[t]he Audit Committee's findings have been submitted to and approved by the Company's Board []."

72.    The Audit Committee's findings did not dissuade the SEC, which on March 20, 2017, issued another comment letter with over ten questions regarding the Company's financial disclosures relating to its arrangement with AvKare, as well MiMedx's revenue recognition practices. MiMedx responded to that letter on April 18, 2017.[1]

73.    On July 5, 2017, the Company announced that its PDA with AvKare had expired "as planned," effective June 30, 2017. Petit stated that "[f]or strategic and financial reasons, we elected to obtain our own FSS contract in 2014." Taylor

---

[1] The Company's response confidentially attached an Executive Summary of the Audit Committee's findings.

stated that the "wind-down" of the AvKare arrangement was "an extremely tedious process involving the development of detailed project plans."

74.    One month later, the Company announced that the Audit Committee "recently conducted" a process to identify a new external auditor to replace Cherry Bekaert.  As a result of this process, the Audit Committee approved the appointment of Ernst & Young as the Company's new external auditor.  The Company stated that "[t]his action effectively dismissed Cherry Bekaert . . . as the Company's independent registered public accounting firm as of August 4, 2017."

75.    In August and September 2017, various research groups issued reports alleging, among other things, issues with the Company's revenue recognition practices, including the perpetuation of channel-stuffing scheme with distributors other than AvKare.

76.    Rather than investigating the allegations made in these reports, the Company instead issued a number of press releases seeking to refute the allegations, and even dedicated an entire section of its website to this end.  Moreover, as it had done with the Former Employees, MiMedx resorted to litigation against certain of the authors of these reports (and/or those affiliated with them) in at least three different federal courts.

77.    On September 21, 2017, the Company issued a press release "announc[ing] its interactions with the [SEC]" wherein defendant Petit disclosed that the Company has been "assembl[ing] summary documentation to supply to the SEC, which would include information from the investigation conducted by the Board of Directors and others."  Petit also noted that the Company had "received a subpoena from the SEC that appears to relate to the former employees' allegations and is primarily related to the matters that were the subject of the Company's previously disclosed internal investigation."  Petit also stated that "we hope to clear up this inquiry relatively quickly" and that the Company believed "that the government's investigation will confirm our Audit committee's prior findings."  Petit concluded by stating that "[y]our Executive Management team continues to operate MiMedx in a very effective manner[.]"

### *The Truth Emerges*

78.    The truth regarding the Company's pervasive accounting improprieties began to emerge on February 20, 2018, when MiMedx issued a press release announcing that it was postponing the release of its fourth quarter 2017 financial results, as well as the filing of its Annual Report on Form 10-K for the financial year ended December 31, 2017.  The press release disclosed that the Audit Committee had commenced a renewed investigation "into current and prior-period matters

relating to allegations regarding certain sales and distribution practices," and that "Company executives are also reviewing, among other items, the accounting treatment of certain distributor contracts." The press release disclosed that "[t]he Company will not be in a position to release its financial results until the Audit Committee's investigation is completed."

79. On February 26, 2018, *Bloomberg* published an article disclosing that the DOJ was investigating whether the Company (1) overcharged the federal government for its products and (2) had been perpetrating the channel-stuffing scheme. The *Bloomberg* article stated that several former employees had confided in interviews that the "the company has inflated its financials by recognizing revenue on products that had been shipped to certain distributors but not used." On February 27, 2018, the Company issued a press release stating it "is not aware of any investigation of MiMedx by the [DOJ]."

80. On March 15, 2018, the Company issued a press release acknowledging that it "was recently informed that, in parallel with the SEC investigation, the [DOJ] is also reviewing . . . matters [relating to] allegations regarding certain sales and distribution practices, including allegations made by certain former employees and short sellers." The Company also acknowledged that "[o]ver the last several months, [it] has posted numerous responses to allegations that have been made against it and

-28-

its employees," but that "[i]n view of the Audit Committee's investigation, the Company no longer intends to post responses to these allegations."

81.    On May 9, 2018, the DOJ indicted three former VA employees in connection with a kickback scheme in which they received inducements from the Company to use MiMedx products.

