# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

| | |
|---|---|
| IN RE MIMEDX GROUP, INC. SHAREHOLDER DERIVATIVE LITIGATION | Lead Case No. 1:18-cv-04486-WMR |
| | (Consolidated with Case No. 1:18-cv-04514-WMR and Case No. 1:18-cv-04864-WMR) |
| This Document Relates To:<br><br>ALL ACTIONS | **VERIFIED CONSOLIDATED SHAREHOLDER DERIVATIVE COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

Plaintiffs James E. Evans ("Plaintiff Evans"), Andrew Georgalas ("Plaintiff Georgalas"), and Michael Roloson ("Plaintiff Roloson," and together with Plaintiff Evans and Plaintiff Georgalas, "Plaintiffs"), by their attorneys, submit this Verified Consolidated Shareholder Derivative Complaint (the "Complaint") against the defendants named herein.  The allegations in the Complaint are based on the personal knowledge of Plaintiffs as to themselves, and on information and belief, as well as an ongoing investigation by Plaintiffs' counsel that includes, among other things, review of public filings with the U.S. Securities and Exchange Commission ("SEC"), news reports, press releases, stock analysts' reports, and other publicly available sources.

## NATURE OF THE ACTION

1.     This is a stockholder derivative action brought by Plaintiffs on behalf of nominal defendant MiMedx Group, Inc. ("MiMedx" or the "Company") against certain current and former members of the Company's Board of Directors (the "Board") and executive officers (collectively the "Individual Defendants," as defined below) for breaches of fiduciary duty, waste of corporate assets, and unjust enrichment.

2.      MiMedx is a biopharmaceutical company that focuses on supplying biomaterials for soft tissue repair and other biomaterial-based products for other medical applications.

3.      From 2012 through late-2017, MiMedx reported tremendous growth, including five straight years of over 50% sales growth.  Throughout this time, MiMedx routinely highlighted impressive sales and revenue increases and forecasted significant future growth.  The Company's public filings also consistently touted the effectiveness of the Company's internal controls over financial reporting.

4.      The market reacted highly favorably to MiMedx's financial projections and the Company's assurances that it maintained adequate internal controls. MiMedx's stock price rose from roughly $4 per share at the beginning of 2013 to $17 per share by the beginning of 2018.

5.      Unfortunately, as the Company's stockholders would belatedly learn, the disclosures that drove the stock price higher were highly misleading.  MiMedx was engaged in a pervasive "channel-stuffing" scheme, in which the Company shipped to distributors and customers more products than had actually been ordered or intended to be used in order to improperly recognize additional revenue.  In addition, MiMedx had been operating for years with material weaknesses in internal

controls over financial reporting and accounting, and would have to restate years of financial statements.

6.      In furtherance of MiMedx's channel-stuffing scheme, Company sales representatives – pressured by senior management near the end of every month or quarter to increase sales volumes – stocked excess inventory at Department of Veterans Affairs ("VA") hospitals without the consent or knowledge of the hospitals' personnel, and then actively took steps to mask the unused inventory. These sales representatives often ordered the products through AvKARE, a distributor for MiMedx since April 2012 that never had control or title to the products, and provided false documentation to help conceal the improper activity. The Company also used other distributors to effectuate large orders right before the end of the Company's fiscal quarters.   MiMedx then falsely booked these orders/product shipments as revenue before the products were returned.  The surplus products were later routed back to MiMedx, and the Company then used future revenues to mask the true losses associated with reclaiming the products.   The Company recognized revenue in violation of Generally Accepted Accounting Principles ("GAAP") and financial accounting standards, which provide (among other things) that revenue may only be recognized at the time of sale if a buyer lacks the right to return the product.  For years MiMedx's wholly inadequate internal

controls over accounting and financial reporting allowed these accounting manipulations to persist and grow to represent an ever-larger percentage of reported revenues.

7.    In December 2016, two former MiMedx employees filed a lawsuit alleging, among other things, that since at least 2014, MiMedx had engaged in a channel-stuffing scheme and had improperly recognized revenue before the revenue had been realized or was realizable and earned.[1]

---

[1] Plaintiffs reference herein allegations made by former employees of MiMedx, including in *Kruchoski and Tornquist v. MiMedx Group, Inc.*, Case No. 0:16-cv-04171-RHK-BRTD. (D. Minn. 2016), and *MiMedx Group, Inc. v. Fox*, Case No. 1:16-CV-11715 (N.D. Ill. January 31, 2018).  The allegations made by those former employees corroborate Plaintiffs' allegations and derivative claims.  Specifically, the allegations by former employees corroborate Plaintiffs' allegations concerning (i) the channel-stuffing scheme at MiMedx; (ii) the defendants' roles in and knowledge of the scheme; and (iii) the Board's and the Audit Committee's conduct in response to allegations raised by the former employees about the channel-stuffing scheme and the improper revenue recognition and accounting practices at the Company.  The former employees' allegations are corroborated, in turn, by the results of the Company's subsequent investigations, as well as the ongoing investigations by the SEC, the Department of Justice ("DOJ"), the VA, and the Defense Department.  The former employees' allegations are also relevant here because they, in part, formed the basis for the Board's and the Audit Committee's improper attempt to cover up the truth about the Company's practices and to whitewash the Company's purported "investigations" into the issues.  Plaintiffs used publicly available information to ascertain with a high degree of confidence that the former employees would have had access to the information that forms the bases of their allegations.  Plaintiffs intend to compel witness testimony (if necessary) when discovery proceeds in this action and believe that additional evidentiary support will be forthcoming after further investigation and discovery.

8.    Rather than thoroughly and fairly investigate and address the issues, the defendants – officers and directors of MiMedx – launched a vicious disinformation campaign to discredit the sources of these revelations.   In response to the whistleblower lawsuits filed by the former employees, on December 15, 2016, MiMedx issued a press release in which defendant Parker H. Petit ("Petit"), MiMedx's former Chairman and Chief Executive Officer ("CEO"), labeled the allegations asserted by the former employees as "not factual and fallacious."

9.    Defendant Petit claimed to have submitted the allegations to the Board—then comprised of defendants Petit, former MiMedx President and Chief Operating Officer ("COO") William C. Taylor ("Taylor"), Joseph G. Bleser ("Bleser"), J. Terry Dewberry ("Dewberry"), Charles R. Evans ("Evans"), Larry W. Papasan ("Papasan"), Bruce L. Hack ("Hack"), Charles E. Koob ("Koob") and Neil S. Yeston ("Yeston")—"to thoroughly review the issues."   On December 27, 2016, however, less than two weeks later, the Company announced that the Audit Committee of the Board—then comprised of defendants Bleser, Dewberry, Evans and Papasan—had "advised the Company's management and the Board of Directors that it has found no credible evidence to indicate that any changes to previously issued financial statements are necessary in light of these allegations."   The Audit Committee's abbreviated "review" was patently inadequate to evaluate even the

known issues, let alone to ferret out the pervasive deficiencies of MiMedx's internal controls that existed under the surface.

10.     The Audit Committee's facile and wholly unsupported conclusion that the Company's financial statements would be unaffected was just the first in a series of steps the Committee and the Board took to cover-up and whitewash the truth about the Company's improper practices and inadequate internal controls over financial reporting.

11.     Just three months later, on March 1, 2017, the Company announced that the Audit Committee had completed its investigation, which purportedly (i) "confirmed there is no credible evidence of any wrongdoing on behalf of members of MiMedx management," and (ii) "determined that the Company has appropriately recognized revenue and found no credible evidence to indicate that any changes to the Company's previously issued financial statements are necessary in light of the former employees' allegations." The Audit Committee's findings were promptly endorsed by the whole Board.

12.     Despite the Audit Committee's self-serving exculpatory "findings," in August and September 2017, numerous research groups published reports expressing concerns about the facts suggesting pervasive unlawful conduct at

MiMedx.  Similarly, the SEC subpoenaed MiMedx in February 2017—a fact the Individual Defendants withheld from the Company's stockholders for seven months.

13.    Nonetheless, throughout the relevant time period, the Individual Defendants continued to respond with vehement (and baseless) denials that any wrongdoing had occurred at the Company.  For example, in late September 2017, MiMedx hosted a conference call during which defendant Petit stated:

> We have nothing in this corporation at MiMedx to be concerned about. And if we did, we'd be going public with it.
>
> We've gone through investigations internal. We publicized that to shareholders. I've been around too long. I've been doing this for 36 years. I'm not going to jeopardize my -- what future I have left with things that -- if there's malfeasance involved.
>
> As far as we know, this company is, and the things that this executive group knows and our board knows and our auditors and everybody else, this company has no issues, except we got some terminated employees that are making up issues. Okay?

14.    The Individual Defendants also caused MiMedx to take the extraordinary step of suing securities analysts who questioned the Company's business practices, asserting claims for libel, slander, and defamation.  The true facts proved to be stubborn, and MiMedx was later forced to dismiss those lawsuits when the truth emerged.

15.    The Individual Defendants' façade of lawfulness came crashing down in February 2018, when MiMedx announced that it was postponing its fourth quarter

and fiscal year 2017 financial results due to "an internal investigation into current and prior-period matters relating to allegations regarding certain sales and distribution practices at the Company" and "the accounting treatment of certain distributor contracts."  In a continuing effort to retain control and minimize the misconduct to the extent possible, however, the "internal investigation" was entrusted to the very same Audit Committee that had previously "investigated" allegations of accounting improprieties and swiftly (and erroneously) determined that there had been no misconduct.

16.  Once again, the true facts proved stubborn.  By the summer of 2018 the Individual Defendants could no longer hide the truth from MiMedx shareholders.  In June 2018, the Company was forced to admit that it would need to restate its financial statements for fiscal years 2012 through 2016, as well as the first, second, and third quarters of 2017 – the same time period as to which the Audit Committee Defendants Bleser, Dewberry, Evans and Papasan had previously found "no credible evidence" of wrongdoing or need for "any changes to the Company's previously issued financial statements."  The restatement was necessary to address "the accounting treatment afforded to [] sales and distribution practices for two distributors for which certain implicit arrangements modified the explicit terms of the contracts, impacting revenue recognition practices" – exactly the areas flagged

by the former employees Defendants had repeatedly and brutally maligned and impugned.

17.     In late June and early July 2018, defendants Petit, Taylor, Michael J. Senken ("Senken") (former Chief Financial Officer ("CFO")), and John E. Cranston ("Cranston") (former Treasurer and Controller) resigned from the Company.  And on September 20, 2018, the Company announced that the Board and its Compensation Committee both determined that the Company had to reclassify the "resignations" of defendants Petit, Taylor, Senken, and Cranston as "terminations 'for cause'" based on information gleaned from the Audit Committee's second investigation.

18.     As detailed herein, the Individual Defendants, as members of MiMedx management, the Board, and its Audit Committee, breached their fiduciary duties by, among other things: (1) willfully ignoring and/or consciously disregarding serious and pervasive deficiencies in the Company's accounting and financial reporting systems; (2) failing to make a good faith effort to address these deficiencies; (3) knowingly permitting the Company and its employees to engage in an improper revenue recognition scheme and/or consciously disregarding the perpetuation of such a scheme; and (4) knowingly disseminating to the public

materially false and misleading statements concerning the Company's financial results and internal controls.

19.   The Individual Defendants' faithless actions have devastated MiMedx's credibility, as reflected by the Company's more than $1.67 billion, or 83.5%, market capitalization loss, from a high of nearly $2 billion in January 2018, to less than $264 million as of January 2019.  In addition to this depletion in MiMedx's market capitalization, the Individual Defendants wasted millions of dollars of the Company's funds by causing MiMedx to repurchase millions of its shares in the market knowing that the price of the Company's stock was artificially inflated by the Company's pervasive accounting improprieties.  In addition, the wrongdoing complained of herein[2] has spawned a series of lawsuits, internal investigations, restatements of financial reports, and governmental investigations.

20.   Defendants Petit, Taylor, Senken, and Haden have derived immense personal benefits as result of the wrongful scheme and concealment of MiMedx's true financial operations through both their annual salary and bonus increases based on MiMedx's supposed financial performance and their participation in MiMedx's

_____

[2] MiMedx has also come under scrutiny for failing to disclose payments the Company made to a number of doctors in violation of the Physician Payments Sunshine Act.  *See* ¶ 77, *infra*.

annual Management Incentive Plan ("MIP"), an annual cash incentive plan designed to incentivize and reward achievement of the current year's financial and operational goals. These defendants were paid bonuses based on financial results that were overstated as a result of the Company's channel-stuffing scheme and improper revenue recognition and accounting practices.

21.     Despite admitting the failure of its internal controls, to date, the Board has dragged its feet in addressing and remediating the problems. It still has not completed its purported investigation or issued restated financials, and has not filed an annual or quarterly financial statement since October 31, 2017. The Company has not even provided any estimates as to when any of these filings or restatements are likely to be completed. As a result, the Company has been delisted by the NASDAQ Stock Market ("NASDAQ"), and it is unclear when, if ever, the restatement will be completed.

22.     In April and June 2018, Plaintiffs, through their respective counsel, sent three separate litigation demands to the MiMedx Board (collectively, the "Demands") to take action against the Individual Defendants and to recover damages to the Company caused by their faithless and unlawful actions. Plaintiffs were separately advised that the Board has formed a special committee ("Special Committee") to evaluate and investigate the allegations contained in the Demands.

In light of the extreme circumstances, it was incumbent upon the members of the Board and the Special Committee to act swiftly to determine all of the material facts at issue, assess the liability of the individuals responsible (including themselves), and take all necessary actions in the best interests of MiMedx.  Consistent with its strategy in dealing with the whistleblowers' allegations, however, the Board has again elected not to aggressively and objectively investigate the facts and determine who is responsible for the channel stuffing, bogus accounting and financial reporting, utterly deficient internal controls, and subsequent cover-up.  Instead, the Board continues to prevaricate, delay and whitewash in a misguided effort to avoid liability.  More than eight months – far longer than the 90 days provided by statute – have passed since Plaintiffs first demanded that the Board investigate the allegations detailed herein, yet neither the Board nor the Special Committee has provided a substantive response to the Demands.

23.    In light of the Board's lengthy and inexcusable delay, Plaintiffs are entitled under Florida law to proceed with this action derivatively on behalf of MiMedx in order to redress the significant harm to the Company caused by the Individual Defendants' egregious misconduct.

## PARTIES

**Plaintiffs**

24.    Plaintiff Evans, a citizen of Ohio, is a stockholder of nominal defendant MiMedx and has been a stockholder of nominal defendant MiMedx continuously since 2014.

25.    Plaintiff Georgalas, a citizen of Pennsylvania, is a stockholder of nominal defendant MiMedx and has been a stockholder of nominal defendant MiMedx continuously since 2014.

26.    Plaintiff Roloson, a citizen of North Carolina, is a stockholder of nominal defendant MiMedx and has been a stockholder of nominal defendant MiMedx continuously since 2014.

**Nominal Defendant**

27.    Nominal Defendant MiMedx is a Florida corporation with its principal executive offices located at 1775 West Oak Commons Ct. NE, Marietta, Georgia, and therefore is a citizen of Florida and Georgia.  MiMedx was formed on March 31, 2008, as a result of a reverse merger transaction between Alynx, Co. ("Alynx") and MiMedx, Inc. ("Legacy MiMedx").   When this action was commenced, MiMedx stock traded on the NASDAQ Capital Market Exchange under the symbol "MDXG."

**Individual Defendants**

28.     Defendant Petit, a citizen of Georgia, served as MiMedx's CEO and Chairman of the Board from February 2009 until his resignation in June 2018.[3]  On September 20, 2018, the Board terminated Petit from his position as a director of

---

[3] A proxy statement filed by MiMedx with the SEC in advance of the Company's 2017 annual meeting of stockholders describes defendant Petit's joint roles as CEO and Chairman as follows:

> Our Board of Directors has carefully considered the benefits and risks in combining the role of Chairman of the Board of Directors and Chief Executive Officer and has determined that Mr. Petit is the most qualified and appropriate individual to lead our Board of Directors as its Chairman. The Board of Directors believes there are efficiencies to the Company of having the Chief Executive Officer also serve in the role of Chairman of the Board of Directors. As our Chief Executive Officer, Mr. Petit is responsible for the day-to-day operation of the Company and for the implementation of the Company's strategy. Mr. Petit serves as a bridge between management and our Board of Directors, ensuring that both groups act with a common purpose. Our Board of Directors further noted that the combined role of Chairman of the Board of Directors and Chief Executive Officer facilitates centralized leadership in one person so that there is no ambiguity about accountability. Our Board of Directors also considered Mr. Petit's knowledge regarding our operations and the industries and markets in which we compete and his ability to promote communication, to synchronize activities between our Board of Directors and our senior management and to provide consistent leadership to both our Board of Directors and our Company.

MiMedx and recategorized his "resignation" as CEO as a termination "for cause."

MiMedx paid defendant Petit the following compensation as an executive:

| Year | Salary and Bonus | Stock and Option Awards | Non-Equity Incentive Plan Compensation | All Other Compensation | Total |
|---|---|---|---|---|---|
| 2016 | $602,904 | $1,088,080 | - | $2,796 | $1,693,780 |
| 2015 | $560,177 | $1,071,447 | $517,254 | $2,975 | $2,151,853 |
| 2014 | $914,892 | $1,535,416 | $580,800 | $4,683 | $3,035,791 |
| 2013 | $465,192 | $1,502,383 | $292,521 | - | $2,260,096 |
| 2012 | $354,327 | $706,713 | | | $1,061,040 |

Actual compensation paid to Petit and the other Individual Defendants for 2017 and 2018 has not been publicly disclosed.

29.     Defendant Taylor, a citizen of Georgia, served as a director of MiMedx from October 2011 until his resignation in June 2018 and as the Company's President and COO[4] from September 2009 until his resignation in June 2018.  On September 20, 2018, the Board recategorized his "resignation" as a "termination for cause."  From 2001 through 2008, defendant Taylor was President and CEO of Facet Technologies, LLC, a Matria Healthcare Inc. ("Matria") subsidiary.  MiMedx paid defendant Taylor the following compensation as an executive:

---

[4] The Company's bylaws state that "[t]he President shall have responsibility for the day-to-day operations of the business of the Corporation and shall report to the Chief Executive Officer," and "may perform such acts … usually performed by the chief operating officer of a corporation …."

| Year | Salary | Stock and Option Awards | Non-Equity Incentive Plan Compensation | All Other Compensation | Total |
|---|---|---|---|---|---|
| 2016 | $502,170 | $690,200 | - | $4,086 | $1,196,456 |
| 2015 | $451,131 | $685,783 | $391,980 | $2,654 | $1,531,548 |
| 2014 | $422,042 | $748,346 | $477,950 | $2,799 | $1,651,137 |
| 2013 | $385,577 | $1,026,704 | $240,721 | | $1,653,002 |
| 2012 | $343,846 | $530,035 | | | $873,881 |

30.    Defendant Senken, a citizen of Georgia, served as the Company's CFO[5] from January 2010 until his resignation in June 2018.  On September 20, 2018, the Board recategorized his "resignation" as a "termination for cause."  MiMedx paid defendant Senken the following compensation as an executive:

| Year | Salary | Stock and Option Awards | Non-Equity Incentive Plan Compensation | All Other Compensation | Total |
|---|---|---|---|---|---|
| 2016 | $365,039 | $324,800 | | - | $689,839 |
| 2015 | $329,615 | $300,108 | $236,300 | - | $866,023 |
| 2014 | $294,990 | $327,488 | $242,000 | $15,438 | $879,916 |
| 2013 | $268,269 | $450,122 | $121,884 | - | $840,275 |

---

[5] The Company's bylaws state that the CFO

> *shall keep and maintain, or cause to be kept and maintained, adequate and correct books and records of accounts of the properties and business transactions of [MiMedx],* including accounts of its assets, liabilities, receipts, disbursements, gains, losses, capital, retained earnings and shares.

> (Emphasis added).

| 2012 | $236,538 | $160,250 | | | $396,788 |
|---|---|---|---|---|---|

31.     Defendant Cranston, a citizen of Georgia, served as the Company's Treasurer, Corporate Controller and Vice-President[6] from at least October 2013 until his resignation in June 2018.  On September 20, 2018, the Board re-categorized his "resignation" as a "termination for cause."