82.    On June 7, 2018, MiMedx's long running accounting scheme came crashing down, as the Company issued a press release stating that its Audit Committee, "with concurrence from management of the Company," had:

> concluded that the Company's previously issued consolidated financial statements and financial information relating to each of the fiscal years ended December 31, 2012, 2013, 2014, 2015 and 2016 and each of the interim periods within such years, along with the unaudited condensed consolidated financial statements included in the Company's Quarterly Reports on Form 10-Q for the quarters ended March 31, 2017, June 30, 2017 and September 30, 2017 should be restated, and therefore, such consolidated financial statements and other financial information, any press releases, investor presentations or other communications related thereto should no longer be relied upon.  Additionally, as a result of the foregoing, all communications and financial information with respect to the fourth quarter of 2017 and the first quarter of 2018 should no longer be relied upon, and the Company is further withdrawing all prior financial guidance issued for 2018.

83.    The June 7, 2018 press release further stated that:

> The determination to restate was based on investigation results to date, which have primarily been focused on the accounting treatment afforded to such sales and distribution practices for two distributors which certain implicit arrangements modified the

explicit terms of the contracts, impacting revenue recognition during specified periods.

84.     The June 7, 2018 press release continued: "The accounting misstatements will also require adjustments to the periods in which such revenues were recognized so that such revenues for products sold are recognized in the period in which such amounts are actually collected," and noted that the Audit Committee's renewed investigation was ongoing and, therefore, could lead to the discovery of additional issues and time periods requiring restatement.

85.     Finally, the June 7, 2018 press release noted that the Company's Chief Financial Officer, defendant Senken, and Vice President, Corporate Controller and Treasurer, defendant Cranston, had left their respective roles with the Company, effective June 6, 2018.

86.     Each quarterly or annual report that required restatement had included a certification signed by defendants Petit and/or Senken affirming that it:

(a)     Fully complied with the requirements of Section 13(a) and 15(d) of the Securities Exchange Act of 1934; and

(b)     The information contained therein fairly presented, in all material respects, the financial condition and result of operations of the Company.

87.     On June 11, 2018, *Bloomberg* published an article detailing Petit's prior run-ins with the law during his time at Healthdyne and Matria, as well as the troubles facing MiMedx.  According to the article, "[i]n interviews, 19 current and former executives and employees of his companies describe a hard-charging leader—one who didn't dwell on the rules as he pursued revenue growth, according to about a dozen of them."

88.     The *Bloomberg* article further noted:

> More than a half-dozen former MiMedx employees interviewed by Bloomberg, who requested anonymity, said they saw little upside to flagging any potential misconduct while working there, an understanding that flowed from what they called an us-vs.-them culture nurtured by Petit.  Several of them noted that while Petit has publicly encouraged workers to write "Dear Pete" letters reporting wrongdoing, he created a culture internally in which workers were reluctant to criticize practices.

89.     On July 2, 2018, the Company issued a press release announcing that defendant Petit had resigned as Chairman and CEO, but that he would continue to serve as a director of MiMedx, and that defendant Taylor had resigned as President and Chief Operating Officer of the Company and also from his position as a director.

90.     The press release also noted that the Audit Committee's renewed investigation was "ongoing and there may be other actions taken based, at least in part, on information from the investigation."

91.     On July 23, 2018, *The Wall Street Journal* published a lengthy feature story on MiMedx, reporting that its review of company emails, court documents and internal complaints, and interviews with current and former employees, "paint[ed] a picture of a company seeking to grow at almost any cost."

92.     The article cited former sales representatives of the Company as receiving streams of texts messages from sales managers at the end of every month and quarter.  One former employee stated, on the record, that she still had "PTSD from the amount of calls [she'd] get asking what [her] numbers were going to be for the month," and being told by managers that "I need you to hit this number."

93.     That former employee, Mary Armstrong, further stated that in 2016 she complained to Company executives, including defendant Petit specifically, about a number of improprieties, including third party distributors overcharging hospitals for MiMedx products.  Despite Petit telling her that he "would fix the problem," the misconduct continued.  Like the Former Employees, MiMedx fired Ms. Armstrong.