32.     Defendant Haden, a citizen of Georgia, has served as MiMedx's General Counsel and Secretary since March 2015.  She joined the Company as a Senior Attorney in June 2013.   MiMedx paid defendant Haden the following compensation as an executive:

| Year | Salary | Stock and Option Awards | Non-Equity Incentive Plan Compensation | All Other Compensation | Total |
|---|---|---|---|---|---|
| 2016 | $327,884 | $267,960 | - | $3,786 | $599,630 |
| 2015 | $273,269 | $190,488 | $150,815 | - | $614,572 |

33.     Defendant Bleser, a citizen of Georgia, has served as a director of the Company since September 2009.  Defendant Bleser is also a member of MiMedx's Audit Committee and has been since at least October 2012.  MiMedx paid defendant Bleser the following compensation as a director:

---

[6] The Company's bylaws state that "[t]he Controller shall have charge of the accounting affairs of [MiMedx]," and "shall report to the [CFO]."

| Fiscal Year | Fees Paid in Cash | Stock Awards | Option Awards | Total |
|---|---|---|---|---|
| 2016 | $69,000 | $150,003 | - | $219,003 |
| 2015 | $69,000 | $127,492 | - | $196,492 |
| 2014 | $67,500 | $56,520 | $55,350 | $179,370 |
| 2013 | $78,500 | $33,000 | $53,940 | $165,440 |
| 2012 | 50,853 | | $25,607 | $76,460 |

34.     Defendant Dewberry, a citizen of Georgia, has served as a director of the Company since September 2009.  Defendant Dewberry is also Chairman of MiMedx's Audit Committee, and has been a member of that since at least October 2012.  MiMedx paid defendant Dewberry the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Stock Awards | Option Awards | Total |
|---|---|---|---|---|
| 2016 | $69,000 | $150,003 | - | $219,003 |
| 2015 | $69,000 | $127,492 | - | $196,492 |
| 2014 | $69,000 | $56,520 | $55,350 | $180,870 |
| 2013 | $80,250 | $33,000 | $53,940 | $167,190 |
| 2012 | 52,000 | | $25,607 | $77,607 |

35.     Defendant Evans, a citizen of Georgia, has served as a director of the Company since September 2012.  Following Petit's resignation, Evans became Chairman of the Board.  Defendant Evans was also Lead Director of MiMedx since at least July 2018.  Defendant Evans is also a member of MiMedx's Audit Committee and has been since at least October 2012.  MiMedx paid defendant Evans the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Stock Awards | Option Awards | Total |
|---|---|---|---|---|
| 2016 | $53,000 | $150,003 | - | $203,003 |
| 2015 | $53,000 | $127,492 | - | $180,492 |
| 2014 | $52,500 | $56,520 | $55,350 | $164,370 |
| 2013 | $60,250 | - | - | $60,250 |
| 2012 | $13,818 | | $72,704 | $86,542 |

36.     Defendant Papasan, a citizen of Tennessee, has served as a director of the Company since January 2008.  Defendant Papasan was also an Alynx director from February 2008 to March 2008 and a Legacy MiMedx director from April 2007 to February 2008.  Defendant Papasan was also a member of MiMedx's Audit Committee from at least October 2012 to at least April 2017.  MiMedx paid defendant Papasan the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Stock Awards | Option Awards | Total |
|---|---|---|---|---|
| 2016 | $72,500 | $150,003 | - | $222,503 |
| 2015 | $72,500 | $127,492 | | $199,992 |
| 2014 | $72,750 | $56,520 | $55,350 | $184,620 |
| 2013 | $84,750 | $33,000 | $53,940 | $171,690 |
| 2012 | $54,000 | | $46,093 | $100,093 |

37.     Defendant Luis A. Aguilar ("Aguilar"), a citizen of Georgia, has served as a director of the Company since March 2017.

38.     Defendant Hack, a citizen of New York, has served as a director of the Company since March 2009.  MiMedx paid defendant Hack the following compensation as a director:

-19-

| Fiscal Year | Fees Paid in Cash | Stock Awards | Option Awards | Total |
|---|---|---|---|---|
| 2016 | $48,000 | $150,003 | - | $198,003 |
| 2015 | $48,000 | $127,492 | - | $175,492 |
| 2014 | $48,000 | $56,520 | $55,350 | $159,870 |
| 2013 | $52,750 | $33,000 | $53,940 | $139,690 |
| 2012 | $31,802 | | $25,607 | $57,408 |

39.     Defendant Koob, a citizen of Wyoming, has served as a director of the Company since March 2008.  Defendant Koob was also an Alynx director from February 2008 to March 2008 and a Legacy MiMedx director from April 2007 to February 2008.  Koob is the brother of MiMedx Chief Scientific Officer Thomas J. Koob, who has served in this capacity since March 2007.  MiMedx paid defendant Koob the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Stock Awards | Option Awards | Total |
|---|---|---|---|---|
| 2016 | $42,000 | $150,003 | - | $192,003 |
| 2015 | $42,000 | $127,492 | | $169,492 |
| 2014 | $42,000 | $56,520 | $55,350 | $153,870 |
| 2013 | $44,500 | $33,000 | $53,940 | $131,440 |
| 2012 | $29,000 | | $25,607 | $54,607 |

40.     Defendant Yeston, a citizen of Connecticut, has served as a director of the Company since September 2012.  MiMedx paid defendant Yeston the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Stock Awards | Option Awards | Total |
|---|---|---|---|---|
| 2016 | $50,500 | $150,003 | - | $200,503 |

| 2015 | $50,500 | $127,492 | - | $177,992 |
| 2014 | $50,750 | $56,520 | $55,350 | $162,620 |
| 2013 | $57,500 | - | - | $57,500 |
| 2012 | $12,818 | | $72,724 | $85,542 |

41.    Defendant Chris Cashman, a citizen of Georgia, was the Company's Executive Vice President and Chief Commercialization Offer from November 2014 until the position was eliminated, as announced by the Company on December 5, 2018.    As the Chief Commercialization Officer, defendant Cashman had responsibility for the Company's global sales & marketing functions, strategic planning and all related revenue growth initiatives.

42.    The defendants identified in ¶¶ 28-32, and 41 are referred to herein as the "Officer Defendants."  The defendants identified in ¶¶ 28, 29, and 33-40 are referred to herein as the "Director Defendants."  The defendants identified in ¶¶ 33-36 are referred to herein as the "Audit Committee Defendants."  Collectively, the defendants identified in ¶¶ 28-41 are referred to herein as the "Individual Defendants."

## **JURISDICTION AND VENUE**

43.    Jurisdiction is conferred by 28 U.S.C. §1332.  Complete diversity among the parties exists and the amount in controversy exceeds $75,000, exclusive of interests and costs.

44.     This Court has jurisdiction over each defendant named herein because each defendant is either a corporation that conducts business in and maintains operations in this District or is an individual who has sufficient minimum contacts with this District to render the exercise of jurisdiction by the District courts permissible under traditional notions of fair play and substantial justice.

45.     Venue is proper in this Court in accordance with 28 U.S.C. §1391 because: (i) one or more of the defendants either resides in or maintains executive offices in this District; (ii) a substantial portion of the transactions and wrongs complained of herein, including the defendants' primary participation in the wrongful acts detailed herein, and aiding and abetting and conspiracy in violation of fiduciary duties owed to MiMedx, occurred in this District; and (iii) defendants have received substantial compensation in this District by doing business here and engaging in numerous activities that had an effect in this District.

## DUTIES OF THE INDIVIDUAL DEFENDANTS

**Fiduciary Duties**

46.     By virtue of their positions as officers, directors, and/or fiduciaries of MiMedx and because of their ability to control the business and corporate affairs of MiMedx, the Individual Defendants owed and owe MiMedx and its stockholders fiduciary obligations of good faith, loyalty, and candor, and were, and are, required

to use their utmost ability to control and manage MiMedx in a fair, just, honest, and equitable manner.  The Individual Defendants were, and are, required to act in furtherance of the best interests of MiMedx and its stockholders and to avoid either actual or apparent conflicts of interest, so as to benefit all stockholders equally and not act in furtherance of their personal interest or benefit.  Each director and officer of the Company owes MiMedx and its stockholders the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, and the highest obligations of fair dealing.

47.    The Individual Defendants, because of their positions of control and authority as directors and/or officers of MiMedx, were able to, and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein. Because of their advisory, executive, managerial, and directorial positions within MiMedx, each of the Individual Defendants had knowledge of material, nonpublic information regarding the Company.

48.    To discharge their duties, the officers and directors of MiMedx were required to exercise reasonable and prudent supervision over the management, policies, practices, and controls of the financial affairs of the Company.  By virtue of such duties, the officers and directors of MiMedx were required to, among other

things: ensure MiMedx maintained adequate internal controls over accounting and

financial reporting;

      (a)     ensure that the Company was operated in a diligent, honest, and prudent manner in compliance with all applicable laws, rules, and regulations;

      (b)     ensure that the Company complied with its legal obligations and requirements—including requirements involving the filing of accurate financial and operational information with the SEC—and refrain from engaging in deceptive conduct;

      (c)     ensure processes were in place for maintaining the integrity and reputation of the Company and reinforcing a culture of ethics, compliance, and appropriate risk management;

      (d)     conduct the affairs of the Company in an efficient, business-like manner in compliance with all applicable laws, rules, and regulations so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

      (e)     remain informed as to how MiMedx conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, make a reasonable inquiry in connection therewith, and take steps to correct such conditions or practices and make such disclosures as necessary to comply with applicable laws; and

      (f)     truthfully and accurately guide investors and securities analysts as to the business operations of the Company at any given time.

**Additional Duties Under the Company's Code of Business Conduct and Ethics**

49.     The Individual Defendants, as well as all employees, directors, and officers of the Company, were and are required to comply with the MiMedx Group, Inc. Code of Business Conduct and Ethics (the "Code of Conduct").  The purpose of the Code of Conduct is, inter alia, to promote:  (i) "honest and ethical conduct"; (ii) "full, fair, accurate, timely and understandable disclosure in reports and documents that the Company files with, or submits to, the SEC] and in other public communications made by the Company"; (iii) "compliance with applicable governmental laws, rules, and regulations"; and (iv) "the prompt internal reporting to an appropriate person or persons identified in the Code of violations of the Code."

50.     The Code of Conduct mandates that the Individual Defendants' activities comply with all laws and regulatory requirements.  Specifically, the Code of Conduct states, *inter alia*:

> 4. Compliance with Laws.  The Company's policy is to operate its businesses in strict compliance with all laws and regulatory requirements. Under no circumstances shall a Covered Person take any action on behalf of the Company that he or she knows or reasonably should know violates any applicable law or regulation. Every Covered Person is expected to be familiar with the basic legal and regulatory requirements that apply to his or her duties on the job.

51.     In addition, the Code of Conduct provides that the Company's employees, including its officers and directors, ensure that MiMedx's public filings

and communications are "full, fair, accurate, timely, and understandable."  Further, the Code of Conduct specifically notes the importance of reporting financial information reasonably and accurately to investors and the broader market, and obligates those who prepare or verify public reports or communications to "take this responsibility very seriously." The Code of Conduct states:

> 5. Disclosure. The Company applies the highest ethical standards in its financial and non-financial public reporting and follows all applicable SEC, NASDAQ and other standards and rules regarding reporting. ***It is of critical importance that all disclosures and announcements made by the Company to security holders or the investment community be accurate and complete, fairly present, in all material respects, the subject matter of the disclosure, and be made on a timely basis.*** Covered Persons who prepare disclosures or review information that will be included in the Company's filings with the SEC or other government agencies or otherwise disclosed to the public ***must take this responsibility very seriously. Such Covered Persons must provide information that is relevant, objective, accurate and complete to promote full, fair, accurate, timely and understandable disclosures.*** Each Covered Person has the responsibility to immediately report to appropriate Company personnel or the Audit Committee any information that he or she becomes aware of that affects disclosures made by the Company.

(Emphasis added).

52.    The Individual Defendants were also responsible for overseeing the "fair, prompt and consistent enforcement of [the Code of Conduct]."  The Code of Conduct obligated the Individual Defendants to promptly bring certain matters to the attention of the Audit Committee:

8. Enforcement.

8.1 The Company's Corporate Compliance Officer --in coordination with *senior management and, where appropriate, the Board of Directors and the Audit Committee-- is responsible for overseeing the fair, prompt and consistent enforcement of this Code, including the investigation of possible violations and the undertaking of remedial actions. Actions prohibited by this Code involving directors or executive officers must be reported to the Audit Committee.* After receiving a report of an alleged prohibited action by a director or executive officer, the Audit Committee must promptly take all appropriate actions necessary to investigate and recommend to the Board of Directors any appropriate remedial actions.

8.2 The Corporate Compliance Officer shall report all matters to the Chairperson of the Audit Committee relating to any (i) alleged violation of the Code by any director or executive officer (ii) complaints, reports, or concerns regarding financial statement disclosures, accounting, internal accounting controls, or auditing matters (collectively, "**Accounting Matters**"); (iii) violation of applicable securities laws, rules, and regulations relating to financial reporting; (iv) retaliation against any employees who make any allegations relating to (i) – (iii) above; and (v) other matters required to be addressed by the Audit Committee (A) set forth in the Reporting Procedures for Accounting Matters, the Charter of the Audit Committee, or otherwise, and (B) pursuant to all applicable laws, rules, and regulations.

(Emphasis added).

**Additional Duties of the Audit Committee Defendants**

53.    Under the MiMedx Board's Audit Committee Charter, the Audit Committee Defendants (*i.e.*, defendants Bleser, Dewberry, Evans, and Papasan) owe and/or owed specific additional duties to MiMedx.   According to the Audit Committee Charter, among other things, the Audit Committee is responsible for

assisting the Board in overseeing the integrity of the Company's financial statements, the Company's accounting and financial reporting processes, and internal controls over financial reporting.  In overseeing the Company's financial reporting processes on behalf of the Board, the Audit Committee is tasked with the following functions:

(a) Oversee and monitor the activities of Company management and outside auditors with respect to the Company's accounting and financial reporting processes;

* * *

(d) Review the proposed scope and plan of the annual audits of the financial statements and internal control over financial reporting;

(e) Direct the Company's outside auditors to review the Company's interim financial statements included in Quarterly Reports on Form 10-Q prior to the filing of such reports with the SEC;

(f) Review and discuss with management and the Company's auditors the Company's annual audited financial statements and quarterly financial statements;

(g) Review with management, before release, the Company's audited financial statements and Management's Discussion and Analysis included in the Company's Annual Report on Form 10-K and recommend to the Board whether the audited financial statements should be included in the Company's Annual Report on Form 10-K;

(h) Review and discuss with the Company's outside auditors the Company's audited financial statements and audit findings and discuss with the outside auditors those matters required to be discussed by Statement of Auditing Standards No. 114, as amended, or such successor standard as may be promulgated by the Public Company Accounting Oversight Board ("PCAOB");

* * *

(k) Review with the Company's outside auditors and management the adequacy of the Company's internal financial controls and reporting systems;

(l) Review the outside auditors' management letter (if any) and consider any comments made by the outside auditors with respect to improvements in the internal accounting controls of the Company, consider any corrective action recommended by the outside auditors, and review any corrective action taken by management;

* * *

(n) Establish procedures for the receipt, retention, and treatment of complaints received by the Company regarding accounting, internal accounting controls, or auditing matters;

(o) Establish procedures for the confidential, anonymous submission by employees of the Company of concerns regarding questionable accounting or auditing matters;

(p) Review and approve related party transactions for potential conflicts of interest;

* * *

(t) Establish and review reporting procedures for accounting matters; and

(u) Review compliance and risk assessment reports from management.

54.    In addition, the Audit Committee Defendants were obligated to investigate any complaint, report, or concern relating to:   (i) questionable accounting, internal accounting controls, and auditing matters; (ii) violations of applicable securities laws, rules, and regulations relating to financial reporting; (iii)

violations of the Company's Code of Conduct by any executive, officer, director, or any other person who performs functions of the principal executive officer, principal financial officer, principal accounting officer or controller; and (iv) retaliation against employees who made any of the foregoing allegations.  The MiMedx Group, Inc. Reporting Procedures for Accounting Matters states:

**<u>Treatment of Complaints, Reports, and Concerns.</u>**

Upon receipt of a complaint, report, or concern relating to any Allegation or Retaliatory Act, or notification by the Company, an officer, or member of the Board of Directors that it (or he or she) has received such a complaint, report, or concern, the Chairperson of the Audit Committee will notify the other members of the Audit Committee. The Audit Committee shall then investigate the complaint, report, or concern. In conducting such investigation, the Audit Committee may enlist officers or employees of the Company and/or outside legal, accounting, or other advisors, as appropriate. Promptly following the completion of such investigation, the Audit Committee will recommend that the Board of Directors take such corrective and disciplinary actions, if any, that are warranted in the judgment of the Audit Committee, which may include, without limitation, a warning or letter of reprimand, demotion, salary reduction, loss of eligibility for a salary increase, bonus, or equity compensation, suspension without pay, or termination of employment.

The Company will not take any adverse action against anyone as a result of their submission of a good faith complaint, report, or concern pursuant to these procedures and will not discharge, demote, suspend, threaten, harass, or in any manner discriminate against any employee in the terms and conditions of employment based upon any lawful actions taken by the employee with respect to good faith reporting of complaints, concerns, or other matters regarding the Company or otherwise as specified in Section 806 of the Sarbanes-Oxley Act of 2002 or any other applicable laws, rules, and regulations. Additionally,

no employee shall be adversely affected because the employee refuses to carry out a directive which, in fact, constitutes corporate fraud, or is a violation of state or federal law or the Company's Code of Business Conduct and Ethics.

55.     Accordingly, the Individual Defendants, because of their positions of control and authority as officers and/or directors of the Company, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

## **THE INDIVIDUAL DEFENDANTS' BREACH OF DUTIES**

56.     The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their fiduciary obligations as officers and directors of MiMedx, the absence of good faith on their part, and a reckless disregard for their duties to the Company that the Individual Defendants were aware or reckless in not being aware posed a risk of serious injury to the Company.

57.     The Individual Defendants breached their duty of loyalty and good faith by allowing defendants to cause, or by themselves causing, the Company to: (i) operate with inadequate financial and governance internal controls; (ii) overstate its revenues for a number of years; (iii) engage in an illicit channel-stuffing scheme; (iv) make improper statements to the public and the Company's stockholders; (v) fail to correct material misstatements made to its shareholders and the investing public; (vi) pay improper compensation packages to certain defendants; and (vii)

causing MiMedx to repurchase millions of its shares in the market even though they knew the price of the Company's stock was artificially inflated. These improper practices wasted the Company's assets and caused MiMedx to incur substantial damage.

58.     The Audit Committee Defendants had a duty to review the Company's earnings, press releases and regulatory filings. The Audit Committee Defendants breached their duty of loyalty and good faith by approving the improper statements detailed herein and failing to properly oversee MiMedx's public statements and internal control functions.

59.     The Individual Defendants, because of their positions of control and authority as officers and/or directors of the Company, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein. The Individual Defendants also failed to prevent the other Individual Defendants from taking such illegal actions and profiting from such wrongful acts. In addition, as a result of the Individual Defendants' breaches of fiduciary duties, the Company has been required to undertake a massive internal investigation (incurring significant forensic accounting and legal fees) examining the wrongful conduct of its fiduciaries, restate multiple years of financial reporting, and secure additional credit financing to permit its operations to continue. Additionally, the Company is the

-32-

subject of at least two federal securities class action lawsuits filed in this Court on behalf of investors who purchased MiMedx's shares (the "Securities Class Actions"). The Securities Class Actions bring claims against MiMedx and defendants Petit and former MiMedx CFO defendant Senken in connection with the Company's misleading statements and improper revenue recognition practices, including causes of action under sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"). In addition, the Individual Defendants' improper conduct has spawned governmental investigations by the SEC, DOJ, VA, and Defense Department. Furthermore, MiMedx common stock has been delisted by NASDAQ. As a result, MiMedx has expended, and will continue to expend, significant sums of money.

## CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

60. In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their common plan or design. In addition to the wrongful conduct alleged herein as giving rise to primary liability, the Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

61.    During all times relevant hereto, the Individual Defendants, collectively and individually, initiated a course of conduct that was designed to and did: (i) deceive the investing public, including stockholders of MiMedx, as to the Company's operations, financial condition, and compliance policies; (ii) deceive and exploit customers through their improper channel-stuffing scheme; and (iii) enhance the Individual Defendants' executive and directorial positions at MiMedx and the profits, power, and prestige that the Individual Defendants enjoyed as a result of holding these positions.  In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants, collectively and individually, took the actions set forth herein.

62.    The Individual Defendants engaged in a conspiracy, common enterprise, and/or common course of conduct.  During all times relevant hereto, the Individual Defendants caused the Company to engage in the improper channel-stuffing scheme and issue improper financial statements.

63.    The purpose and effect of the Individual Defendants' conspiracy, common enterprise, and/or common course of conduct was, among other things: (i) to disguise the Individual Defendants' violations of law, breaches of fiduciary duties, waste of corporate assets, and unjust enrichment; (ii) to conceal adverse information

concerning the Company's operations, financial condition, and future business prospects; and (iii) to profit from such conduct.