94.     In one detailed accounting, the *Wall Street Journal* story noted that: "MiMedx sales records show the company recorded a shipment of 135 oversized skin grafts to a Las Vegas plastic surgeon's office, which former employees said is way beyond the 10 or so smaller pieces in a typical physician order." That shipment was recorded at 8 p.m. on September 29, 2016, one day before the end of the sales

quarter.  The former employee of the surgeon's office, after being shown a security video of the order being picked up, recognized the person doing so as "a representative for a company that did business with MiMedx" and not an employee of the surgeon's office.

95.    The *Wall Street Journal* story contained another harrowing account of the "Dear Pete" program.  In January 2018, Tom Tierney, a former regional sales director for surgical products, cited what he coined "a mind-boggling level of sales and accounting irregularities" which were part-and-parcel of a "win at all cost" Company culture.  MiMedx fired Tierney just over a week later.  During his time at the Company, Tierney separately warned "top management" and "executives" that employees were falsifying inventory reconciliations and improperly advising doctors how to maximize reimbursement on MiMedx products.

96.    On July 26, 2018, MiMedx disclosed that it had received a letter from the NASDAQ staff notifying the Company that its stock could be delisted as a consequence of its failure to file timely SEC filings.

97.    On August 31, 2018, the Company filed a Form 8-K disclosing that its failure to file timely periodic reports with the SEC had resulted in the termination of a longstanding credit line with Bank of America.

98.    On September 20, 2018, the *Atlanta Journal Constitution* reported that the Veterans Affairs Medical Center in Minneapolis had "parted ways" with five doctors "over improprieties with [MiMedx's] biopharma products."

99.    Also on September 20, 2018, the Company announced that the Board and its Compensation Committee had both determined to reclassify the "resignations" of defendants Petit, Taylor, Senken, and Cranston as "terminations 'for cause.'"   In addition, the Company noted that the Board's Compensation Committee has taken "all required action to cause all equity and incentive awards outstanding under the Plans held by the Separated Employees to be forfeited.  The Board and Compensation Committee action was based on findings that the Separated Employees engaged in, among other things, conduct detrimental to the business or reputation of the Company."   The Company further stated that the Board and Compensation Committee would take steps to recover an undefined and undisclosed amount of compensation paid to these defendants.  The Company also announced that defendant Petit was resigning from the Board, effective immediately.

### *MiMedx's Improper Share Repurchases*

100.   During the time MiMedx was engaging in the channel stuffing scheme, the Company was also engaged in an aggressive share repurchase program.

-34-

101.   On January 8, 2018, the Company announced that it had spent a total of $124.2 million purchasing MiMedx shares in the market since instituting the share repurchase program in May 2014.

102.   Defendants Petit, Taylor, Senken, Cranston, Dewberry, Evans, Hack, Koob, Papasan, and Yeston knowingly caused MiMedx to repurchase millions of its shares in the market even though they knew the price of the Company's stock was artificially inflated as a result of the Company's pervasive accounting improprieties.

### *The Individual Defendants' False and Misleading Statements*

103.   The Individual Defendants were responsible for disseminating numerous false and misleading statements concerning the Company's internal controls and its financial status.  In particular, the Individual Defendants knowingly caused or allowed the Company to:

> (a)   Repeatedly assure stockholders that the Company's internal controls were adequate and effective, when the Individual Defendants knew that was not true; and

> (b)   Report quarterly and annual financial results the Individual Defendants knew were materially inaccurate as a result of the Company's accounting improprieties.

104.  In addition to false and misleading quarterly and annual reports, the Individual Defendants knowingly caused or allowed the Company to issue false and misleading press releases, conference calls and investor presentations, including, without limitation, the following:

(a)  January 7, 2018 press release and Form 8-K, in which Petit stated "the fourth quarter of 2017 makes 28 consecutive quarters of sequential revenue growth;"

(b)  December 13, 2017 press release and Form 8-K, announcing guidance for the upcoming year;

(c)  November 30, 2017 press release and Form 8-K, announcing the Company's expected revenues for the period ended December 31, 2017;

(d)  October 26, 2017 press release and Form 8-K, announcing the Company's financial results for the period ended September 30, 2017;

(e)  October 10, 2017 conference call and Form 8-K discussing the Company's financial performance for the preceding quarter;