64.     The Individual Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by causing the Company to purposefully or recklessly engage in the illegal channel-stuffing scheme and mislead the investing public regarding the Company's internal controls and Board oversight. Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

65.     Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein.  In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each Individual Defendant acted with knowledge of the primary wrongdoing, substantially assisted in the accomplishment of that wrongdoing, and was aware of his or her overall contribution to and furtherance of the wrongdoing.

## FACTUAL ALLEGATIONS

**Overview of the Company and its Relationship with AvKARE**

66.     MiMedx is a biopharmaceutical company that develops, manufacturers, and markets biomaterials utilizing human placental allografts for soft tissue repair and other medical applications.   The Company sells its products through a combination of a direct sales force, independent stocking distributors and representatives in the U.S., and independent distributors in international markets.

67.     The Company has acknowledged in its public filings that sales to government accounts, such as the VA, comprise a "significant portion of [MiMedx's] revenues and accounts receivable."

68.     Historically, a significant portion of the Company's sales to government accounts was made through MiMedx's distributor relationship with AvKARE, a General Services Administration Federal Supply Schedule ("FSS") contractor.

69.     MiMedx and AvKARE began their distributor relationship in April 2012, upon the execution of a Product Distribution Agreement ("PDA").  The PDA initially had a three-year term ending in April 2015, but, through two amendments, was extended through June 30, 2017.   In total, the PDA has undergone four

amendments.    Defendants Taylor or Petit signed the PDA and each of its amendments.

70.    In 2014, MiMedx applied for, and in early 2015 received, its own FSS contract with a term through 2020, which permitted the Company to sell products directly to government accounts.  The Company thereafter disclosed in its public filings that it "intend[ed] to transition all of our Government sales to sales sold directly to Government accounts on the FSS."

71.    According to information disclosed in the Company's public filings through the end of 2015, sales through AvKARE have been responsible for a substantial portion of the Company's total revenues and accounts receivable:

| Year | Percentage of MiMedx total revenue attributable to AvKARE | Percentage of MiMedx accounts receivable attributable to AvKARE |
|---|---|---|
| 2012 | 40% | 53% |
| 2013 | 56% | 55% |
| 2014 | 34% | 33% |
| 2015 | 24% | 26% |

72.    The Individual Defendants were aware of the Company's relationship with AvKARE and the substantive terms of that relationship by virtue of, among other things: (1) the fact that sales through AvKARE constituted a substantial portion of the Company's total revenues and accounts receivable; (2) the sales through AvKARE were part of the Company's financial reporting that was presented and

approved by the Individual Defendants at board meetings; (3) the Individual Defendants' approval of the PDA and/or the amendments thereto; and (4) the Company's decision to apply for its own FSS and transition sales to government accounts away from AvKARE.

**MiMedx's Improper Revenue Recognition Scheme Continued for Several Years**

73.    From 2012 through the majority of 2017, MiMedx experienced tremendous growth, including five straight years of over 50% sales growth.  In order to meet revenue expectations, MiMedx employed a "channel-stuffing" scheme by which the Company artificially inflated its sales and revenues by shipping inventory to its distributors and customers while knowing that such products had not been requested and could not be resold.

74.    A *Wall Street Journal* investigative report titled "Highflying Medical Firm, a Help to Wounded Veterans, Falls to Earth," dated July 23, 2018, detailed the channel-stuffing at MiMedx.  *The Wall Street Journal* investigation, based on a review of Company emails, court documents, internal complaints, and interviews with current and former MiMedx employees, revealed "a company seeking to grow at almost any cost."  In the *Wall Street Journal* article, several current and former MiMedx employees explained that MiMedx would ship more product than had been

ordered and book the shipments as sales, improperly accelerating the recognition of revenue.[7]

75.     In addition, former MiMedx employees recounted that near the end of every month or quarter, the Company's senior management pressured sales representatives to increase sales volumes.  One former employee reported receiving a text message saying, "What else can u ship by end of month?" and "Need all you can put in today up to $100k if possible."  Mary Armstrong ("Armstrong"), a former MiMedx account executive, similarly reported that her superiors would tell her "I need you to hit this number."  Armstrong further stated: "I still have PTSD from the amount of calls I'd get asking what my numbers were going to be for the month."

76.     While the Company said it encouraged employees to speak up if they saw problems at the Company, former employees disagreed.  According to the *Wall Street Journal* article, employees who brought these issues to the Company's attention were subject to retaliation.  In fact, the *Wall Street Journal* article reported that at least eight former employees were fired after raising concerns with MiMedx's senior management.  Armstrong, for example, explained that she complained to executives, including defendant Petit, about what she considered improprieties, such

---

[7] A true and correct copy of the July 23, 2018 *Wall Street Journal* article is attached hereto as Exhibit A.

as third-party distributors overcharging hospitals for MiMedx products.  Despite defendant Petit assuring her that he "would fix the problem," the misconduct continued and she was fired soon after her complaint.  Two former MiMedx regional sales directors reported similar experiences:  (1) Jennifer R. Scott explained that she was fired after identifying to her supervisors the mislabeling of surgical implants, and (2) Tom Tierney reported that he was fired roughly a week after reporting to defendant Petit and the Board what he called "a mind-boggling level of sales and accounting irregularities.".

**MiMedx Failed to Disclose Its Financial Ties to Physicians in Violation of Federal Law**

77.    As the Company came under scrutiny for its improper revenue recognition scheme, other wrongdoing at MiMedx also began to come to light.  On February 22, 2018, *The Wall Street Journal* published an article titled "MiMedx, Fast-Growing Developer of Tissue Graft Products, Didn't Report Payments to Doctors,"  reporting that MiMedx violated the Physician Payments Sunshine Act by failing to disclose payments the Company made to more than twenty doctors.[8] MiMedx's executives contended that its products, made from donated placental

---

[8] The Physician Sunshine Act requires most biotechnology companies and drug and medical-device manufacturers to disclose payments or gifts they make to doctors and teaching hospitals.

tissue, were not among those that required a disclosure of doctor payments. MiMedx's website stated that it had "received an opinion from CMS which confirms that MiMedx does not have a need to report at this time." However, Tony Salters, a spokesperson for the Centers for Medicare and Medicaid Services ("CMS"), the governmental agency that oversees the program, told *The Wall Street Journal* that the agency does not provide such opinions in writing or otherwise; rather it provides general guidance that companies can consider.[9]

**MiMedx Forced the VA to Buy More Expensive Products Than Was Necessary and Engaged in Suspicious Financial Arrangements with VA Doctors**

78. On October 5, 2018, *The Wall Street Journal* published an article titled "MiMedx Kept Cheaper Products Out of Its Offerings to VA Hospitals," reporting that MiMedx was under investigation by the Defense Criminal Investigative Service, a unit of the Defense Department, relating to the Company's financial arrangements with a physician at an Augusta, Georgia-based VA hospital, and that a grand jury

---

[9] A true and correct copy of the February 22, 2018 *Wall Street Journal* article is attached hereto as Exhibit B.

had been commissioned to hear testimony on this matter.[10]  The *Wall Street Journal*

article stated:

> [A]n examination of the embattled company's dealings with Veterans
> Affairs hospitals and those run by the Defense Department shows that
> MiMedx's sales to these entities came at a high cost to taxpayers.
> According to former employees and company product lists, MiMedx
> limited the range of products it offered to federal buyers, forcing the
> government to buy more expensive products than it needed for some
> very common treatments.
>
> *          *          *
>
> The company's practices are under investigation by the Justice
> Department, the Commission, The Wall Street Journal has previously
> reported.
>
> The company's relationships with health-care providers at government
> run hospitals are also under scrutiny. Last month, a grand jury in
> Savannah, Ga., heard testimony about financial ties between MiMedx
> and a surgeon at the Dwight D. Eisenhower Army Medical Center in
> Fort Gordon, according to a person familiar with the matter. The
> investigation, which hasn't been previously reported, is being
> conducted by the Defense Criminal Investigative Service, a unit of the
> Defense Department.
>
> *          *          *
>
> Former employees say the company's questionable practices toward
> federal hospitals were more extensive than previously known.
>
> For example, MiMedx had one set of product offerings for federal
> customers and others for private hospitals and doctors' offices, internal

---

[10] A true and correct copy of the October 5, 2018 *Wall Street Journal* article is
attached hereto as Exhibit C.

documents show. At Veterans Affairs and Department of Defense hospitals, for example, MiMedx didn't offer the small sizes of two popular products it offered elsewhere; as a result, these accounts had to buy bigger, more expensive offerings for smaller treatments, former employees said.

\*     \*     \*

Unlike other manufacturers of amniotic-tissue products, MiMedx doesn't report its financial arrangements with health-care providers like Dr. Martin. Under a 2013 law, drug companies must report to a government agency payments made to medical professionals for research, consulting, speaking fees and travel costs.

Earlier this year, the Journal identified at least 20 doctors who had recently received money, MiMedx shares or stock options from the company for research, consulting or other activities.

**The Individual Defendants Issue Improper Statements Concerning the Company's Internal Controls and Financial Condition**

79.   The   Individual   Defendants   disseminated   numerous   improper statements concerning the Company's internal controls and its financial condition from at least March 2013 to January 2018.  In particular, the Individual Defendants repeatedly boasted that the Company's "disclosure controls and procedures were effective," while highlighting MiMedx's purportedly impressive sales and revenue growth.  In reality, the Company (i) operated with materially weak internal controls over financial reporting and accounting and (ii) improperly recognized revenue throughout this time.

80.    On March 7, 2013, MiMedx issued a press release announcing the Company's financial and operating results for the fourth quarter and fiscal year ended December 31, 2012.  The Company reported revenue of $27.1 million for the fiscal year and $10.5 million for the quarter.  Defendant Petit highlighted the "record revenue" and "excellent year" MiMedx had, emphasizing that the Company "produced revenue growth of over three times the previous year."

81.    One week later, on March 15, 2013, MiMedx filed its Annual Report on Form 10-K with the SEC for the fourth quarter and fiscal year ended December 31, 2012 (the "2012 Form 10-K"), which reaffirmed the Company's financial results previously announced that month.  The 2012 Form 10-K was signed by defendants Petit, Senken, Bleser, Dewberry, Evans, Hack, Koob, Papasan, Taylor, and Yeston and stated that defendants Petit and Senken had evaluated the effectiveness of the Company's disclosure controls and procedures.  The 2012 Form 10-K improperly claimed that MiMedx's disclosure controls and procedures were "designed to provide reasonable assurance that information required to be disclosed by the Company in [SEC filings was accurate]," and that the Company's disclosure controls and procedures were effective.  The 2012 Form 10-K stated:

> *We maintain "disclosure controls and procedures" within the meaning of Rule 13a-15(e) of the Securities Exchange Act of 1934, as amended, or the Exchange Act. Our disclosure controls and procedures are designed to provide reasonable assurance that*

*information required to be disclosed by the Company in the reports filed under the Exchange Act, such as this Annual Report on Form 10-K, is recorded, processed, summarized and reported within the time periods specified in the U.S. Securities and Exchange Commission's rules and forms.* Our disclosure controls and procedures include controls and procedures designed to provide reasonable assurance that such information is accumulated and communicated to our management, including our Chief Executive Officer and Chief Financial Officer, as appropriate, to allow for timely decisions regarding required disclosure.

82.    In addition, the 2012 Form 10-K stated that the Company's "internal control over financial reporting [is] effective" and that no material changes in the Company's internal controls over financial reporting had occurred during the quarter.  Specifically, the 2012 Form 10-K stated that there was "no change in our internal control over financial reporting that occurred during our latest fiscal quarter that has materially affected, or is reasonably likely to materially affect, our internal control over financial reporting."

83.    The 2012 Form 10-K was certified as accurate by defendants Petit and Senken pursuant to the Sarbanes-Oxley Act of 2002 ("SOX").  Defendants Petit's and Senken's certifications acknowledged their responsibility "for establishing and maintaining disclosure controls and procedures … and internal control over financial reporting … for [MiMedx]" and incorrectly stated that they had:

> (a)    designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the

registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

(b)     designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

(c)     evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this annual report based on such evaluation; and

(d)     disclosed in this annual report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting.

84.     Defendants Petit and Senken also falsely asserted that they had disclosed any deficiencies and material weaknesses in the Company's internal controls, including:

(a)     All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

(b)     Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

85.     On May 1, 2013, MiMedx issued a press release announcing the Company's financial and operating results for the first quarter ended March 31, 2013.  The Company reported revenue of $11.6 million for the quarter.  Defendant Petit boasted that the Company "increased revenue three fold over the prior year first quarter and continued to produce strong gross profit margins, equaling [its] fourth quarter of 2012 record gross margins of 84%."

86.     The following week, on May 10, 2013, MiMedx filed with the SEC its Quarterly Report on Form 10-Q for the first quarter ended March 31, 2013 (the "Q1 2013 Form 10-Q").  The Q1 2013 Form 10-Q reaffirmed the above announced financial results and claimed that the Company's disclosure controls and procedures were effective.  The Q1 2013 Form 10-Q was signed by defendant Senken and was certified as accurate by defendants Petit and Senken pursuant to SOX.  These certifications were substantially similar to the certifications detailed in ¶¶ 83-84 above.

87.     On July 31, 2013, the Company issued a press release announcing its financial and operating results for the second quarter ended June 30, 2013.  The Company reported revenue of $13.51 million for the quarter.  In the press release

defendant Petit highlighted the Company's rapid growth, explaining that the Company's total revenues were up more than 175% compared to the same period in the prior year.

88.     The following week, on August 8, 2013, MiMedx filed with the SEC its Quarterly Report on Form 10-Q for the second quarter ended June 30, 2013 (the "Q2 2013 Form 10-Q").  The Q2 2013 Form 10-Q reaffirmed the Company's financial results previously announced earlier that month and claimed that the Company's disclosure controls and procedures were effective.  The Q2 2013 Form 10-Q was signed by defendant Senken, and was certified as accurate by defendants Petit and Senken pursuant to SOX.  These certifications were substantially similar to the certifications detailed in ¶¶ 83-84 above.

89.     On October 30, 2013, MiMedx issued a press release announcing the Company's financial and operating results for the third quarter ended September 30, 2013.  The Company reported revenue of $16.1 million for the quarter.  The press release highlighted the Company's strong third quarter performance and included statements by defendant Petit touting the Company's impressive revenue growth: "We are pleased with our performance this quarter.  We exceeded the $16.0 million upper range of our goal and achieved greater than a 100% increase over our 2012

third quarter revenue. This was our 8th straight quarter where we met or exceeded the upper end of our revenue forecast."

90.     The following week, on November 8, 2013, MiMedx filed with the SEC its Quarterly Report on Form 10-Q for the third quarter ended September 30, 2013 (the "Q3 2013 Form 10-Q").  The Q3 2013 Form 10-Q reaffirmed the Company's financial results announced earlier that month and claimed that the Company's disclosure controls and procedures were effective.  The Q3 2013 Form 10-Q was signed by defendant Senken and was certified as accurate by defendants Petit and Senken pursuant to SOX.  These certifications were substantially similar to the certifications detailed in ¶¶ 83-84 above.

91.     On February 26, 2014, MiMedx issued a press release announcing the Company's financial and operating results for the fourth quarter and fiscal year ended December 31, 2013.  The Company reported revenue of $52.9 million for the fiscal year and $18 million for the quarter.  In the press release, defendant Petit touted the Company's "strong quarter-over-quarter growth," and highlighted that MiMedx "more than doubled [its] revenue over 2012."

92.     The following week, on March 4, 2014, MiMedx filed its Annual Report on Form 10-K with the SEC for the fourth quarter and fiscal year ended December 31, 2013 (the "2013 Form 10-K"), which reaffirmed the Company's

financial results previously announced that month.  The 2013 Form 10-K explained that a significant portion of the Company's revenues were derived from its federal contractors, specifically AvKARE.  According to the 2013 Form 10-K, distribution through the Company's agreement with AvKARE accounted for 56% of the Company's total revenue in 2013.

93.     The 2013 Form 10-K was signed by the majority of the Individual Defendants (Petit, Senken, Bleser, Dewberry, Evans, Hack, Koob, Papasan, Taylor, and Yeston) and certified as accurate pursuant to SOX by defendants Petit and Senken.  The 2013 Form 10-K again reassured the market that the Company's disclosure controls and procedures were effective.   These disclosure and certifications were substantially similar to the disclosures and certifications detailed in ¶¶ 83-84 above.

94.     On April 25, 2014, MiMedx issued a press release announcing the Company's financial and operating results for the first quarter ended March 31, 2014.  The Company reported revenue of $19.6 million for the quarter.  The press release quoted defendant Petit highlighting the Company's impressive revenue growth: "We are very pleased with our first quarter performance. We exceeded the upper end of our guidance range and marked our 10th straight quarter of meeting or

exceeding our revenue forecast.   Quarter-over-quarter revenue growth was extremely solid with a 77% increase over the first quarter of 2013."

95.     Approximately two weeks later, on May 12, 2014, MiMedx filed its Quarterly Report on Form 10-Q with the SEC for the first quarter ended March 31, 2014 (the "Q1 2014 Form 10-Q").   The Q1 2014 Form 10-Q reaffirmed the Company's financial results previously announced and claimed that the Company's disclosure controls and procedures were effective.   The Q1 2014 Form 10-Q was signed by defendant Senken, and was certified as accurate by defendants Petit and Senken pursuant to SOX.   These certifications were substantially similar to the certifications detailed in ¶¶ 83-84 above.

96.     On July 28, 2014, MiMedx issued a press release announcing the Company's financial and operating results for the second quarter ended June 30, 2014.  The Company reported revenue of $25.6 million for the quarter.  In the press release, defendant Petit highlighted the Company's "excellent" second quarter results, "impressive top line growth," and "record revenue" for the six months ended June 30, 2014.

97.     Roughly two weeks later, on August 11, 2014, MiMedx filed its Quarterly Report on Form 10-Q with the SEC for the second quarter ended June 30, 2014 (the "Q2 2014 Form 10-Q").   The Q2 2014 Form 10-Q reaffirmed the

Company's financial results previously announced and claimed that the Company's disclosure controls and procedures were effective.  The Q2 2014 Form 10-Q was signed by defendant Senken and was certified as accurate by defendants Petit and Senken pursuant to SOX.  These certifications were substantially similar to the certifications detailed in ¶¶ 83-84 above.

98.    On October 30, 2014, MiMedx issued a press release announcing the Company's financial and operating results for the third quarter ended September 30, 2014.  The Company reported revenue of $33.5 million for the quarter.  The press release highlighted the Company's "extremely impressive" sequential quarter-over-quarter revenue growth and "continuing strong period-over-period revenue growth" that significantly exceeded the upper end of MiMedx's quarterly revenue guidance.

99.    The following week, on November 10, 2014, MiMedx filed its Quarterly Report on Form 10-Q with the SEC for the third quarter ended September 30, 2014 (the "Q3 2014 Form 10-Q").  The Q3 2014 Form 10-Q reaffirmed the Company's financial results previously announced earlier that month and claimed that the Company's disclosure controls and procedures were effective.  The Q3 2014 Form 10-Q was signed by defendant Senken and was certified as accurate by defendants Petit and Senken pursuant to SOX.  These certifications were substantially similar to the certifications detailed in ¶¶ 83-84 above.

100.   On February 26, 2015, MiMedx issued a press release announcing the Company's financial and operating results for the fourth quarter and fiscal year ended December 31, 2014.  The Company reported revenue of $118.2 million for the fiscal year and $39.6 million for the quarter.  The press release highlighted the Company's "continually increas[ing] [] revenue growth rate," and noted that revenue from government accounts grew 18%.  Defendant Petit proclaimed in the press release that the results purportedly "demonstrate[d] the operating leverage that [the Company] ha[s] created," and defendant Taylor bragged that "wound care revenue is growing very rapidly in both the commercial payer and federal payer segments."

101.   Approximately two weeks later, on March 13, 2015, MiMedx filed its Annual Report on Form 10-K with the SEC for the fourth quarter and fiscal year ended December 31, 2014 (the "2014 Form 10-K"), which reaffirmed the Company's financial results previously announced.  The 2014 Form 10-K explained that a significant portion of the Company's revenues were derived from its federal contractors, specifically AvKARE.  According to the 2014 Form 10-K, distribution through the Company's agreement with AvKARE accounted for 34% of the Company's total revenue in 2014.

102.   In addition, the 2014 Form 10-K misrepresented the Company's revenue recognition controls, claiming that revenue was recorded in the proper quarter, as appropriate, stating:

Revenue Recognition

The Company sells its products primarily through a combination of a direct sales force, independent stocking distributors and third - party representatives in the U.S. and independent distributors in international markets.  The Company recognizes revenue when title to the goods and risk of loss transfers to customers, provided there are no material remaining performance obligations required of the Company or any matters of customer acceptance.  In cases where the Company utilizes distributors or ships products directly to the end user, it recognizes revenue according to the shipping terms of the agreement provided all revenue recognition criteria have been met.  A portion of the Company's revenue is generated from inventory maintained at hospitals or with field representatives.  For these products, revenue is recognized at the time the product has been used or implanted.  The Company records estimated sales returns, discounts and allowances as a reduction of net sales in the same period revenue is recognized.