(f)  July 26, 2017 press release and Form 8-K, announcing the Company's financial results for the period ended June 30, 2017;

(g)     July 13, 2017 press release and Form 8-K, announcing the Company's second quarter revenue was expected to exceed the Company's guidance range;

(h)     April 28, 2017 press release and Form 8-K, announcing the Company's financial results for the period ended March 31, 2017;

(i)     February 23, 2017 press release and Form 8-K, announcing the Company's "record" financial results for the quarter and year ending December 31, 2016;

(j)     January 9, 2017 press release and Form 8-K, announcing the Company's financial results for the fourth quarter of 2016 was expected to be in the upper range of guidance;

(k)     October 27, 2016 press release and Form 8-K, announcing the Company's financial results for the third quarter of 2016;

(l)     July 26, 2016 press release and Form 8-K, announcing the Company's financial results for the second quarter of 2016;

(m)     April 25, 2016 press release and Form 8-K, announcing the Company's financial results for the first quarter of 2016;

(n)   February 23, 2016 press release and Form 8-K, announcing the Company' financial results for year ending December 31, 2015.

## *The Individual Defendants' Breaches of Duty*

105.   During the relevant period, the Individual Defendants were well aware of the problems with the Company's internal controls and its deficient accounting and financial reporting practices, procedures, and systems.  Through their attendance at Board, Audit Committee, and management meetings, their review of the Company's financial statements, and conversations with the Company's management, auditors, and consultants, the Individual Defendants knew MiMedx lacked adequate accounting and financial reporting systems, yet they declined to implement the necessary systems and expertise.

106.   In breach of their duties owed to the Company and, with respect to defendants Dewberry, Bleser, Evans, and Papasan, their enumerated responsibilities under the Audit Committee Charter, the Individual Defendants willfully ignored the deficiencies in the Company's accounting and financial reporting systems; failed to make a good faith effort to address the deficiencies; knowingly permitted, and indeed actively encouraged, the Company and its employees to engage in an improper revenue recognition scheme; and knowingly disseminated to the public

materially false and misleading statements concerning the Company's financial results.

107.  Defendants Petit, Taylor, Senken, Cranston, Dewberry, Evans, Hack, Koob, Papasan, and Yeston further breached their duties by knowingly causing MiMedx to repurchase millions of its shares in the market even though they knew the price of the Company's stock was artificially inflated as a result of the Company's pervasive accounting improprieties.

108.  As a direct and proximate result of the misconduct alleged herein, the Company has sustained damages, including, but not limited to, costs and expenses incurred in connection with: (1) the restatement of the Company's financial statements; (2) the investigations into the Company being conducted by the SEC and DOJ; (3) the potential delisting of the Company's common stock from the NASDAQ Stock Market; (4) amendments to the Company's credit agreement as a result of the Company's failure to timely file its financial statements; (5) repurchases of Company stock while the price of MiMedx common stock was trading at artificially inflated prices based on the Company's overstated and inaccurate financial results; and (6) excessive compensation awarded to its executive officers in connection with the Company's overstated and inaccurate financial performance.

## <u>DERIVATIVE AND DEMAND ALLEGATIONS</u>

109.   Plaintiff brings this action derivatively in the right and for the benefit of the Company to redress the Individual Defendants' breaches of fiduciary duties and other violations of law.

110.   Plaintiff is a shareholder of the Company, was a shareholder of the Company at the time of the wrongdoing alleged herein, and has been a shareholder of the Company continuously since that time.

111.   Plaintiff will adequately and fairly represent the interests of the Company and its shareholders in enforcing and prosecuting its rights.

112.   On June 22, 2018, Plaintiff made his Demand on the Board.  A true and correct copy of the Demand is attached hereto as Exhibit A.

113.   On July 2, 2018, the Board, by and through counsel for a purported "Special Committee" appointed "to evaluate and investigate the allegations [in the Demand] and to determine what action or actions to take in response," sent Plaintiff's counsel a letter acknowledging receipt of the Demand and requesting evidence of Plaintiff's ownership of MiMedx stock.  A true and correct copy of the July 2, 2018 letter is attached hereto as Exhibit B.