103.   The 2014 Form 10-K was signed by the majority of the Individual Defendants, including defendants Petit, Senken, Bleser, Dewberry, Evans, Hack, Koob, Papasan, Taylor, and Yeston, and certified as accurate pursuant to SOX by defendants Petit and Senken.  The 2014 Form 10-K again reassured the market that the Company's disclosure controls and procedures were effective.   These certifications were substantially similar to the disclosures and certifications detailed in ¶¶ 83-84 above.

104.   On April 27, 2015, MiMedx issued a press release announcing the Company's financial and operating results for the first quarter ended March 31, 2015.  The Company reported revenue of $40.8 million for the quarter.  In the press release, defendant Petit boasted that this quarter marked the "fourteenth consecutive quarter of meeting or exceeding revenue guidance" and defendant Taylor highlighted the Company's "achievement of hitting the upper end of [its] revenue range."

105.   A few days later, on May 1, 2015, MiMedx filed its Quarterly Report on Form 10-Q with the SEC for the first quarter ended March 31, 2015 (the "Q1 2015 Form 10-Q").  The Q1 2015 Form 10-Q reaffirmed the Company's financial results announced the previous week and claimed that the Company's disclosure controls and procedures were effective.  The Q1 2015 Form 10-Q was signed by defendant Senken and was certified as accurate by defendants Petit and Senken pursuant to SOX.  These certifications were substantially similar to the certifications detailed in ¶¶ 83-84 above.

106.   On July 30, 2015, MiMedx issued a press release announcing the Company's financial and operating results for the second quarter ended June 30, 2015.  The Company reported revenue of $45.7 million for the quarter.  In the press release, defendant Petit touted the Company's "excellent" second quarter results and

"record revenue" for the six-month period ended June 30, 2015.   According to defendant Taylor, wound care revenue growth was a result of "market share gains and expanded product usage."

107.   The following week, on August 7, 2015, MiMedx filed its Quarterly Report on Form 10-Q with the SEC for the second quarter ended June 30, 2015 (the "Q2 2015 Form 10-Q").   The Q2 2015 Form 10-Q reaffirmed the Company's financial results previously announced and claimed that the Company's disclosure controls and procedures were effective.   The Q2 2015 Form 10-Q was signed by defendant Senken and was certified as accurate by defendants Petit and Senken pursuant to SOX.   These certifications were substantially similar to the certifications detailed in ¶¶ 83-84 above.

108.   On October 29, 2015, the Company issued a press release announcing the Company's financial and operating results for the third quarter ended September 30, 2015.   The Company reported revenue of $33.5 million for the quarter.   In the press release, defendant Petit touted the Company's "strong performance," noting that both third quarter revenue and EPS exceeded securities analysts' expectations.

109.   The following week, on November 6, 2015, MiMedx filed its Quarterly Report on Form 10-Q with the SEC for the third quarter ended September 30, 2015 (the "Q3 2015 Form 10-Q").   The Q3 2015 Form 10-Q reaffirmed the Company's

financial results previously announced and claimed that the Company's disclosure controls and procedures were effective.  The Q3 2015 Form 10-Q was signed by defendant Senken and was certified as accurate by defendants Petit and Senken pursuant to SOX.  These certifications were substantially similar to the certifications detailed in ¶¶ 83-84 above.

110.   On February 23, 2016, MiMedx issued a press release announcing the Company's financial and operating results for the fourth quarter and fiscal year ended December 31, 2015.  The Company reported revenue of $187.3 for the fiscal year and $51.8 million for the quarter.   In the press release, defendant Petit highlighted the Company's consistent quarter-over-quarter revenue growth and noted that the fourth quarter of 2015 marked the seventeenth consecutive quarter the Company met or exceeded its revenue guidance.

111.   Roughly one week later, on February 29, 2016, MiMedx filed its Annual Report on Form 10-K with the SEC for the fourth quarter and fiscal year ended December 31, 2015 (the "2015 Form 10-K"), which reaffirmed the Company's financial results previously announced that month.  The 2015 Form 10-K explained that a significant portion of the Company's revenues were derived from its federal contractors, specifically AvKARE.  According to the 2015 Form 10-K,

distribution through the Company's agreement with AvKARE accounted for 24% of the Company's total revenue in 2015.

112.   In addition, the 2015 Form 10-K explained the Company's revenue recognition practices, and stated that revenue was recorded in the appropriate quarter:

> *Revenue Recognition and Sales Returns, Discounts, and Allowances Accruals*
>
> The Company sells its products primarily through a combination of a direct sales force, independent stocking distributors and third - party representatives in the U.S. and independent distributors in international markets.  The Company recognizes revenue when title to the goods and risk of loss transfers to customers, provided there are no material remaining performance obligations required of the Company or any matters of customer acceptance.  In cases where the Company utilizes distributors or ships products directly to the end user, it recognizes revenue according to the shipping terms of the agreement provided all revenue recognition criteria have been met. A portion of the Company's revenue is generated from inventory maintained at hospitals or with field representatives.  For these products, revenue is recognized at the time the product has been used or implanted. The Company records estimated sales returns, discounts and allowances as a reduction of net sales in the same period revenue is recognized.

113.   The 2015 Form 10-K was signed by the majority of the Individual Defendants (Petit, Senken, Bleser, Dewberry, Evans, Hack, Koob, Papasan, Taylor, and Yeston) and certified as accurate pursuant to SOX by defendants Petit and Senken.  The 2015 Form 10-K again reassured the market that the Company's disclosure controls and procedures were effective.   These disclosure and

certifications were substantially similar to the disclosures and certifications detailed in ¶¶ 83-84 above.

114.   On April 25, 2016, MiMedx issued a press release announcing the Company's financial and operating results for the first quarter ended March 31, 2016.  The Company reported revenue of $53.4 million for the quarter.

115.   Approximately two weeks later, on May 10, 2016, MiMedx filed its Quarterly Report on Form 10-Q with the SEC for the first quarter ended March 31, 2016 (the "Q1 2016 Form 10-Q").   The Q1 2016 Form 10-Q reaffirmed the Company's financial results previously announced and claimed that the Company's disclosure controls and procedures were effective.  The Q1 2016 Form 10-Q was signed by defendant Senken and was certified as accurate by defendants Petit and Senken pursuant to SOX.   These certifications were substantially similar to the certifications detailed in ¶¶ 83-84 above.

116.   On July 26, 2016, MiMedx issued a press release announcing the Company's financial and operating results for the second quarter ended June 30, 2016.   The Company reported revenue of $57.3 million for the quarter.   In the announcement, defendant Petit touted the considerable progress MiMedx was making across all of its product lines, particularly in its Wound Care business.

117.   The following week, on August 2, 2016, MiMedx filed its Quarterly Report on Form 10-Q with the SEC for the second quarter ended June 30, 2016 (the "Q2 2016 Form 10-Q").   The Q2 2016 Form 10-Q reaffirmed the Company's financial results announced the week prior and claimed that the Company's disclosure controls and procedures were effective.   The Q2 2016 Form 10-Q was signed by defendant Senken and was certified as accurate by defendants Petit and Senken pursuant to SOX.   These certifications were substantially similar to the certifications detailed in ¶¶ 83-84 above.

118.   On October 27, 2016, the Company issued a press release announcing the Company's financial and operating results for the third quarter ended September 30, 2016.   The Company reported revenue of $64.4 million for the quarter. Defendant Petit bragged in the press release that the Company once again exceeded its revenue guidance and "continue[s] to add to [its] record of 20 consecutive quarters of sequential revenue growth."   Likewise, in the announcement defendant Taylor touted the Company's "very strong growth," particularly in its Wound Care business.

119.   The following week, on November 8, 2016, MiMedx filed its Quarterly Report on Form 10-Q with the SEC for the third quarter ended September 30, 2016 (the "Q3 2016 Form 10-Q").   The Q3 2016 Form 10-Q reaffirmed the Company's

financial results previously announced and claimed that the Company's disclosure controls and procedures were effective. The Q3 2016 Form 10-Q was signed by defendant Senken and was certified as accurate by defendants Petit and Senken pursuant to SOX. These certifications were substantially similar to the certifications detailed in ¶¶ 83-84 above.

**The Individual Defendants Fail to Investigate and Respond in Good Faith to Credible Allegations of Improper Revenue Recognition Practices and Other Misconduct at the Company**

120. On December 15, 2016, two former MiMedx employees, Jess Kruchoski ("Kruchoski") and Luke Tornquist ("Tornquist"), commenced a whistleblower lawsuit against MiMedx, alleging that their employment with the Company was wrongfully terminated after they jointly reported and opposed a channel-stuffing scheme at MiMedx that involved AvKARE.[11]

121. According to Kruchoski and Tornquist, on November 2, 2016, they submitted a joint report to "MiMedx management and legal counsel about MiMedx's fraudulent revenue recognition scheme in violation of [SOX] ...."[12]

---

[11] *See generally* Complaint and Jury Demand, *Kruchoski, et al. v. MiMedx Group, Inc., et al.*, Case No. 0:16-cv-04171 (D. Minn. Dec. 15, 2016).

[12] *Id.* at ¶ 69.

122.   Kruchoksi's and Tornquist's joint report was reviewed by MiMedx management. In litigation brought by the Company against another former employee, Michael Fox ("Fox"), MiMedx expressly admits that: "[O]n December 12, 2016, MiMedx held a meeting of senior leadership in Marietta, Georgia. MiMedx admits that Parker H. Petit, William Taylor, Debbie Dean, Michael Carlton, Christopher Cashman, Kevin Lilly, Stephen Blocker, Nicholas Andolino, William Wagner, and Thornton Kuntz attended that meeting."[13]   Furthermore, MiMedx admits that "allegations by Kruchoski and Tornquist about MiMedx's revenue recognition practices was one of many issues discussed during the December 12, 2016 meeting."[14]

123.   On the same day the joint report was reviewed by the highest-ranking officers at the Company, MiMedx simultaneously fired Kruchoski and Tornquist. The Company then commenced lawsuits against each individual based on purported breaches of their employment agreements and other duties.

---

[13]  MiMedx Group, Inc. Answer and Affirmative Defenses to Michael Fox's Seconded Counterclaim, *MiMedx Group, Inc. v. Fox*, Case No. 1:16-CV-11715 (N.D. Ill. February 14, 2018) at ¶ 83.

[14] *Id.* at ¶ 84.

124.   On December 15, 2016, MiMedx issued a press release titled "MiMedx Comments on Meritless Lawsuit" in response to the whistleblower lawsuit initiated by Kruchoski and Tornquist that day.   In the press release, defendant Petit characterized the former employees' allegations as "not factual and fallacious."

125.   Four days later, the Company held a conference call to discuss its fiscal year 2017 outlook.  During the call, defendant Petit disclosed that the Board had established a purported "independent committee" to review the former employees' allegations:

> Our Board set up an independent committee to review all the allegations in [Kruchoski and Tornquist's] lawsuit. They have been working for well over a month on the project. ***And from what I'm aware of, thus far, there's nothing to indicate there's any merit to these former employee' claims.***
>
> ***I hope to be able to publish enough of those results to make the shareholders realized that this lawsuit would be best to be recognized as frivolous***. *We hope to do that within a matter of days, not weeks. My personal belief is these charges are actually false and baseless. I expect that through review by this Board committee, the documents will attest that fact....*
>
> ***I hope I made it clear that Management is not a bit concern[ed] about the outcome of the lawsuit.*** It will run its course. We have done nothing to these two employees other than terminate them for breaches of their contract with us….
>
> As I said, I hope to have a press release out very shortly with the principle points that had been determined by this investigation. I will also apologize for just another step in our quote wall of worry as we continue to be very effective in growing this corporation.

126.   Later in the call, both Petit and Taylor indicated that the Board and its Audit Committee (then comprised of defendants Bleser, Dewberry, Evans and Papasan) was conducting the investigation.  Petit also described his interaction with the "investigation committee" (i.e., the Audit Committee) as follows:

> ***So, now my discussion with the investigation committee is I hope and would suggest highly that you when you're investigation is complete that we put out a press release. We don't have to necessarily go to every nuance of it. But shareholders need to clearly understand that in their opinion there's nothing here that's going to cost this company some kind of accounting issue or other SCC [sic: SEC] matter or anything like that.***

> My knowledge of the situation is that's not going to be the case. But I believe it's in our interest to see that that information gets out to shareholders quickly. And I said in my comment that I think this is going to be a matter of days and not weeks. Now, I could miss that from conversations that I was given but I think it's going to be days not weeks.

> (Emphasis added).

127.   True to Petit's word, on December 27, 2016, the Company issued a press release announcing the "preliminary findings" of the Audit Committee's investigation "regarding allegations made by two former employees against the Company."  The press release stated:

> As the Company has previously stated publicly, management believes the claims made in the lawsuit brought by these former employees, including claims made about the Company's sales practices, are without merit, and the Company does not anticipate any material effect on the Company's financial statements resulting from these allegations.

\*   \*   \*

*The Audit Committee has advised the Company's management and the Board of Directors that it has found no credible evidence to indicate that any changes to previously issued financial statements are necessary in light of these allegations.*

(Emphasis added).

128.   On January 9, 2017, the SEC sent MiMedx a comment letter inquiring into the Company's financial disclosures relating to its arrangement with AvKARE. The SEC asked that MiMedx "tell us the significant terms of your agreement with AvKare, including payment terms and rights of return," as well as the Company's "policies for recognizing revenues for sales to them."  The Company responded to the SEC's comment letter on January 23, 2017.

129.   On February 6, 2017, the Company issued a press release announcing that the Board approved a $10 million increase to the Company's Share Repurchase Program.  As the press release made clear, the announcement of the repurchase was designed to underscore the Individual Defendants' message to the Company's stockholders that there was no truth to the claims made by former employees regarding the Company's improper sales and accounting practices.   Quoting defendant Petit, the press release stated:

> … "MiMedx management is just as frustrated with the volatility of our shares as are our shareholders.  We know there are ongoing issues associated with naked short selling in our stock. These naked short

selling practices are illegal, and we are continuing to be diligent in bringing to light the perpetrators of these illegal activities.

"We believe the 'fake allegations and fake news' should be discredited when the Company publishes the key findings of the Report from the Audit Committee and the 2016 audited financial results on February 22nd …"

130.   On February 23, 2017, MiMedx issued a press release announcing the Company's financial and operating results for the fourth quarter and fiscal year ended December 31, 2016.  In the press release, defendant Petit emphasized that the Company's fourth quarter performance marked "21 consecutive quarters of sequential revenue growth and 20 of 21 quarters of meeting or exceeding [MiMedx's] revenue guidance."

131.   The press release also disclosed that the Company's final revenue figures were $1.8 million lower than the figure issued in prior guidance due to MiMedx's decision to increase its sales returns and allowances reserves for AvKARE.  In the press release, Petit stated that the $1.8 million charge resulted from a decision to take "a very conservative approach related to the transition of certain government accounts from a distributor's Federal Supply Schedule (FSS) contract to our own FSS contract."  Defendant Petit further stated that "[i]n connection with that transition, we have an obligation to repurchase AvKare's remaining inventory, if any, within 90 days following the expiration of the agreement on June 30, 2017,"

but that MiMedx expected "AvKare's inventory to be minimal based on AvKare's obligation to use commercially reasonable efforts to achieve target sales levels over the remaining term of the agreement."

132.   That same day, MiMedx hosted a conference call with investors and securities analysts to discuss the Company's fourth quarter 2016 results.  During the call, Petit stated that the $1.8 million revenue reduction "came up late in our detailed review process of AvKare's inventory." Defendant Petit further stated that "we felt it was prudent to increase our sales returns and allowances reserves specifically for AvKare," and noted that "[o]ver the last year, we've continued to rapidly reduce the inventory that AvKare's purchased[.]"

133.   The $1.8 million AvKARE reserve charge was a significant focus of securities analysts during the February 23, 2017 conference.  During the conference, analysts questioned, among other things, whether the reserve charge had any connection to the former employees' allegations:

**Mike Matson** - Needham & Company - Analyst

I guess I just wanted to start with the $1.8 million revenue reduction. So just curious, does that -- is that related at all to this channel stuffing allegation and the subsequent investigation?

**Pete Petit** - MiMedx Group, Inc. - Chairman and CEO

Well, the answer to that is no. It's related to, as we stated, the termination date of the AvKare contract and the legal agreement associated with that.

**Mike Matson** - Needham & Company - Analyst

Okay. But I guess why take the revenue back now versus in '17 when the distribution agreement actually ends, I guess?

**Mike Senken** - MiMedx Group, Inc. - CFO

According to GAAP, we have to estimate what the liability will be at the end of the contract. And because we basically shipped the product in 2016, because you're shipping it with a right to return, you basically have to reserve for whatever you think is going to be returned.

Now speaking to the timing of this, we attempted to estimate as best as possible what we thought was in the AvKare inventory prior to that prerelease of revenue. But as Pete mentioned earlier, our inventory is in 100 different facilities and a number of different departments within those facilities. And so, we undertook a process over the course of January in terms of somewhat validating what we could figure out in terms of what was sitting in stock, looking at it in terms of what the demand was and what the usage was in each one of those facilities and then came to this conclusion that, conservatively speaking, we wanted to make sure that we had everything covered.

And so it was really from a GAAP perspective that we had to go through that process. Quite frankly, our thoughts internally are that there's enough demand out there that most, if not all, of that product can be utilized. But again, you have to be somewhat conservative, and that's where we were.

We just got caught up in a desire to give a feel to The Street in terms of where we were leading into JPMorgan. Because of this unique singular contract and event which shouldn't occur again, we shouldn't have that repeat itself.

**Mike Matson** - Needham & Company - Analyst

So, I guess, you didn't know that you were going to have to go through this exercise when you preannounced. Or if you did know, you just didn't realize it was going to be this material, I guess, the amount that you had to increase the reserves by?

**Mike Senken** - MiMedx Group, Inc. - CFO

Well, again, when you talk about the complexity of trying to go out and determine what's in that inventory across the country, you do the best estimates you can leading up to that point. But quite frankly, we wanted to be -- and part of this is, you also have to look at what's happening with the rate of implants at all these different facilities, and these things can change dramatically one way or the other. And so it's not as easy to estimate as you might think.

**Pete Petit** - MiMedx Group, Inc. - Chairman and CEO

Mike, this is Pete. This contract has gone on for some years. It's been very smooth, generally speaking; strong relationship between both the distributor, ourselves and the VA facilities, but it's coming to an end, okay? It's coming to an end June 30. And with that particular closure to the contract, that required some extra analysis and scrutiny. So the process, there's no issue here in terms of demand falling off or some other set of issues. It's the fact the contract's coming to closure, and in so doing, the accounting regs, GAAP, et cetera, required us to do certain things. And in our desire to try to keep shareholders always very informed, we have traditionally given some insight into quarterly revenues within the shortest period of time as we could at the end of a quarter. And like I said at the start, I've never had, in my 35 years of running public companies, something like this come up. It's a small amount, 0.6%, but the fact is it's a change, and no one likes change. But facts are this is a contract coming to closure, coming to an end, and as such, we had to do some extra work here.

134.   Undeterred by the SEC's and securities analysts' inquiries into the

Company's arrangement with AvKARE, on March 1, 2017, the Company issued a

press release announcing that the "Audit Committee … has completed its

investigation and found no merit regarding allegations of wrongdoing that were made by two former employees against the Company." The press release further stated that the Audit Committee "confirmed there is no credible evidence of any wrongdoing on behalf of members of MiMedx management," and that its "investigation determined that the Company has appropriately recognized revenue and found no credible evidence to indicate that any changes to the Company's previously issued financial statements are necessary in light of the former employees' allegations." The press release stated that the Audit Committee's findings were submitted to and approved by the full Board.

135.  Two members of the Audit Committee tasked with conducting the investigation into the former employees' allegations, defendants Bleser and Dewberry, have close, longstanding ties to defendant Petit that call into question their ability to protect the best interests of the Company. Both men were appointed to the Board shortly after Petit became Chairman and CEO of MiMedx in February 2009.

136.  In 1970, Petit founded a company known as Healthdyne, which later became known as Healthdyne Information Enterprises, then HIE, Inc., and, eventually, Healthcare.com. Defendant Bleser served as CFO of Healthdyne, and its successor Healthcare.com, from March 1995 through May 1998. From October

1997 through July 1998, defendant Bleser also served as director of that company. He continued to act as a consultant to Healthdyne from July 1998 through June 2004. Beginning in July 2001, defendant Bleser's consulting agreement with Healthdyne paid him approximately $100,000 per year.