114.   On July 25, 2018, Plaintiff's counsel sent the Special Committee's counsel a letter enclosing confidential documentation evidencing Plaintiff's

ownership of MiMedx stock and requesting identification of (i) the directors who appointed the Special Committee, and (ii) the members of the Special Committee. A true and correct copy of the July 25, 2018 letter, without the enclosures, is attached hereto as Exhibit C.

115.   On August 6, 2018, the Special Committee's counsel sent Plaintiff's counsel a letter disclosing, among other things, that defendant Bleser – a long time close friend and colleague of defendant Petit – was one of three members of the committee, which was now referred to as a "Special Litigation Committee."  A true and correct copy of the August 6, 2018 letter is attached hereto as Exhibit D.

116.   Neither the Board nor the Special Committee/Special Litigation Committee has provided a substantive response to the Demand, which Plaintiff sent more than ninety days ago.  Accordingly, pursuant to Fla. Stat. § 607.07401(2), Plaintiff is entitled to proceed with this action derivatively on behalf of the Company.

## FIRST CAUSE OF ACTION

### Against the Individual Defendants for Breach of Fiduciary Duties of Loyalty and Good Faith

117.   Plaintiff incorporates by reference all preceding and subsequent paragraphs as if fully set forth herein.

118.   The Individual Defendants, by reason of their positions as fiduciaries of the Company, owed the Company the duties of undivided loyalty and good faith.

119.   By their misconduct, the Individual Defendants breached their fiduciary duties of loyalty and good faith, as alleged in detail herein.

120.   As a direct and proximate result of the Individual Defendants' breaches of fiduciary duties, the Company has sustained, and will continue to sustain, substantial harm, as alleged herein.

## SECOND CAUSE OF ACTION

### Against Defendants Petit, Taylor, Senken, Cranston and Haden for Unjust Enrichment

121.   Plaintiff incorporates by reference all preceding and subsequent paragraphs as if fully set forth herein.

122.   Defendants Petit, Taylor, Senken, Cranston and Haden, by virtue of their role as company executives, each received unwarranted and undeserved compensation based on false and misleading statements regarding the Company's financial status.

123.   It would be unconscionable to allow the foregoing defendants to keep any ill-gotten gains or unwarranted compensation they have received.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff demands judgment as follows:

(A)     Awarding the Company the amount of damages it sustained as a result of the Individual Defendants' breaches of fiduciary duties;

(B)     Ordering defendants Petit, Taylor, Senken, Cranston and Haden to disgorge to the Company the unwarranted compensation they received;

(C)     Ordering any and all appropriate equitable relief to remedy the misconduct alleged herein;

(D)     Awarding to Plaintiff the costs and disbursements of this Action, including reasonable attorneys' fees, accountants' and experts' fees, costs and expenses, and

(E)     Granting such other and further relief as the Court deems just and proper.

## **JURY TRIAL DEMANDED**

Plaintiff requests a trial by jury.

DATED:  September 25, 2018          **JOHNSON FISTEL, LLP**

_/s/ Michael I. Fistel, Jr._
MICHAEL I. FISTEL, JR.
(Ga. Bar No.: 262062)

William W. Stone (Ga. Bar No.: 273907)
Murray House
40 Powder Springs Street
Marietta, GA 30064
Telephone: (470) 632-6000
Facsimile: (770) 200-3101
michaelf@johnsonfistel.com
williams@johnsonfistel.com

**KESSLER TOPAZ MELTZER**
   **& CHECK, LLP**
Eric L. Zagar
ezagar@ktmc.com
Christopher M. Windover
cwindover@ktmc.com
280 King of Prussia Road
Radnor, PA 19087
Telephone: (610) 667-7706
Facsimile: (267) 948-2512

*Counsel for Plaintiff*

## **VERIFICATION**

I, James E. Evans, hereby verify that I have authorized the filing of the attached Verified Shareholder Derivative Complaint, that I have reviewed the Verified Shareholder Derivative Complaint, and that the facts therein are true and correct to the best of my knowledge, information and belief.

I declare under penalty of perjury that the foregoing is true and correct.

DATE: 9/24/2018 _____

_James Evans_____

James E. Evans