137.    Defendant Dewberry has even stronger ties to defendant Petit. Dewberry and Petit were fraternity brothers at Georgia Tech in the early 1960s. Furthermore, Dewberry served as President and COO of Healthdyne from September 1987 through March 1992, having previously served there as an Executive Vice President from August 1984 through September 1987.  Defendant Dewberry also served as a director of Healthdyne from February 1981 through March 1996, and as Vice Chairman of Healthdyne from 1992 to 1996.  Indeed, in an interview, defendant Petit stated that he and defendant Dewberry are "very close" and that Dewberry "has been a member of the executive team for all of our businesses over the years."

138.    In addition to their roles at Healthdyne, defendants Bleser and Dewberry also both served on the board of directors of another Petit company, Matria Healthcare ("Matria").  Matria was formed through the merger of Healthdyne Maternity Management, a division of Healthdyne, Inc., and Tokos Medical Corporation, on March 8, 1996.  Defendant Petit served as Chairman of the Board

of Matria from that date until Inverness Medical Innovations acquired Matria in May 2008 (the "Inverness Acquisition").  Defendant Petit also served as CEO of Matria from October 2000 until the Inverness Acquisition and as President and CEO from October 2000 through February 2003.  Defendant Bleser served on the Board of Directors of Matria from October 2004 until the Inverness Acquisition, and defendant Dewberry served on the Board of Directors of Matria from May 2006 until the Inverness Acquisition.

139.   In addition to defendants Bleser's and Dewberry's longstanding ties to Petit, none of the Audit Committee members could independently evaluate the allegations made by the former employees because such allegations implicated the Audit Committee members' own misconduct in failing to oversee the Company's accounting and financial reporting functions.  The fact that the Audit Committee's investigation was assisted by the Company's then-current external auditor, Cherry Bekaert LLP ("Cherry Bekaert"), does little to dissuade these concerns.  Indeed, similar to the Audit Committee members, Cherry Bekaert could not properly investigate its own purported misconduct.  Put simply, the Audit Committee could not be trusted to conduct a reasonable and good faith investigation into the serious allegations of wrongdoing and should never have been entrusted with the internal investigation on behalf of MiMedx.

140.   Also on March 1, 2017, MiMedx filed with the SEC its Annual Report on Form 10-K for the fourth quarter and fiscal year ended December 31, 2016 (the "2016 Form 10-K"), which reaffirmed the Company's financial results previously announced.   The 2016 Form 10-K explained that management had identified a deficiency in the Company's internal control over financial reporting relating to the its accounting for income taxes.   The Company admitted that the deficiency constituted a material weakness in its internal controls over financial reporting, but assured the investing public that it had developed and begun implementing a remediation plan to address the control deficiency that led to the material weakness. Among other things, the remediation plan included more involvement by defendants Senken and Cranston.   According to the 2016 Form 10-K, these measures were designed both to remediate the material weakness and "generally strengthen [MiMedx's] internal control over financial reporting."

141.   In addition, the 2016 Form 10-K summarized the Company's revenue recognition practices with regard to its agreement with AvKARE, and claimed that revenues were properly recorded in the appropriate quarters:

*Revenue Recognition*

The Company sells its products through a combination of a direct sales force, independent stocking distributors and third - party representatives in the U.S. and independent distributors in international markets. The Company recognizes revenue when title to the goods and

risk of loss transfers to customers, provided there are no material remaining performance obligations required of the Company or any matters of customer acceptance. The Company records revenues from sales to our independent stocking distributors at the time the product is shipped to the distributor. Our stocking distributors, who sell the products to their customers or sub-distributors, contractually take title to the products and assume all risks of ownership at the time of shipment. Our stocking distributors are obligated to pay us the contractually agreed upon invoice price within specified terms regardless of when, if ever, they sell the products. Our stocking distributors do not have any contractual rights of return or exchange other than for defective product or shipping error; however, in limited situations, we do accept returns or exchanges at our discretion.

Some of the Company's sales to Government accounts, including the Department of Veterans Affairs, are made through a distributor relationship with AvKARE, which is a veteran-owned General Services Administration Federal Supply Schedule (FSS) contractor. The Company's agreement with AvKARE expires, subject to certain for-cause termination rights, on June 30, 2017. The Company may also elect to terminate the agreement without cause and pay a termination fee to AvKARE as specified in the agreement. Upon termination of the agreement, the parties may mutually agree to extend the agreement or the Company has an obligation to repurchase AvKARE's remaining inventory, if any, within ninety (90) days in accordance with the terms of the Agreement. At the end of the term, the parties expect AvKARE's inventory to be minimal, based upon AvKARE's obligation to use commercially reasonable efforts to achieve target sales levels over the remaining term of the agreement.

***We continually evaluate new and current customers, including our stocking distributors, for collectability based on various factors including past history with the customer, evaluation of their credit worthiness, and current economic conditions. We only record revenue when collectability is reasonably assured.*** A portion of the Company's revenue is generated from inventory maintained at hospitals or physician's offices.

*We make estimates of potential future sales returns, discounts and allowances related to current period product revenue and these are reflected as a reduction of revenue in the same period revenue is recognized.* We base our estimate for sales returns, discounts and allowances on historical sales and product return information, including historical experience and actual and projected trend information as well as projected sales returns based on estimated usage and contractual arrangements with AvKARE. These estimates have historically been consistent with actual results.

(Emphasis added).

142.  The 2016 Form 10-K was signed by the majority of the Individual Defendants (Petit, Senken, Bleser, Dewberry, Evans, Hack, Koob, Papasan, Taylor, and Yeston) and certified as accurate pursuant to SOX by defendants Petit and Senken.  These certifications were substantially similar to the certifications detailed in ¶¶ 83-84 above.

143.  The Company's announcement of the Audit Committee's findings and the disclosures contained in the Company's 2016 10-K did little to dissuade the SEC, which on March 20, 2017, issued another comment letter with over ten questions regarding the Company's financial disclosures relating to its arrangement with

AvKARE and MiMedx's revenue recognition practices.  MiMedx responded to that letter on April 18, 2017.[15]

144.  On April 28, 2017, MiMedx issued a press release announcing the Company's financial and operating results for the first quarter ended March 31, 2017.  The press release proclaimed that the Company experienced a "solid performance" in the first quarter, with a revenue increase of 36% for the first quarter of 2017, compared to the same quarter in 2016, and defendant Petit boasted that the Company exceeded the top end of [its] revenue guidance."

145.  A few days later, on May 1, 2017, MiMedx filed with the SEC its Quarterly Report on Form 10-Q for the first quarter ended March 31, 2017 (the "Q1 2017 Form 10-Q").  The Q1 2017 Form 10-Q reaffirmed the Company's financial results previously announced and claimed that the Company's disclosure controls and procedures were effective.  The Q1 2017 Form 10-Q was signed by defendant Senken and was certified as accurate by defendants Petit and Senken pursuant to SOX.  These certifications were substantially similar to the certifications detailed in ¶¶ 83-84 above.

---

[15] The Company's response confidentially attached an "Executive Summary of the Audit Committee's findings from its investigation."  Upon information and belief, this summary is not publicly available.

146.   On July 5, 2017, the Company announced that its PDA with AvKARE had expired "as planned," effective June 30, 2017.

147.   On July 26, 2017, MiMedx issued a press release announcing the Company's financial and operating results for the second quarter ended June 30, 2017.   In the press release, defendant Petit again touted the Company's remarkable consistency in meeting or beating revenue guidance (twenty five out of the last twenty six quarters).

148.   The following day, MiMedx hosted a conference call with securities analysts and investors to discuss the Company's second quarter 2017 results.  During the call, Petit stated that there was only "$50,000 in differences" in connection with the winding down of the Company's arrangement with AvKARE.   Petit further stated that he viewed this as "a credit to the AvKare and the MiMedx staff that over this five-year period, this is the only discrepancy that [w]e had found so far between their systems and our systems and our audits."

149.   During the call, an unidentified analyst again inquired as to the finality of the Company's previously disclosed $1.8 million AvKARE reserve charge. Defendant Senken replied that "[w]hen we booked that adjustment as of year-end, it was our intention for that to be final," but that"whether it's a hit to revenue or a hit to expense, ***all of those financial exposures are fully covered***.

150.  A few days later, on July 31, 2017, MiMedx filed with the SEC its Quarterly Report on Form 10-Q for the second quarter ended June 30, 2017 (the "Q2 2017 Form 10-Q").  The Q2 2017 Form 10-Q reaffirmed the Company's financial results announced the week prior and claimed that the Company's disclosure controls and procedures were effective.  The Q2 2017 Form 10-Q was signed by defendant Senken and was certified as accurate by defendants Petit and Senken pursuant to SOX.  These certifications were substantially similar to the certifications detailed in ¶¶ 83-84 above.

151.  Less than two weeks later, MiMedx replaced Cherry Bekaert as the Company's external auditor.  Specifically, on August 10, 2017, the Company announced that the Audit Committee "recently conducted" a process to identify a new external auditor for the year ending December 31, 2017.  As a result of this process, the Audit Committee approved the appointment of Ernst & Young ("EY") to replace Cherry Bekaert, effective August 4, 2017.

**The Individual Defendants Continued to Mislead the Market Even As MiMedx's Scheme Began to Unravel**

152.  In early September, an investigative news company, The Capital Forum, issued a report stating that it had confirmed that "[t]he VA Office of Inspector General (OIG) is conducting an investigation that involves documents related to MiMedx."  On September 7, 2017, the Company responded with a press

release acknowledging the investigation, but stating that it was not the subject of it.

The press release stated:

> MiMedx has been aware for some time of an ongoing investigation by the Department of Veterans Affairs ("VA") Office of Inspector General, but the Company is <u>not</u> a target of that investigation. The Company is assisting with the investigation as requested by the government. To the extent there has been any innuendo by The Capitol Forum or others that somehow MiMedx is a target, that is simply incorrect[.]

153.   Two weeks later, on September 20, 2017, two research groups—Aurelius Value and Viceroy Research—published separate reports expressing concerns about the risks of serious and pervasive fraud at MiMedx.  The Aurelius Value report, titled "MiMedx Flying Too Close to the Sun," highlighted a number of red flags indicating potential illegal activity at MiMedx.   Aurelius Value summarized its findings:

> We see large undiscounted channel stuffing and kickback risks lurking beneath the surface at MiMedx (NASDAQ: MDXG). This report specifically exposes:
>
> - Undisclosed related party transactions and entanglements with distributors, including a key MiMedx distributor that has been controlled by an insider. These relationships are especially problematic because secret ties to distributors have featured prominently in historical channel stuffing schemes.
>
> - Detailed allegations that MiMedx's channel stuffing scheme relies on at least three more distributors who have undisclosed special agreements involving millions in discounted product and favorable financing terms as "house accounts". Not only does the

-79-

alleged scheme now extend significantly beyond the VA, but MiMedx has allegedly manipulated its financials through multiple avenues to hit sales targets.

- Documents showing that over 40 podiatrists across the country, including the current President of the American Podiatric Medical Association, received undisclosed membership interests in a MiMedx reseller linked to MiMedx affiliates. The HHS Office of Inspector General has declared physician owned distributors as "inherently suspect" in a special fraud alert.

154.   Viceroy Research similarly reported that MiMedx had "serious issues in senior management, acquisitions, operations, and accounts…"  The Viceroy Research report explained that their investigation into MiMedx revealed evidence of channel-stuffing and noted that "the MiMedx-AvKARE supplier-distributor relationship [was] extremely suspicious."  In addition, Viceroy Research explained that their Freedom of Information Act ("FOIA") request was withheld by the SEC, suggesting that MiMedx was the target of an undisclosed SEC enforcement investigation.

155.   MiMedx once again denied these accusations, labeling the allegations of "channel-stuffing" in the Aurelius Value and Viceroy Research reports as "false," and sued each of the organizations for libel, slander, and defamation.  However, MiMedx was subsequently forced to dismiss its baseless lawsuits against the analysts.  In March, October and November 2018, the Company's claims against

Viceroy Research, Capitol Forum, and Aurelius Value, respectively, were dismissed with prejudice.

156.  On September 21, 2017, the Company issued a press release "announc[ing] its interactions with the [SEC]."  In the press release, defendant Petit disclosed that the Company has been "assembl[ing] summary documentation to supply to the SEC, which would include information from the investigation conducted by the Board of Directors and others."   Defendant Petit also acknowledged that the Company had "received a subpoena from the SEC that appears to relate to the former employees' allegations and is primarily related to the matters that were the subject of the Company's previously disclosed internal investigation."[16]  Defendant Petit also stated:

> The Company believes that the matters related to the subpoena were reviewed as part of the completed investigation conducted by the Audit Committee of the MiMedx Board of Directors, independent outside legal counsel, the Company's independent auditors, and executive management. …

\*        \*        \*

---

[16] Defendant Petit has expressly admitted that MiMedx received a subpoena from the SEC in **February 2017**—*i.e.*, approximately seven months before it was disclosed by the Company in September of that year.  *See* Parker H. Petit's Answer to Luke Tornquist's Verified Second Amended Counterclaims, *MiMedx Group, Inc. v. Tornquist*, Case No. 1:17-CV-00399-LMM (N.D. Ga. July 9, 2018), at ¶ 103 ("Mr. Petit states that MiMedx received a subpoena from the SEC in February 2017.").

"[W]e hope to clear up this inquiry relatively quickly.  We believe that the government's investigation will confirm our Audit Committee's prior findings."

157.  Also on September 21, 2017, MiMedx held a conference call with securities analysts and investors to discuss, among other things, "Short Selling Matters and Proactive Remedies."  During the call, Petit commented on its response to the former employees' allegations and interaction with regulators as follows:

> **As always, we did the right thing**. We did our investigation through the executive management, through our board, through our audit committee, through our outside attorneys, through our auditors, and we even hired an outside expert on revenue recognition….
>
> **Again, our organization has done the right thing. And this painful process will soon pass. I do not believe there will be anything that dismantles our rapid revenue and profit growth. I'll say that again. I do not believe there will be anything that transpires that dismantles our rapid revenue and profit growth. There are very few public companies that have the quality, compliance systems and the disciplines to administer them as we do.**
>
> **I hate to have to give you all this history in this amount of detail. However, all these recent allegations are questioning the honesty and integrity of this executive management. And frankly, that's the most disappointing to me.**

(Emphasis added).

158.  During the earnings call, defendant Petit specifically denied that MiMedx was engaged in channel-stuffing:

> Incidentally, for those of you who do not understand what channel stuffing is, I'll give you a brief explanation. It's where a manufacturer forces products on a distributor's shelves that will not be sold through

the system in a reasonable time period. The products are generally returned on some predetermined schedule or sit on the shelf unsold and cause future orders to be late because the products do not sell within a reasonable time period.

Generally, when this is taking place, the company's financial statements clearly show the trends. The accounts receivable build at levels that are way out of balance. MiMedx days sales outstanding in receivables had varied from about 70 days to 90 days. We're down near 90 days at this point….

\* \* \*

Our cash flows have been extremely strong. Therefore, we have not put product on distributors' shelves that did not move through the system in a reasonable amount of time.

In addition, our sales to distributors over the last 3 or 4 years have dropped dramatically because our business model is to make as many sales directly to end user customers as possible. We're now down to the point where we have less than 5% of annual revenues with distributors.

***MiMedx has used some consignment inventory over the years. That's where we put inventory in a hospital or a wound care center for the doctors to use at their convenience. However, the particular inventory is not billed and does not show up as revenue until it's actually implanted in the patient.***

(Emphasis added).

159.   Defendant Petit continued to deny that "malfeasance" had occurred at

MiMedx and touted the Company's "transparency":

If you'll sit back and reflect on all this and you reread our press releases carefully, because we've disclosed a lot of information on these issues, it's become their circus. It's really become their circus. It's unfortunate this has happened to a quality company, but quality organizations also have situations that must be managed. This will soon pass. ***To have the***

*quality of board members that we have, and that includes a recent member who was a former SEC Commissioner for 8 years to the Bush and Obama administrations, you have to give us some credit for having a great deal of business expertise and honesty and integrity. As I pointed out numerous times, I've run public health care companies for 36 years. There's very little I have not seen, experienced or certainly heard about. The other executives that are involved at MiMedx are also quality and very successful persons in their own rights. Again, you don't get to be the fastest growing public company in the United States with incompetence or corporate malfeasance.*

\* \* \*

*We've also been very open and transparent with our shareholders, as we've always done on these matters.* We've given you enough information from the lawsuits and written communications that we have obtained to put this issue in stark perspective. If you will think about what you've heard from this -- from a group of honest and experienced executives, in at least press releases, which if they are filled with misinformation can be very detrimental to the individuals versus what you've heard from short-sellers, who think they have no risk with publishing misinformation and lies, you should be able to put this in stark perspective.

(Emphasis added).

160. In a question and answer session with analyst Michael Stephen Matson of Needham & Company, LLC regarding certain allegations raised by the research groups, defendants Petit and Taylor doubled-down on their proclamation of innocence, and in the case of defendant Petit, falsely claimed that the Board's and Audit Committee's findings were public:

MICHAEL STEPHEN MATSON: … [I]n the press release on September 7, you did acknowledge that some of the terminated reps

-84-

have been providing gifts and meals to VA employees. And I understand that you view these particular people of sort of bad apples. But I guess, how can we get confident that those practices aren't more widespread among your broader sales force[?]

\*      \*      \*

WILLIAM CHARLES TAYLOR: … We have policies and procedures that explicitly prohibit that kind of behavior. We also have controls in place that should that behavior occur, we can typically pick it up. But if people operate outside of our controls, if they do something on their own, where we have no way of verifying what they've done or no knowledge of it, those are the kind of situations that we're talking on here. Because we have strong controls, we have strong policies that prohibit that kind of thing. …

PARKER H. PETIT:  Let me give you 2 other reasons why we're very comfortable. Number one, our audit committee, the board, outside law firm, auditors, and again, an outside consultant on revenue recognition, poured through -- as well as executive management poured through all these process, procedures, all the communications we could get our hands on, and subsequent communications we've gotten our hands on. I think that we know very well what was going on. ***And the board's report is public. We've made that public many, many months ago.*** And believe me, this board is a group of individuals that are very independent, this management group, Bill and I are on the board. ***But I can tell you if there was malfeasance, Bill Taylor and Pete wouldn't be here today.***

(Emphasis added).

161.   Similar proclamations – including the false statement that the Board's and Audit Committee's findings were publicized – were made by defendant Petit in response to a question from Kevin Michael Farschchi of Piper Jaffray Companies:

We have nothing in this corporation at MiMedx to be concerned about. And if we did, we'd be going public with it. We've gone through investigations internal. We publicized that to shareholders. I've been around too long. I've been doing this for 36 years. I'm not going to jeopardize my -- what future I have left with things that -- if there's malfeasance involved.

As far as we know, this company is, and the things that this executive group knows and our board knows and our auditors and everybody else, this company has no issues, except we got some terminated employees that are making up issues. Okay?

162.   On October 9, 2017, MiMedx issued a press release announcing that the Board authorized a $10 million increase in the Company's share repurchase program.  In the press release, Defendant Petit stated:

The recent deceptive and contrived attacks on our stock have caused the MiMedx shares to become very undervalued in my opinion. I believe it is a very prudent use of our capital to acquire our shares at this point, and our high growth profile in both revenues and profits should produce an extremely anti-dilutive result from our stock repurchases.

***We share the frustration from the short selling activity with all of our shareholders, and we are aggressively pursuing avenues that will expose these illegal activities***[,]

(Emphasis added).

163.   On October 11, 2017, MiMedx held a conference call with securities analysts and investors to discuss the Company's third quarter 2017 revenue guidance.  During the call, defendant Petit once again specifically denied that channel stuffing was occurring at the Company:

I want to highlight the fact that allegations of "channel stuffing" can be easily refuted by focusing on the company's accounts receivable. The company is pushing products and our distributor is not going to be sold through -- in their channel so that the collected money in the regional rate, they're going to slow down to stop paying their bills to the manufacturer. The quickest way to detect channel stuffing is to review the company's accounts receivable and see it growing dramatically and to large levels. This type of problem has occurred with another smaller company in our industry, where their accounts receivable have grown to excessive levels such approximately 140 days before things blew up. Based on my experience in the industry, I know levels of DSOs in the 140 days is way out of control. With all the insights that we have, I think we can safely assume that our product that we ship is moving through the system being used on patients at a relatively rapid rate. Also, as we duly noted, our shipments to distributors where channel stuffing exchanges occur at other companies is down less than 5% of our revenues. This includes our distributors and our OEM accounts such as Medtronic and Zimmer.

164.   During the call, defendant Petit continued to deny that the Company and its management had committed any wrongdoing despite the former employees' and research groups' allegations:

I'm sorry the company is going through this particular phase of our growth. I'm sorry that the integrity of your executives are being questioned. However, our track records stand on their own. We're a group of individuals with core values of integrity and behave in an honest manner. When you have a track record of behavior that we've exhibited over the decades, you're always going to prevail. *MiMedx is going to continue to perform very strongly. And over a short period of time, it would very obvious that our short sellers have picked the wrong candidate for this particular effect.*

(Emphasis added).

165.   During a question and answer session on the conference call, defendant Petit deflected an inquiry from an analyst into whether any excess inventory had returned to Mimedx as a result of the closing of the AvKARE account.  Defendant Petit stated that "we'll get into some of that detail when we report the full quarter in about 2 weeks," but assured the analyst that "simply put, we're well reserved," and "there's not going to be any hits from that standpoint."

166.   On October 23, 2017, First Analysis analyst Joseph Munda suspended his price target for MiMedx, stating that the Company had excluded First Analysis from asking questions on several calls while spending substantial time sparring with short sellers and filing lawsuits.  The First Analysis report explained that the number of unanswered questions was growing and asserted that MiMedx's increased stock price was driven by regulatory and compliance factors instead of fundamentals.

167.   On this news, the Company's stock fell $2.60 per share, or nearly 20%, over the next two trading days to close at $11.30 per share on October 24, 2017, erasing more than $288.6 million in market capitalization.

168.   On October 26, 2017, the Company issued a press release announcing the Company's financial and operating results for the third quarter ended September 30, 2017.  In the press release, defendant Petit touted the Company's "impressive" third quarter results and "extremely strong growth in revenue."  Defendant Petit also

commented on the Aurelius Value and Viceroy Research articles and asserted that the "short sellers" were engaged in a "coordinated scheme… against the Company."

169.   Two days later, on October 28, 2017, the Company held an earnings conference call with securities analysts and investors in connection with its third quarter 2017 results.   During the question and answer session, securities analysts again inquired as to the Company's reconciliation of its arrangement with AvKARE. After Petit previously deferred an answer to this question at the Company's October 11, 2017 revenue guidance call, defendant Senken again deferred an answer to this question until the end of fiscal year 2017, stating "the third quarter revenue was not affected by any reserve reversals, but that "[w]e quite frankly will look at that situation for the full year and make a determination at the end of the year."

170.   Piper Jaffray analyst Matt O'Brien asked about the allegations of improper sales practices at MiMedx, to which defendant Petit provided assurances that there was no corporate malfeasance at the Company and attributed any improprieties to "rogue" sales people:

> So from that standpoint, this could have been a better learning experience, even though from a corporate standpoint, ***there's no malfeasance. We had some rogue employees.***… ***But in terms of buttoning up systems here, we're in pretty doggone good shape….*** But are there going to be cases that can go off the ranch from time-to-time? Yes. ***But in terms of this company doing the right things, we know the regulations, we follow them, we educate, we get people to sign***

> ***documents, they have been educated, but that doesn't keep some
> individual from getting an idea and going off base with it.***

(Emphasis added).

171.   On October 31, 2017, MiMedx filed its Quarterly Report on Form 10-Q with the SEC for the third quarter ended September 30, 2017 (the "Q3 2017 Form 10-Q").   The Q3 2017 Form 10-Q reaffirmed the Company's financial results announced earlier that month and claimed that the Company's disclosure controls and procedures were effective.   The Q3 2017 Form 10-Q was signed by defendant Senken and was certified as accurate by defendants Petit and Senken pursuant to SOX.   These certifications were substantially similar to the certifications detailed in ¶¶ 83-84 above.

172.   On November 9, 2017, in a public forum hosted by Canaccord Genuity, defendant Petit reiterated that the Company was not engaged in any irregular revenue recognition practices and assured securities analysts that MiMedx had compliance practices in place to prevent accounting improprieties:

> So, people that were dishonest with us, they've tied in with these short sellers and they're just creating information. We're trying to post and are posting on our website these allegations, they just keep coming. ***But most – all of them, when you look at, we've got 10 years of audited financial statements. We've got a big four auditing firm now.***
>
> ***We went through the board, went through a very serious lengthy litigation when these first allegations came up last December, did the things we're supposed to do. Brought in a revenue recognition expert.***

These people have no idea about business processes here. They've never seen the actual contract. They just keep throwing stuff out there with an email that has nothing to do with anything relating to their favorite word, channel stuffing.

***You can't run a business like we've run it, have a cash flow we have and the strength of the balance sheet we have and do "channel stuffing" or any kind of malfeasance, it's just not possible, so.*** But they are very artful at what they do, and over time here, we'll keep performing, and we'll get to an audit here shortly which should be number 11 and this soon will take care of itself.

(Emphasis added).

173.   On December 13, 2017, MiMedx held a conference call with securities analysts and investors to discuss the Company's fiscal year 2018 business plan and revenue guidance.  During the call, defendant Petit again denounced the research groups' allegations.   Among other things, Defendant Petit touted MiMedx's "professional management systems" which "stood review of the Department of Justice 3 years ago, and we've improved our system since that point in time." Defendant Petit further stated that "[w]e've been very meticulous in correcting the misinformation and lies that have been published by this group of short sellers," whose "allegations have been easily refutable because we believe they are based on up trumped-up concepts from our terminated sales employee and apparently a total lack of understanding of federal rules, regulations and laws."   Defendant Petit concluded:

*As far as we know, there is nothing they have alleged, including this morning, that we have not seen very -- that we've not very sufficiently explained and refuted.* Incidentally, this should be helpful to not only you, as shareholders, but to the regulators who are busy trying to sort out fact from fiction from all those noise. In other words, we're going about this in meticulous and professional fashion. And I believe this approach is going to be very helpful with the regulators and their responsibilities.

*       *       *

*MiMedx will continue to address these allegations even as ridiculous as they are. We're doing this because it is the professional way to approach this matter. Also, this should prove to be extremely helpful in assisting regulators with their review of all this misinformation, these false allegations.*

(Emphasis added).

174.   On January 7, 2018, MiMedx issued a press release announcing the Company's preliminary financial results for the fourth quarter and fiscal year ended December 31, 2017.   In the press release, defendant Petit touted the Company's "strong quarter-over-quarter growth," and highlighted that MiMedx "more than doubled [its] revenue over 2012."

175.   On January 18, 2018, MiMedx hosted a conference call to provide an update on the progress on certain of its clinical studies and its patent portfolio. During the call, defendant Petit stated:

> We anticipate another year of predictable quarter-over-quarter revenue growth, continuing balance sheet and cash flow strength and profit growth. In short, we will be relentless with our operating performance. *We expect the audit to go smoothly. We expect our interaction with*

*the SEC investigation to continue to move along at a good pace, and we look forward to separating fact from fiction with them.*

(Emphasis added).

176.   Undaunted by defendant Petit's relentless disinformation campaign, on February 15, 2018, Aurelius Value published "An Open Letter to the MiMedx Auditors," detailing "serious and pervasive fraud" within the Company.  Aurelius reported that MiMedx had been "using AvKARE's consignment agreements to hit sales targets by filling shelves before the end of quarters with excess product that neither AvKARE nor the VA had requested."  Aurelius Value also reported that "[s]ince MiMedx recognized revenue as soon as product is shipped to stocking distributors, as opposed to when the product is implanted," the Company was able to recognize revenue that had not yet been realized or realizable and earned.

**MiMedx Announces The Financial Restatement**

177.   MiMedx finally began to acknowledge the truth behind its unlawful business practices on February 20, 2018, announcing that it was postponing its fiscal year 2017 earnings release and that it would be unable to timely file its Annual Report on Form 10-K for the fiscal year ended December 31, 2017 (the "2017 Form 10-K"), by the prescribed due date.  The Company revealed that it could not timely file its 2017 Form 10-K due to an Audit Committee investigation "into current and prior-period matters relating to allegations regarding certain sales and distribution

practices at the Company," and that "Company executives are also reviewing, among other items, the accounting treatment of certain distributor contracts." MiMedx continued to maintain "that the outcome of such investigation should not have a material impact on revenue guidance for 2018."

178.   On this news, MiMedx's market capitalization plunged nearly 40%, or $5.72 per share, on February 20, 2018, to close at $8.75 per share compared to the previous trading day's closing of $14.47 per share – erasing more than $635 million in market capitalization in a single day.

179.   Two days later, on February 22, 2018, MiMedx's market capitalization took another hit when *The Wall Street Journal* published the article revealing that MiMedx violated the Physician Payments Sunshine Act by failing to disclose payments the Company made to more than twenty doctors.

180.   On this news MiMedx's stock price fell another 12% on February 22, 2018, to close at $7.83 per share on February 23, 2018, erasing another $116 million in market capitalization.

181.   Additional investigations into MiMedx's improper practices also began to emerge.  On February 26, 2018, *Bloomberg* reported that, in addition to the previously disclosed investigations, the DOJ was also investigating the Company's distribution practices and whether the Company overcharged government

contractors for its products.  In the article, titled "U.S. Probes MiMedx's Federal Contracts, Accounting," *Bloomberg* reported that several former employees had confided in interviews that the "the company has inflated its financials by recognizing revenue on products that had been shipped to certain distributors but not used."  The article also stated that "[t]hree other former employees, who asked not to be identified, told Bloomberg in interviews that company executives at times asked salespeople to meet targets by shipping products that hadn't been ordered."[17]

182.   When this news reached the market, MiMedx's stock price fell $0.48 per share, or approximately 6%, to close at $7.35 per share on February 26, 2018, erasing more than $53 million in market capitalization.  The commencement of the DOJ investigation further highlighted the inadequacy of the Audit Committee's prior "investigations" and the reason the Individual Defendants went to such great lengths to silence the whistleblowers and to bury the truth.

183.   On March 2, 2018, the Company filed a Form 12b-25 stating that its third quarter Form 10-Q would not be filed on time because the internal review was not yet complete.  That same day, after the stock market closed, the Company announced that it had received a notice from NASDAQ earlier that day, stating that

---

[17] A true and correct copy of the February 26, 2018 *Bloomberg* article is attached hereto as Exhibit D.

the Company was not in compliance with NASDAQ Listing Rule 5250(c)(1) because it did not timely file its Annual Report on Form 10-K for the year ended December 31, 2017.

184.   Approximately two weeks later, in a March 15, 2018 press release, the Company announced that it had recently been made aware of a DOJ investigation into its practices.   The press release further stated that, in light of the Audit Committee's investigation, "the Company no longer intends to post responses to [] allegations [that have been made against it and its employees]."   The game was up – the Individual Defendants could no longer issue baseless denials with impunity or hide behind sham investigations conducted by the Board's Audit Committee.

185.   On May 9, 2018, three former employees at the VA—Donna Becker ("Becker"), Marcela Dolores Ferrer ("Ferrer"), and Carol Guardiola ("Guardiola")—were indicted on charges that they accepted thousands of dollars from MiMedx for pushing certain of its products at the VA and committing healthcare fraud.   According to the indictment, from 2012 to 2016, Becker, Ferrer, and Guardiola received benefits from the Company in the form of meals, salaries, trips, gifts, and other gratuities in return for excessively using MiMedx's products on patients.   The indictment further alleged that Becker and Ferrer had not just received gratuities, but also participated in speaking engagements on MiMedx's

behalf that were designed to increase sales to VA facilities.  Again, the emergence of these damning facts further corroborated the allegations of the former employee whistleblowers and the inadequacy of the Audit Committee's inquiries and determinations.

186.   On May 18, 2018, MiMedx announced that it had received an additional notice from NASDAQ on May 14, 2018, stating that the Company was not in compliance with NASDAQ Listing Rule 5250(c)(1) because it did not timely file its Quarterly Report on Form 10-Q for the first quarter ended March 31, 2018, with the SEC.  The announcement did not provide any indication of when the Company expected to complete its review and file its belated financial statements.

187.   On June 7, 2018, the Company filed with the SEC a Current Report on Form 8-K, disclosing that (i) on June 6, 2018, the Audit Committee, which had been overseeing the internal review of the Company's financial statements, had reached preliminary findings, and (ii) management, in consultation with the Audit Committee and Board, had determined that MiMedx's financial statements for fiscal years 2012 to 2016, as well as the interim periods of 2017, would need to be restated. As disclosed in the Form 8-K and in direct contravention of Petit's repeated statements to the contrary, MiMedx had been operating with "material weaknesses" in internal controls over financial reporting during each of the above noted periods,

and that its previously filed financial statements for those periods "***should no longer be relied upon***." (Emphasis added).  These conclusions stood in stark contrast to the Audit Committee's previous self-serving and conclusory determinations that there was no evidence of wrongdoing and no need to amend the Company's financial statements.

188.   The Form 8-K also disclosed that the restatements would focus on the timing of revenue recognition and were expected to result in MiMedx restating certain revenues, expenses, and related balance sheet accounts as reported in prior periods.  The Company further disclosed that the adjustments would affect, among other things, gross margin, operating income, income before taxes, net income, and earnings per share in above mentioned periods.   While the Company did not definitively quantify the impact of the necessary adjustments to its prior financial statements, MiMedx admitted that the restatement would have a material impact on the financial statements relating to certain of the above-noted periods.  The Company was unable to provide assurance that additional errors would not be identified or impact prior accounting periods.  The Form 8-K stated:

> **Item 4.02 Non-Reliance on Previously Issued Financial Statements or a Related Audit Report or Completed Interim Review.**
>
> On June 6, 2018, the Audit Committee of the Board of Directors (the "Board") of MiMedx Group, Inc. (the "Company"), with concurrence from management of the Company, concluded that the Company's

previously issued consolidated financial statements and financial information relating to each of the fiscal years ended December 31, 2012, 2013, 2014, 2015 and 2016 and each of the interim periods within such years, along with the unaudited condensed consolidated financial statements included in the Company's Quarterly Reports on Form 10-Q for the quarters ended March 31, 2017, June 30, 2017 and September 30, 2017 (collectively, the "Non-Reliance Periods"), should be restated (the "Restatement"), and therefore, such consolidated financial statements and other financial information, any press releases, investor presentations or other communications related thereto should no longer be relied upon. Additionally, as a result of the foregoing, all communications and financial information with respect to the fourth quarter of 2017 and the first quarter of 2018 should no longer be relied upon, and the Company is further withdrawing all prior financial guidance issued for 2018.

As previously announced, the Audit Committee has been conducting an independent investigation into current and prior-period matters relating to allegations regarding certain sales and distribution practices at the Company and certain other matters. ***The determination of the need to restate was based on investigation results to date which have primarily been focused on the accounting treatment afforded to such sales and distribution practices for two distributors for which certain implicit arrangements modified the explicit terms of the contracts, impacting revenue recognition during specified periods.[18] The Restatement will have a material impact on the financial statements relating to certain of the Non-Reliance Periods.***

***The accounting misstatements will also require adjustments to the periods in which such revenues were recognized so that such revenues for product sold are recognized in the period in which such amounts were actually collected. This will also affect gross margin, operating income, income before taxes, income taxes, net income, earnings per share, accounts receivable and related reserves, returns***

---

[18] On a conference call later that day, Petit stated that investigation focused on two "terminated" distributors, but did not identify whom.

*allowances, inventories, and other financial items in particular periods.*

The Audit Committee investigation is ongoing, continues to evaluate sales and distribution practices at other distributors and customers, and may ultimately result in the identification of additional issues, broaden the scope of financial items or periods required to be restated, may result in additional actions taken by the Company, and may affect the preliminary conclusions expressed above. The Company does not intend to provide additional updates on the results of the investigation until it is concluded or the Company determines that further disclosure is appropriate or necessary.

Although the Company cannot at this time estimate when it will file its restated financial statements and its Annual Report on Form 10-K for the year ended December 31, 2017 and subsequent interim periods, it is diligently pursuing completion of the Restatement and intends to make such filings as soon as reasonably practicable.

The Company has previously concluded in certain of the periods requiring restatement that its controls over financial reporting were effective. In the period ending December 31, 2016, the Company previously concluded that its controls over financial reporting were ineffective due to material weaknesses in certain internal controls over tax accounting. *As a result of material weaknesses relating to the Restatement described above, the Company has now concluded that its controls over financial reporting were ineffective in all of the Non-Reliance Periods. Accordingly, the Company will restate its disclosures for the affected periods to include the identification of material weaknesses related to its restatement.*

(Emphasis added).

189.   In addition, without providing further details, the Form 8-K announced the immediate departures of defendants Senken and Cranston, the Company's CFO and Treasurer/Controller, respectively. As would later be revealed, however, these

were actually terminations "for cause" based on these defendants' roles in the improper revenue recognition practices at the Company.

190.   On this news, MiMedx's market capitalization fell more than 23%, or $1.92 per share, on June 7, 2018, to close at $6.29 per share compared to the previous trading day's closing of $8.21 per share, erasing more than $213 million in market capitalization in a single day.

191.   On June 11, 2018, *Bloomberg* published an article titled "Federal Probes at MiMedx Carry a Familiar Ring for CEO," detailing eerily similar channel stuffing schemes and accounting improprieties that defendant Petit had perpetrated during his time at Healthdyne and Matria Healthcare, as well as the troubles currently facing MiMedx.  The article explained that, "[i]n interviews, 19 current and former executives and employees of his companies describe a hard-charging leader—one who didn't dwell on the rules as he pursued revenue growth, according to about a dozen of them."  The *Bloomberg* article further stated:

> Over more than four decades as a health-care entrepreneur, Petit built up medical-device companies that later came under scrutiny, one by the Justice Department and another by the Securities and Exchange Commission. …
>
> Now he may be facing a stiffer challenge, with both the Justice Department and the SEC investigating sales practices and government contracts at MiMedx, and short sellers circling. Last month, three health-care workers were indicted over allegations they accepted bribes from MiMedx representatives. Announcing last week that years of

financial results may not have been accurate, MiMedx also said two top finance executives had stepped down.

\* \* \*

More than a half-dozen former MiMedx employees interviewed by Bloomberg, who requested anonymity, said they saw little upside to flagging any potential misconduct while working there, an understanding that flowed from what they called an us-vs.-them culture nurtured by Petit. Several of them noted that while Petit has publicly encouraged workers to write "Dear Pete" letters reporting wrongdoing, he created a culture internally in which workers were reluctant to criticize practices.

192. On July 2, 2018, in a press release and Current Report filed on Form 8-K, the Company announced the resignation of its CEO, defendant Petit, and its President and COO, defendant Taylor. According to the announcement, these resignations, which followed those of defendants Senken and Cranston "are based on the Board of Directors' business judgment regarding the Company's leadership and direction, and arise, in part, from information the Audit Committee has identified through its previously announced independent investigation."

193. On this news, MiMedx's market capitalization plunged nearly 40%, or $2.46 per share, on July 2, 2018, to close at $3.93 per share compared to the previous trading day's closing of $6.39 per share, erasing more than $270 million in market capitalization in a single day. In total, from February 16, 2018, the trading day before the truth began to emerge, and July 2, 2018, when defendant Petit resigned as CEO,

the Company's stock price fell $10.54 per share, or 72%, erasing more than $1.17 billion in market capitalization in less than six months.

194.  On July 10, 2018, MiMedx notified the NASDAQ staff that the Company would be unable to bring its SEC filings up to date by the initial August 28, 2018 deadline previously communicated by the NASDAQ staff. Consequently, on July 20, 2018, the Company received an anticipated letter from the NASDAQ staff, stating that, because MiMedx will not regain compliance with NASDAQ Rule 5250(c) (1) by such initial deadline, the NASDAQ staff had determined that the Company's stock will be delisted unless the Company requests a hearing before a Nasdaq Listing Qualifications Panel ("Hearings Panel") by July 27, 2018. The non-compliance with NASDAQ Rule 5250(c) (1) relates to the Company's delinquency in filing its Annual Report on Form 10-K for the fiscal year ended December 31, 2017 and its Quarterly Report for the quarterly period ended March 31, 2018.

195.  On July 23, 2018, *The Wall Street Journal* published the aforementioned article titled "Highflying Medical Firm, a Help to Wounded Veterans, Falls to Earth," detailing the channel-stuffing at MiMedx. *The Wall Street Journal* reported that its review of company emails, court documents, internal complaints, and interviews with current and former employees, "paint[ed] a picture of a company seeking to grow at almost any cost."  This further corroborated the

whistleblowers' allegations and shone an even brighter light on the Individual Defendants' efforts to conceal the truth and the unfounded "conclusions" previously reached by the Audit Committee and reported to MiMedx shareholders and the rest of the investing public.

196.   Three days later, on July 26, 2018, MiMedx announced that it had received a letter from the NASDAQ staff notifying the Company that its stock could be delisted as a result of its failure to file timely SEC filings.

197.   On August 31, 2018, the Company filed a Current Report on Form 8-K disclosing that Bank of America was terminating its longstanding credit line with MiMedx as a result of the Company's failure to file timely periodic reports with the SEC.

198.   On September 20, 2018, the *Atlanta Journal Constitution* reported that the Veterans Affairs Medical Center in Minneapolis had "parted ways" with five doctors "over improprieties with [MiMedx's] biopharma products."

199.   Also on September 20, 2018, the Company issued a press release announcing that defendant Petit had resigned from the Board, effective immediately, and that the Company was treating the previously announced separations of defendants Petit, Senken, Taylor, and Cranston as "terminations 'for cause.'" According to the press release, the Board's determinations that these four former

executives engaged in conduct detrimental to the Company were based on information identified as part of the Audit Committee's belated, and still incomplete, investigation.

200.   In addition, the Company noted that the Board's Compensation Committee has taken "all required action to cause all equity and incentive awards outstanding under the Plans held by the Separated Employees to be forfeited.  The Board and Compensation Committee action was based on findings that the Separated Employees engaged in, among other things, conduct detrimental to the business or reputation of the Company."   The Company further stated that the Board and Compensation Committee would take steps to recover an undefined and undisclosed amount of compensation paid to these defendants.

201.   That same day, the law firm of Quinn Emanuel Urquhart & Sullivan LLP ("Quinn Emanuel") issued a press release in response to the Company's announcement that defendants Petit and Taylor had been terminated "for cause."  In the press release, Quinn Emanuel attorney Bill Weinreb stated:

> The internal investigation that led to today's announcement has spun out of control.   Shareholders should question whether the Audit Committee, which has led the investigation, is acting in the Company's best interests or its own best interests in finding others responsible for accounting matters for which the Committee itself bears ultimate responsibility[.]

202. Also, on September 20, 2018, MiMedx issued a press release announcing that the Hearings Panel granted the Company's request for continued listing of the Company's stock on NASDAQ pursuant to an extension through February 25, 2019, subject to the conditions that MiMedx regain compliance with its SEC reporting obligations by that date and provide the Hearings Panel with certain interim progress reports.   The press release stated that "[t]he Audit Committee is working diligently with its advisors to complete the investigation, and the Company is also working to prepare its financial statements for audit and regain compliance with its SEC reporting obligations and Nasdaq listing rules as soon as practicable."

203. On October 5, 2018, *The Wall Street Journal* published the aforementioned article titled "MiMedx Kept Cheaper Products Out of Its Offerings to VA Hospitals," reporting that MiMedx was under investigation by the Defense Criminal Investigative Service, a unit of the Defense Department, relating to the Company's financial arrangements with a physician at an Augusta, Georgia-based VA hospital, and that a grand jury had been commissioned to hear testimony on this matter.

204.   On this news, the Company's stock fell $0.80 per share, or almost 13%, to close at $5.65 per share on October 5, 2018, erasing more than $87 million in market capitalization.

205.   MiMedx was also forced to dismiss with prejudice its baseless lawsuits against Viceroy Research, Capitol Forum, and Aurelius Value in 2018.

206.   On October 19, 2018, shortly after certain of the Company's claims – for false light invasion of privacy, tortious interference with business relations, and violations of the Lanham Act – were dismissed for failure to state a claim, the Company voluntarily dismissed all of its claims against Capitol Forum.

207.   On January 12, 2018, Magistrate Judge Katharine H. Parker issued a Report and Recommendation recommending that the motion to dismiss the claims against Aurelius Value be granted, and that recommendation was adopted via court order on September 29, 2018.  MiMedx elected to not file an amended complaint, and an order dismissing the claims against Aurelius Value was issued on November 7, 2018.

208.   MiMedx also voluntarily dismissed with prejudice against Viceroy Research on March 9, 2018.  On November 7, 2018, in a press release and Current Report filed on Form 8-K, the Company announced that the Hearings Panel" has reconsidered the Company's request for continued listing of the Company's

common stock on The Nasdaq Capital Market and has determined that Nasdaq will suspend trading in the Company's stock effective at the open of business on Thursday, November 8, 2018."   The Form 8-K disclosed that the Company submitted a report to the Hearings Panel on October 31, 2018 indicating that MiMedx "***has now determined that, for the restatement period, it must conduct an assessment of revenue recognition for all of the Company's sales,*** which will prolong the amount of time it will take for the Company to prepare the restated financial statements." (Emphasis added).

209.   Also, on November 7, 2018, the Company announced that the Board had authorized the adoption of a limited duration shareholder rights plan after receiving notification from NASDAQ that it will suspend trading in the Company's common stock.

210.   On this news, the Company's stock fell $3.81 per share, or 61.25%, over the next several trading days to close at $2.41 per share on November 15, 2018, erasing more than $416 million in market capitalization.

211.   On December 5, 2018, MiMedx filed with the SEC a Form 8-K attaching (i) a press release issued by the Company that announced an organization realignment program and (ii) a press release announcing leadership changes and promotions at the Company.

212.  In the December 5, 2018 press release concerning the organizational realignment, MiMedx announced plans to implement a broad-based organizational realignment, cost reduction and efficiency program to better ensure the Company's cost structure is appropriate given its revenue expectations." The press release stated that "the Audit Committee's independent investigation has required changes to business practices to address issues identified in the investigation," and that "MiMedx's realignment program was developed largely in response to these changes that have resulted in a material softening in the Company's recent revenue performance and expected near-term sales forecast." The realignment "will include a reduction of the MiMedx workforce by approximately 240 full-time employees, or 24% of its total workforce, of which about half are salesforce personnel."

213.  The December 5, 2018 press release also provided an update on the Company's financial condition, the status of the restatement, and the status of the Company's internal investigations and related matters. Specifically, the Company stated:

> Due to the depth, breadth and complexity of issues identified, management has expanded the scope of work in connection with the preparation of the Company's financial statements and is unable to estimate the expected completion date at this time.

> Due to the changes in business practices discussed above and other factors, including the inability to provide the full context of current or past performance, the Company is not currently in a position to provide

any financial performance-related information. Moreover, at this time, the Company cannot estimate its exposure, if any, to potential contingent liabilities related to pending and threatened shareholder lawsuits, pending governmental investigations or other legal proceedings.

As previously disclosed, the Compensation Committee and the Board determined that the separations of the Company's former CEO, COO, CFO and Corporate Controller should be treated as "for cause" and that these former executive officers had engaged in, among other things, conduct detrimental to the business or reputation of the Company …

\*        \*        \*

The Audit Committee's independent investigation is still ongoing, and there may be other actions taken based, at least in part, on information from the investigation. The Company continues to incur significant legal and accounting-related expenses related to, among other things, the Audit Committee's independent investigation and other legal matters, the Company's work to prepare its restated financial statements and the implementation of improved business controls.

Separately, the Board of Directors' search process for a permanent CEO is active and ongoing, and the Board has been meeting with candidates. However, the ongoing investigation, resulting extensive accounting analysis and pending financial restatement process make it challenging to attract qualified candidates. In addition, the financial restatement process has presented a practical issue with respect to candidates having sufficient information to evaluate the Company's financial situation and overall business.

214.   In the second December 5, 2018 press release, concerning changes in the Company's leadership, MiMedx announced that as "part of the organizational realignment, the role of Chief Commercialization Officer has been eliminated and [defendant] Chris Cashman will be departing the organization."   Defendant

-110-

Cashman, among other things, participated in the December 12, 2016 meeting at which the Company's senior leadership team reviewed the joint report of former employees Kruchoksi and Tornquist.

215.   In a Form 8-K filed with the SEC on December 7, 2018, EY informed the Audit Committee on December 4, 2018, that EY was resigning from the engagement to audit the Company's consolidated financial statements for the years ended December 31, 2017 and 2018, effective immediately, The Form 8-K stated that EY had a "disagreement" with certain members of the Company's prior senior management who were subsequently separated from the Company "for cause" regarding "revenue recognition under certain distributor contracts."  The reason for EY's resignation was not disclosed in the Form 8-K, leaving MiMedx shareholders without answers to the central questions about the commitment of MiMedx's current Board and management team to finding the facts at the heart of the matter and to acknowledging and reckoning with the full scope of the pervasive financial fraud.

216.   Nonetheless, the Form 8-K disclosed the following disturbing findings made by E&Y:

- EY advised the Company that the internal controls necessary for the Company to develop reliable financial statements do not exist;

- Although EY could accept representations from the current Interim CEO and Interim CFO based on their knowledge, EY

advised the Company that EY is unable to rely on representations from them because, as of the date of the resignation, the current Interim CEO and Interim CFO, in turn, would have needed to rely on representations from certain legacy management personnel still in positions that could affect what is reflected in the Company's books and records. At the time of EY's resignation, the Audit Committee's independent investigation was still ongoing;

- EY advised the Company of the need to significantly expand the scope of its audit, due to material allegations of inappropriate financial reporting, material allegations of noncompliance with laws and regulations, the findings to date from the independent investigation conducted by the Audit Committee into these allegations, and the lack of internal controls necessary for the Company to develop reliable financial statements. EY had not completed the necessary work in connection with this expanded audit scope at the time of its resignation; and

- EY advised the Company that information has come to EY's attention that EY has concluded materially impacts the reliability of previously issued financial statements, and the issues raised by this information have not been resolved to EY's satisfaction prior to its resignation.

217.  To date, the Company has still not completed the restatement of its delinquent financial statements, and has not filed annual or quarterly financial statements since October 31, 2017, over a year ago.  Nor has the Company provided any estimates as to when any of these filings or restatements are likely to be completed.

218.   In addition, upon information and belief, the investigations into the Company being conducted by the SEC, DOJ, VA and Defense Department remain pending.

## REASONS THE INDIVIDUAL DEFENDANTS' STATEMENTS WERE FALSE AND MISLEADING

219.   Certain of the statements referenced above were each improper when made because they failed to disclose and misrepresented the following material, adverse facts, which the Individual Defendants knew, consciously disregarded, or were reckless in not knowing:

(a)   MiMedx lacked adequate internal controls over accounting and financial reporting;

(b)   MiMedx failed to employ proper compliance measures to ensure appropriate accounting practices;

(c)   MiMedx was improperly recognizing revenue that had not yet been realized;

(d)   MiMedx failed to implement all GAAP and other accounting standards to properly recognize revenue;

(e)   MiMedx's financial statements materially overstated the Company's revenue and earnings;

(f)   MiMedx failed to disclose its financial ties to physicians, as required by federal law;

(g)   MiMedx failed to implement proper corporate governance to prevent manipulation of revenue recognition and ensure compliance with its disclosure obligations; and

(h)   as a result of the foregoing, the Individual Defendants' representations concerning MiMedx's business and operations were improper.

## DAMAGES TO THE COMPANY

220.   As a result of the Individual Defendants' improprieties, MiMedx disseminated improper, public statements concerning the Company's financial success, compliance with GAAP, internal controls, and business forecasts and practices.  These improper statements have devastated MiMedx's credibility, as reflected by the Company's staggering $1.67 billion, or 83.5% market capitalization loss, from a high of nearly $2 billion in January 2018, to less than $265 million as of January 2019.

221.   The Individual Defendants' improper practices and gross failures to timely address, remedy, or even disclose such practices also severely damaged MiMedx's reputation within the business community and in the capital markets.  In addition to price, MiMedx's current and potential customers consider a company's ability to timely file its financial results, accurately account for revenues, and evaluate its own financial results and growth.  Businesses and government entities are less likely to award contracts to companies that pass off excessive inventory to distributors knowing that the products will not be sold.  In addition, MiMedx's ability to raise equity capital or debt on favorable terms in the future is now

impaired.  The Company stands to incur higher marginal costs of capital and debt because the improper statements and misleading projections disseminated by the Individual Defendants have materially increased the perceived risks of investing in, and lending money to the company.

222.   As a result of the breaches of fiduciary duty set forth herein, defendants Petit, Taylor, Senken, and Haden, with the assistance of the Compensation Committee, increased compensation paid to themselves generally as a reward by the compensation committee for strong Company financial performance and specifically through incentive compensation plans targeting financial performance.

223.   Members of management were entitled to participate in a yearly MIP. The MIP is an annual cash incentive plan that is designed to incentivize and reward achievement of the current year's financial and operational goals.  The MIP has been operational from 2012 through the present.

224.   Defendants Petit, Taylor, Senken, Haden and other executives who report directly to the Chairman and CEO or president and COO were eligible to participate in the MIP, with a targeted base bonus equal to a specified percentage of his/her base salary.   Payment of bonuses under the MIP is contingent on the achievement of annual performance measures specific to each fiscal year.   In the first quarter of each fiscal year, the compensation committee approves and

recommends to the full board the MIP criteria for targeted incentive amounts, eligibility, performance measures and calculation formula of earned incentives.

225.    Petit's target base bonus under the MIP was 55% for 2013-2014, 60% for 2015, and 75% of Petit's annual base salary from 2016 forward. Taylor's target base bonus under the MIP was 55% for 2013-2014, 60% for 2015, and 65% of Taylor's annual base salary from 2016 forward.  Senken's target base bonus under the MIP was 40% for 2013-2014, 45% for 2015, and 50% of Senken's annual base salary from 2016 forward.  Haden's target base bonus under the MIP was 35% for 2015, and 45% of Haden's annual base salary from 2016 forward.

226.    Further, as a direct and proximate result of the Individual Defendants' actions, MiMedx has expended, and will continue to expend, significant sums of money.  Such expenditures include, but are not limited to:

> (a)    costs incurred in connection with the Company's internal investigations and review of the accounting violations;
>
> (b)    costs incurred in connection with restating and revising several years' worth of financial statements;
>
> (c)    costs incurred in defending and paying any potential settlement in the Securities Class Actions for violations of federal securities laws;
>
> (d)    costs incurred in complying with the investigations by the SEC, DOJ, VA, and Defense Department;

(e)     costs incurred in connection with compensation and benefits paid to the Individual Defendants who have breached their duties to MiMedx;

(f)     costs incurred in connection with repurchases of Company stock while its price was trading at artificially inflated prices based on the Company's overstated and inaccurate financial results; and

(g)     costs incurred in obtaining new lines of credit and capital to permit MiMedx to continue its business operations.

## DERIVATIVE AND DEMAND ALLEGATIONS

227.   Plaintiffs bring this action derivatively in the right and for the benefit of the Company to redress the Individual Defendants' breaches of fiduciary duties and other violations of law.

228.    Plaintiffs are shareholders of the Company, were shareholders of the Company at the time of the wrongdoing alleged herein, and have been shareholders of the Company continuously since that time.

229.   Plaintiffs will adequately and fairly represent the interests of the Company and its shareholders in enforcing and prosecuting its rights.

**Demand Requirement Under Section 607.07401 of the Florida Business Corporation Act**

230.   Section 607.07401(2) Florida Business Corporation Act requires only that "[a] complaint in a proceeding brought in the right of a corporation must be verified and *allege with particularity the demand made to obtain action by the*

-117-

***board of directors and that the demand was refused or ignored by the board of directors for a period of at least 90 days from the first demand*** unless, prior to the expiration of the 90 days, the person was notified in writing that the corporation rejected the demand, or unless irreparable injury to the corporation would result by waiting for the expiration of the 90-day period." (Emphasis added). Section 607.0741 does not require a plaintiff to specifically allege ***why*** a demand refusal was wrongful. *See* Fla. Stat. § 607.07401 (requiring only that a complaint allege with particularity that a demand made and that it was refused or ignored).

231. Here, as demonstrated below, Plaintiffs have alleged with particularity that: (i) they made demands on the MiMedx Board to take action; and (ii) the Board ignored those demands for at least 90 days. Nothing more is required.

232. Nevertheless, the facts alleged fully support the inference that the Board's delay in providing a substantive response to the demands is unreasonable and utterly inconsistent with the directors' fiduciary duties. For example, refusal of a demand is wrongful under applicable Florida law where the Board refuses to investigate and/or otherwise to act in good faith to determine the merits of the allegations and what, if any, action should be taken on the corporation's behalf.

233.   As alleged below, Plaintiffs have described with particularity the MiMedx Board's dilatory failure to fully investigate and substantively respond to Plaintiffs' demands.

**Plaintiff Georgalas' Demand**

234.   On April 10, 2018, Plaintiff Georgalas sent a letter to the Board to take action against certain of the Individual Defendants and to recover damages for the Company (the "Georgalas Demand").[19]

235.   After more than two months without a response from the Company, Plaintiff Georgalas sent another letter to the Board on June 15, 2018, detailing additional facts supporting his concerns that the fiduciaries of MiMedx breached their fiduciary duties. [20]   In particular, Plaintiff Georgalas' letter explained that in May 2018, three former employees at the VA had been indicted on charges that they accepted thousands of dollars from MiMedx in exchange for pushing certain of its products at the VA.  As additional evidence of wrongdoing, the June 15, 2018 letter also discussed the Company's admission that it would need to restate more than five years' worth of financial statements as a result of MiMedx's accounting treatment

---

[19] A true and correct copy of the Georgalas Demand is attached hereto as Exhibit E.

[20] A true and correct copy of Plaintiff Georgalas' June 15, 2018 letter is attached hereto as Exhibit F.

of certain sales and distribution practices, and the sudden and unexpected departures of defendants Senken and Cranston, who, as the Company would admit, were terminated "for cause" based on conduct detrimental to the Company.

236.   Plaintiff Georgalas also expressed concern about the Board's failure to conduct an independent investigation into these allegations.   The letter explained that the Company's internal investigation was plagued by debilitating conflicts of interest.   He explained that MiMedx's internal investigation was being led by defendant Dewberry, defendant Petit's college fraternity "little brother" and colleague of nearly forty years.   Plaintiff Georgalas' counsel noted that this conflict was particularly concerning given that defendant Petit is perhaps the individual most responsible for the wrongdoing at MiMedx, repeatedly making false and misleading public statements about the Company's internal controls over financial reporting, consistently denying the truth about the Company's channel-stuffing scheme and revenue recognition practices, and spearheading the Company's efforts to silence anyone who dared to expose the Company's practices.

237.   Nearly three months after Plaintiff Georgalas sent his initial demand, the Board finally responded.   In a letter dated July 2, 2018, Edmund Polubinski III of the law firm Davis Polk & Wardwell LLP ("Davis Polk"), stated that the Board had created a Special Committee to investigate the Georgalas Demand and that his

firm had been retained to assist the Special Committee.[21]  Despite the passage of months since Mr. Georgalas made his demand, the Special Committee claimed that it was unable to provide even an estimate of when its purported investigation would be completed, and admitted that it had not even begun to investigate.  The Special Committee's counsel closed with a request for evidence that Mr. Georgalas owned MiMedx stock.

238.  In response, on July 20, 2018, Plaintiff Georgalas sent counsel for the Special Committee a letter urging the Special Committee act with alacrity and take into account further developments in considering his demand.[22]  The letter advised the Special Committee to investigate the sudden resignations of defendants Petit and Taylor, which the Company stated arose "from information the Audit Committee [] identified through its … independent investigation[,]" since they directly undermined the Company's and Audit Committee's earlier statements vehemently denying wrongdoing on the part of any officer or the need to correct or restate any financial statements.

---

[21] A true and correct copy of the July 2, 2018 letter is attached hereto as Exhibit G.

[22] A true and correct copy of Plaintiff Georgalas' July 20, 2018 letter is attached hereto as Exhibit H.

239.   Plaintiff Georgalas' July 20, 2018 letter also expressed concern over the Board's delay in investigating his demand.  Plaintiff noted that the Special Committee was just beginning its investigation three months after Plaintiff Georgalas first demanded that the Board investigate accounting improprieties, violations of federal law, and other wrongdoing at MiMedx.  In addition, although Plaintiff Georgalas' counsel disputed the Special Committee's counsel's interpretation of Florida law and the Special Committee's apparent position that the Board need not move quickly to investigate the serious and well-founded allegations of wrongdoing at the Company, to avoid further delay, Plaintiff Georgalas' counsel enclosed documentary evidence demonstrating Plaintiff Georgalas' ownership of MiMedx stock during the relevant time period and evidence of his initial purchase.

240.   Over a month later, after receiving scant information regarding the scope and timing of the Special Committee and its purported investigation, on August 29, 2018, Plaintiff Georgalas' counsel wrote to the Special Committee's counsel requesting the identities of the purportedly "independent" directors who had

constituting the Special Committee and the identities of the individuals serving on the Special Committee.[23]

241.   Davis Polk responded to Plaintiff Georgalas on September 12, 2018.[24] According to the September 12, 2018 letter, the Special Committee was formed on June 6, 2018 by a vote of defendants Papasan, Dewberry, Aguilar, Hack, Evans, Bleser, and Yeston, and was comprised of three of the Individual Defendants in this case: (i) Aguilar; (ii) Yeston; and (iii) Bleser.

242.   Despite Plaintiff Georgalas' efforts to work with the Special Committee, the Committee failed to provide any information about the scope or timing of its investigation, let alone any assurance as to when Mr. Georgalas might receive a substantive response, over the 170 days following service of his demand. Accordingly, as permitted under Fl. Stat. § 607.07401(2), Plaintiff Georgalas filed a Verified Stockholder Derivative Complaint for Breach of Fiduciary Duty, Waste of Corporate Assets, and Unjust Enrichment in this Court on September 27, 2018.

---

[23] A true and correct copy of Plaintiff Georgalas' August 29, 2018 letter is attached hereto as Exhibit I.

[24] A true and correct copy of the September 12, 2018 letter is attached hereto as Exhibit J.

**Plaintiff Roloson's Demand**

243.   On June 20, 2018, Plaintiff Roloson sent a letter to the Board to take action against certain of the Individual Defendants and to recover damages to the Company (the "Roloson Demand").[25]

244.   On July 2, 2018, Davis Polk sent a letter advising that the Board formed a Special Committee to investigate and evaluate the allegations contained in the Roloson Demand, but that it could not estimate how long the committee would need to do its work.[26]

245.   On July 10, 2018, Plaintiff Roloson sent a letter to Davis Polk asking for disclosure of the Special Committee's membership and the mandate that was given to the committee.[27]  Plaintiff Roloson further pointed out that the independence of the committee was suspect because all of the "independent" directors were conflicted and were the same individuals who had had previously investigated the former employees' allegations and found no wrongdoing.  Plaintiff Roloson pressed the Board to take action sooner rather than later to protect the claim from expiring based upon the fact that the restatement would reach back to 2012.  Plaintiff Roloson

---

[25] A true and correct copy of the Roloson Demand is attached hereto as Exhibit K.

[26] A true and correct copy of the July 2, 2018 letter is attached hereto as Exhibit L.

[27] A true and correct copy of the July 10, 2018 letter is attached hereto as Exhibit M.

again demanded that the Board take action based upon the already considerable evidence that was known.

246. On July 17, 2018, Davis Polk responded to Plaintiff Roloson's July 10 letter raising concerns about the Special Committee's investigation.[28] Davis Polk disclosed the identity of the Special Committee's members (i.e., defendants Bleser, Yeston, and Aguilar) and gave a summary of the committee's investigatory charge. Davis Polk again refused to estimate how long it would take for the investigation to be completed but referenced the ninety-day period set forth in the Fl. Stat. §607.07401(2).

247. On September 20, 2018, Plaintiff Roloson sent a letter to Davis Polk asking that action be taken against defendant Petit and others.[29] After pointing out conflicts held by the Special Committee members and facts justifying such action (e.g., failure to implement FASB regulations concerning revenue recognition), Plaintiff Roloson again demanded action.

248. Having failed to receive a substantive response to the Roloson Demand from the Board and/or Special Committee in over 90 days, *see* Fl. Stat.

---

[28] A true and correct copy of the July 17, 2018 letter is attached hereto as Exhibit N.

[29] A true and correct copy of the September 20, 2018 letter is attached hereto as Exhibit O.

-125-

§607.07401(2), Plaintiff Roloson filed a Verified Shareholder Derivative Complaint in this Court on October 22, 2018.

**Plaintiff Evans' Demand**

249.  On June 22, 2018, Plaintiff Evans sent a letter to the Board to take action against certain of the Individual Defendants and to recover damages to the Company (the "Evans Demand").[30]

250.  On July 2, 2018, Davis Polk sent a letter advising that the Board formed a Special Committee to investigate and evaluate the allegations contained in the Evans Demand, but would not estimate how long the committee would need to do its work.  The letter also requested evidence of Plaintiff Evans' ownership of MiMedx stock.[31]

251.  On July 25, 2018, Plaintiff's counsel sent Davis Polk a letter enclosing confidential documentation evidencing Plaintiff Evan's ownership of MiMedx stock and requesting identification of: (i) the directors who appointed the Special Committee, and (ii) the members of the Special Committee.[32]

---

[30] A true and correct copy of the Evans Demand is attached hereto as Exhibit P.

[31] A true and correct copy of the July 2, 2018 letter is attached hereto as Exhibit Q.

[32] A true and correct copy of the July 25, 2018 letter, without the enclosures, is attached hereto as Exhibit R.

252.   On August 6, 2018, the Special Committee's counsel sent Plaintiff's counsel a letter disclosing that the Special Committee was formed on June 6, 2018 by a vote of defendants Papasan, Dewberry, Aguilar, Hack, Evans, Bleser, and Yeston.  The Special Committee was comprised of defendants Aguilar, Yeston, and Bleser. [33]

253.   Having failed to receive a substantive response to the Evans Demand from the Board and/or Special Committee in over 90 days, *see* Fl. Stat. §607.07401(2), Plaintiff Evans filed a Verified Shareholder Derivative Complaint in this Court on September 25, 2018.

**The Special Committee and the Board Have Wrongfully Ignored and Effectively Refused Plaintiffs' Demands**

254.   The Board and Special Committee had an affirmative duty under Florida law to conduct a reasonable, objective, and good faith investigation into the allegations in the Demands, and to determine on the basis of that investigation whether the Demands' factual allegations and legal claims have merit and whether pursuing the claims in litigation would be in the Company's best interests.  However, the Board and Special Committee's investigation into the Demands were neither

---

[33] A true and correct copy of the August 6, 2018 letter is attached hereto as Exhibit S.

independent nor conducted in good faith. Moreover, under the extraordinary circumstances alleged herein, the Board was obligated to move with alacrity to complete a comprehensive investigation and to evaluate the culpability of (i) officer defendants Petit, Taylor, Senken, and Cranston, who were clearly aware of intimately involved in the Company's improper practices and who took actions to silence and defame the whistleblowers and securities analysts who exposed the ugly truth; and (ii) defendants Bleser, Dewberry, Evans and Papasan, who, as members of the Audit Committee, conducted a sham preliminary inquiry and investigation and swiftly reached a finding that there was no wrongdoing, while causing and permitting the Company to attack the individuals that were seeking to reveal the truth about the Company's practices – and now those same individuals claim that they need an indefinite time to evaluate their own conduct.

255.   In fact, the Board's conduct supports the inference that it has not acted independently with respect to the investigation of the demands, but has consciously abdicated its duty to conduct a fair, reasonable and impartial investigation.

256.   The Board did not appoint an "independent" Special Committee. The Board was well aware of Defendant Bleser's longstanding business relationship with defendant Petit when it appointed Bleser to the Special Committee. Defendants Bleser's and Petit's relationship of working together for more than two decades

demonstrates that their close ties go beyond just a typical business relationship. Furthermore, in his employment at the aforementioned companies, defendant Bleser received substantial compensation.   As a result of their long-standing business relationship and the substantial rewards defendant Bleser reaped from defendant Petit, defendant Bleser is beholden to defendant Petit.   Accordingly, defendant Bleser cannot be trusted to consider the Demands with the requisite disinterestedness and independence.

257.   In addition, defendant Bleser is a member of the Audit Committee that conducted a whitewash investigation into the channel stuffing allegations raised by the former employees.

258.   Defendant Yeston is a member of the Board which approved the Audit Committee's findings.

259.   Neither defendants Bleser nor Yeston can be trusted to properly investigate the allegations contained in the Demand because they have already prejudged them.

260.   The Board also was well aware that defendants Yeston and Bleser, directors of MiMedx since at least 2012, will be investigating and evaluating their own misconduct.   The same goes for defendant Aguilar, who has been with the Board since March 2017.

261.   The full Board cannot independently and disinterestedly consider the Demand because its members either: (i) approved the Audit Committee's findings from its prior investigation into the former employees' allegations; and/or (ii) are tasked with investigating (and/or approving findings made regarding) their own misconduct.

262.   In a tacit acknowledgement of Bleser's lack of independence, counsel for the Company at Sidley Austin LLP ("Sidley Austin") advised Plaintiffs Georgalas' and Evans' counsel via e-mail on October 17, 2018 that defendant Bleser "was no longer a member" of the Special Committee.  Sidley Austin provided no explanation for defendant Bleser's departure, but it is clear that the Special Committee as comprised is not sufficiently disinterested and independent. No explanation has been provided of how the Committee will address bias introduced into the investigation by Bleser's participation to date.  While Plaintiffs are pleased that the Special Committee agreed that defendant Bleser never should have been on the committee, the remaining two members of the Special Committee similarly lack the necessary disinterestedness and independence to ensure a full and impartial investigation in the best interests of MiMedx and its shareholders.

263.   Moreover, in that same email, Sidley Austin advised that Davis Polk was "no longer counsel to the [Special] Committee," but was now counsel to

defendants Bleser, Dewberry, Evans, Hack, Koob, Papasan and Yeston.  In other words, the same counsel who was previously tasked with independently *investigating* in good faith the allegations and claims raised in the Demands against these defendants was now *defending* these individuals against these very same allegations and claims.  Sidley Austin provided no explanation for Davis Polk's: (i) removal as the Special Committee's counsel; or (ii) retention as counsel for defendants Bleser, Dewberry, Evans, Hack, Koob, Papasan and Yeston.

264.   More than seven months have passed since Plaintiffs first demanded that the Board investigate the allegations detailed herein, giving the Board ample time to undertake an investigation, evaluate the Demands, and determine an appropriate response.  Notwithstanding this passage of time, the Special Committee has failed to complete its investigation and has not even deigned to provide Plaintiffs any estimate of when it plans to do so.  Much like the completion of the restatement, the Special Committee's investigation has no end in sight.

265.   Furthermore, the Special Committee has failed to disclose any investigative activities it has conducted in the seven months that have elapsed since Plaintiffs first submitted their Demands to the Board.  The Special Committee's dilatory response indicates its failure to conduct a reasonable investigation in good faith in response to Plaintiffs' demands.

266. The Board has known about the Company's improper practices and the individuals responsible for more than two years, since at least 2016. The Company's CEO, defendant Petit, on the Board's watch and with the assistance of the Audit Committee, has repeatedly and invariably taken steps to bury the truth and whitewash so-called "investigations" into the Company's improper practices. This resulted in a devastating series of reversals of public statements and meritless lawsuits, all designed to harm, silence, and defame anyone who attempted to expose the truth about the Company's improper channel-stuffing and accounting practices and to shield those responsible from liability. It was and is incumbent upon the members of the Board and the Special Committee to act with alacrity to fully and expeditiously get to the bottom of the facts at issue, determine the liability of the individuals responsible, and take all necessary action in the best interests of MiMedx. There is not and cannot be any justification for the undue delay in responding to Plaintiffs' demands.

267. Accordingly, pursuant to Fla. Stat. §607.07401(2), Plaintiffs are entitled to proceed with this action derivatively on behalf of the Company.

## COUNT I

**Against the Individual Defendants for Breach of Fiduciary Duty**

268.   Plaintiffs incorporate by reference and reallege each and every allegation contained above, as though fully set forth herein.

269.   As alleged in detail herein, the Individual Defendants, by reason of their positions as officers and directors of MiMedx and because of their ability to control the business and corporate affairs of MiMedx, owed and owe the Company fiduciary obligations of due care and loyalty, and were and are required to use their utmost ability to control and manage MiMedx in a fair, just, honest, and equitable manner.

270.   The Individual Defendants and each of them violated and breached their fiduciary duties of care and loyalty.

271.   The Officer Defendants either knew, were reckless, or were grossly negligent in disregarding the illegal activity of such substantial magnitude and duration.   The Officer Defendants either knew, were reckless, or were grossly negligent in not knowing: (i) for years the Company was improperly recognizing revenue in violation of GAAP; (ii) for years the Company was overstating its revenue; (iii) for years the Company lacked adequate financial and internal controls; and (iv) as a result of the forgoing, at least five years of representations concerning the Company's revenue, impressive revenue growth, business prospects, and

financial controls were improper. The Officer Defendants also breached their fiduciary duty of loyalty by taking steps to conceal the truth and whitewash so-called "investigations" that would have exposed the channel-stuffing scheme, the improper revenue recognition and accounting practices, and the inadequate internal controls over financial reporting at the Company. The Officer Defendants further breached their fiduciary duty of candor by failing to ensure the timely restatement of several of the Company's financial statements and by failing to ensure the timely filing of MiMedx' financial statements. Accordingly, the Officer Defendants breached their duty of care and loyalty to the Company.

272. The Director Defendants, as directors of the Company, owed and owe MiMedx the highest duty of loyalty and care. These defendants breached their duty of loyalty by recklessly issuing or recklessly permitting the Company to issue improper statements. The Director Defendants knew or were reckless in not knowing that: (i) for years the Company was improperly recognizing revenue in violation of GAAP; (ii) for years the Company was overstating its revenue; (iii) for years the Company lacked adequate financial and internal controls; and (iv) as a result of the forgoing, at least five years of representations concerning the Company's revenue, impressive revenue growth, business prospects, and financial controls were improper. The Director Defendants also breached their fiduciary duty

of loyalty by taking steps to conceal the truth and whitewash so-called "investigations" that would have exposed the channel-stuffing scheme, the improper revenue recognition and accounting practices, and the inadequate internal controls over financial reporting at the Company. The Director Defendants further breached their fiduciary duty of candor by failing to ensure the timely restatement of several of the Company's financial statements and by failing to ensure the timely filing of MiMedx's financial statements. Accordingly, the Director Defendants breached their duty of loyalty to the Company.

273. The Audit Committee Defendants breached their fiduciary duty of loyalty by approving the statements described herein which were made during their tenure on the Audit Committee, which they knew or were reckless in not knowing contained improper statements and omissions. The Audit Committee Defendants completely and utterly failed in their duty of oversight, including in particular by taking steps to conceal the truth and whitewash so-called "investigations" that would have exposed the channel-stuffing scheme, the improper revenue recognition and accounting practices, and the inadequate internal controls over financial reporting at the Company. The Audit Committee Defendants also failed in their duty to appropriately review financial results, as required by the Audit Committee Charter in effect at the time.

-135-

274.   As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, MiMedx has sustained significant damages, as alleged herein.  As a result of the misconduct alleged herein, these defendants are liable to the Company.

275.   Plaintiffs, on behalf of MiMedx, have no adequate remedy at law.

## COUNT II

**Against the Individual Defendants for Waste of Corporate Assets**

276.   Plaintiffs incorporate by reference and reallege each and every allegation contained above, as though fully set forth herein.

277.   As a result of the misconduct described above, the Individual Defendants have wasted corporate assets by forcing the Company to expend valuable resources in defending itself in the Securities Class Actions that they brought on with their improper statements.  In addition, due to the Individual Defendants' mismanagement, the Company has been forced to interrupt its business and dedicate its resources and attention to restating and revising its past financial statements.

278.   Finally, as a result of the decision to allow the Company to operate in an environment devoid of adequate internal and financial controls, the Individual Defendants have caused MiMedx to waste its assets by: (i) causing MiMedx to

repurchase millions of its shares in the market even though they knew the price of the Company's stock was artificially inflated; and (ii) paying improper compensation and bonuses to certain of its executive officers and directors that breached their fiduciary duties.

279.   As a result of the waste of corporate assets, the Individual Defendants are liable to the Company.

280.   Plaintiffs, on behalf of MiMedx, have no adequate remedy at law.

## COUNT III

### Against the Individual Defendants for Unjust Enrichment

281.   Plaintiffs incorporate by reference and reallege each and every allegation contained above, as though fully set forth herein.

282.   By their wrongful acts and omissions, the Individual Defendants were unjustly enriched at the expense of and to the detriment of MiMedx.  The Individual Defendants were unjustly enriched as a result of the compensation and director remuneration they received while breaching fiduciary duties owed to MiMedx.

283.   Plaintiffs, as stockholders and representatives of MiMedx, seek restitution from these defendants, and each of them, and seeks an order of this Court disgorging all profits, benefits, and other compensation obtained by these defendants, and each of them, from their wrongful conduct and fiduciary breaches.

284.   Plaintiffs, on behalf of MiMedx, have no adequate remedy at law.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs, on behalf of MiMedx, demand judgment as

follows:

A.   Declaring that Plaintiffs may maintain this action on behalf of MiMedx and that Plaintiffs are adequate representatives of the Company;

B.   Against all of the defendants and in favor of the Company for the amount of damages sustained by the Company as a result of the defendants' breaches of fiduciary duties, waste of corporate assets, and unjust enrichment;

C.   Ordering defendants to provide to Plaintiffs and the Company's stockholders accurate operational reports and financial statements for all previous quarters and years identified by the Audit Committee as inaccurate;

D.   Ordering defendants to take whatever measures are reasonably necessary to ensure they publish timely and accurate operational reports and financial statements for all quarterly and annual periods going forward;

E.   Directing MiMedx to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect MiMedx and its stockholders from a repeat of the damaging events described herein;

F.   Extraordinary equitable and/or injunctive relief as permitted by law, equity, and state statutory provisions sued hereunder, including attaching, impounding, imposing a constructive trust on, or otherwise restricting the proceeds of defendants' trading activities or their other assets so as to assure that plaintiff on behalf of MiMedx has an effective remedy;

-138-

G.    Awarding to MiMedx restitution from defendants, and each of them, and ordering disgorgement of all profits, benefits, and other compensation obtained by the defendants;

H.    Awarding to plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

I.    Granting such other and further relief as the Court deems just and proper.

## **JURY TRIAL DEMANDED**

Plaintiffs demand a trial by jury.

Dated: January 22, 2019

**JOHNSON FISTEL, LLP**

/s/ Michael I. Fistel, Jr.
Michael I. Fistel, Jr.
Georgia Bar No.: 262062
michaelf@johnsonfistel.com
40 Powder Springs Street
Marietta, GA 30064
Telephone: (470) 632-6000
Facsimile: (770) 200-3101

*Liaison Counsel for Plaintiffs*

**KESSLER TOPAZ MELTZER
   & CHECK, LLP**
Eric L. Zagar
ezagar@ktmc.com
Christopher M. Windover
cwindover@ktmc.com
280 King of Prussia Road
Radnor, PA 19087
Telephone: (610) 667-7706
Facsimile: (267) 948-2512

*Co-Lead Counsel for Plaintiffs*

**ROBBINS ARROYO LLP**
Brian J. Robbins
brobbins@robbinsarroyo.com
Craig W. Smith
csmith@robbinsarroyo.com
600 B Street, Suite 1900
San Diego, CA 92101
Telephone: (619) 525-3990
Facsimile: (619) 525-3991

*Co-Lead Counsel for Plaintiffs*

**GLANCY PRONGAY**
 **& MURRAY LLP**
Matthew M. Houston
mhouston@glancylaw.com
Benjamin Sachs-Michaels
bsachsmichaels@glancylaw.com
712 Fifth Avenue, 31st Floor
New York, NY 10019
Telephone: (212) 935-7400
Facsimile: (212) 756-3630

*Additional Counsel for Plaintiffs*

## **LOCAL RULE 7.1D CERTIFICATION**

By signature below, counsel certifies that the foregoing document was prepared in Times New Roman, 14-point font in compliance with Local Rule 5.1B.

/s/ MICHAEL I. FISTEL, JR.
Michael I. Fistel, Jr.
Georgia Bar No. 262062
*michaelf@johnsonfistel.com*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on the 22nd day of January, 2019, I electronically filed the foregoing document with the Clerk of Court by using the CM/ECF system, and a copy of the foregoing pleading has been electronically mailed to all attorneys of record.

/s/ MICHAEL I. FISTEL, JR.
Michael I. Fistel, Jr.
Georgia Bar No. 262062
*michaelf@johnsonfistel.com*

## <u>VERIFICATION</u>

I, James E. Evans, hereby verify that I have authorized the filing of the attached Verified Consolidated Shareholder Derivative Complaint (the "Consolidated Complaint"), that I have reviewed the Consolidated Complaint, and that the facts therein are true and correct to the best of my knowledge, information and belief.

I declare under penalty of perjury that the foregoing is true and correct.


DATE: __1/18/2019_____          _James Evans_____
                                     James E. Evans

## **VERIFICATION**

I, Andrew Georgalas, hereby declare as follows:

I am one of the plaintiffs in the consolidated shareholder derivative action. I have read the Verified Consolidated Shareholder Derivative Complaint. Based upon discussions with and reliance upon my counsel, and as to those facts of which I have personal knowledge, the Consolidated Shareholder Derivative Complaint is true and correct to the best of my knowledge, information, and belief.

I declare under penalty of perjury that the foregoing is true and correct.

Signed and Accepted:                     Dated: 1-19-19

Andrew Georgalas

1328242

<u>VERIFICATION</u>

I, Michael Roloson, do hereby verify that I am a holder of common stock of MiMedx Group, Inc., and was a holder of such common stock at the time of the wrongs complained of in the foregoing Verified Consolidated Shareholder Derivative Complaint ("Complaint"). I have authorized the filing of the Complaint. I have reviewed the Complaint and all of the averments contained in the Complaint regarding me are true and correct upon my personal knowledge and, with respect to the remainder of the averments, are true and correct to the best of my knowledge, information and belief.

I declare under penalty of perjury that the foregoing is true and correct.

Date: January 22, 2019

Michael Roloson